IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

───────────────────────────────

JEFFREY A. NELSON,

                Plaintiff,

      v.

BRUCE PLUMLEY, *et al.*,

                Defendants.

Civil Action No.
9:12-CV-0422 (TJM/DEP)

───────────────────────────────

<u>APPEARANCES</u>:

<u>FOR PLAINTIFF</u>:

JEFFREY A. NELSON
98-A-4066
Attica Correctional Facility
Box 149
Attica, NY 14011

<u>OF COUNSEL</u>:

<u>FOR DEFENDANTS</u>:

HON. ERIC T. SCHNEIDERMAN
New York State Attorney General
The Capitol
Albany, NY 12224

GREGORY RODRIGUEZ, ESQ.
Assistant Attorney General

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Jeffrey A. Nelson, a New York State prison inmate, has brought this action pursuant to 42 U.S.C. § 1983 alleging that several individuals employed by or affiliated with the New York State Department of Corrections and Community Supervision ("DOCCS") have deprived him of his civil rights. Plaintiff contends that, while incarcerated, two of the defendants used excessive force against him, two other defendants subjected him to conditions of confinement tantamount to cruel and unusual punishment, and a fifth defendant denied him procedural due process during a disciplinary hearing.

Now that discovery in the action has closed, defendants have moved for summary judgment dismissing plaintiff's claims. Defendants seek dismissal of two of plaintiff's claims based on his alleged failure to exhaust administrative remedies before filing suit, and contend that plaintiff's other claims lack merit. For the reasons set forth below, I recommend that plaintiff's conditions of confinement and due process claims be dismissed on the merits, and that an evidentiary hearing be conducted to determine whether plaintiff properly exhausted available administrative remedies in connection with his excessive force claim.

I.   BACKGROUND[1]

Plaintiff is a prison inmate currently in the custody of the DOCCS. Dkt. No. 1 at 1. While he is now incarcerated elsewhere, at the time of the relevant events Nelson was confined in a satellite unit of the Central New York Psychiatric Center ("CNYPC") in the Clinton Correctional Facility ("Clinton"), located in Dannemora, New York. *Id.* at 1, 4. Plaintiff suffers from mental illnesses, described by him as "depression, nervous panic attacks, . . . and memory loss." *Id.* at 16.

On December 26, 2011, plaintiff was placed in the Residential Crisis Treatment Program ("RCTP") at Clinton for observation based upon a threat of self-harm. Dkt. No. 50-1 at 2. Upon entering an observation cell in the RCTP, plaintiff was provided with a specialized tear- and fire-resistant mattress, two tear-resistant mats, a specialized tear-resistant smock, soap, a toothbrush, and toothpaste.[2] *Id.*

Plaintiff alleges that, on January 3, 2012, while confined in his RCTP observation cell, he was involved in an altercation with defendants Bruce Plumley and Jeffrey Spear, both of whom are corrections officers at Clinton.

---

[1]     In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]     Although plaintiff denies that he was provided with these amenities while in the observation cell, Dkt. No. 57-1 at 16-17, the parties' disagreement does not create a genuine dispute of material fact precluding the entry of summary judgment.

Dkt. No. 1 at 4-5; Dkt. No. 57-1 at 11-12. Plaintiff alleges that he was assaulted by the two officers without provocation and, as a result, lost consciousness and suffered a concussion and laceration near his right eye requiring stitches. Dkt. No. 1 at 7; Dkt. No. 57-1 at 12-13. After being treated for his injuries by medical staff at Clinton, Nelson was returned to the RCTP observation cell without incident. Dkt. No. 49-6 at 2, 6.

As a result of the physical altercation, defendants Plumley and Spear each issued plaintiff separate misbehavior reports dated January 3, 2012. Dkt. No. 1 at 13; Dkt. No. 49-3 at 2, 9-10. Both misbehavior reports accused Nelson of failing to obey a direct order, assaulting a staff member, and engaging in violent conduct. Dkt. No. 49-3 at 2, 9-10. Beginning on or about January 9, 2012, Corrections Lieutenant John Miller, a defendant in this action, conducted a Tier III disciplinary hearing to address the charges contained in the misbehavior reports.[3] *Id.* at 3, 58-89. On or about January 20, 2012, following the close of the hearing, defendant Miller found Nelson guilty on all six counts, and imposed a penalty that included eighteen months of disciplinary confinement in a facility special housing unit ("SHU"),

_____

[3]    The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes*, 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

4

with a corresponding loss of telephone, package, and commissary privileges, and a recommendation that plaintiff lose twelve months of good time credits. *Id.* at 12, 88-89. Defendant Miller's determination was affirmed following review by D. Venettozzi, the DOCCS Acting Director of Special Housing/Inmate Disciplinary Program. *Id.* at 91.

On January 3, 2012, the date of the alleged assault by defendants Plumley and Spear, the RCTP cells at Clinton were monitored by defendant Dr. Sohail Gillani,[4] a psychiatrist employed by the New York Office of Mental Health ("OMH") and assigned to the CNYPC satellite unit at Clinton. Dkt. No. 50-1 at 1, 3. On that date, according to defendant Gillani, he ordered that plaintiff be permitted only a smock in his cell after determining that plaintiff was at risk to himself, based upon his expression of suicidal ideation. *Id.* at 3. A "smock only" instruction meant that plaintiff would be provided only with a cloth smock comprised of heavy tear-resistant quilted material and designed to provide coverage and warmth to his body and reduce the risk of self-inflicted harm. Dkt. No. 50-1 at 3. In accordance with standard procedures applicable to observation cells in the RCTP, defendant Gillani's "smock only" order, and his corresponding instruction that plaintiff

---

[4]    The clerk is respectfully directed to modify the court's records to reflect the correct spelling of this defendant's name, as demonstrated in the declaration submitted in support of defendants' pending motion. Dkt. No. 50-1 at 1.

not be provided a blanket, were to be reviewed every twenty-four hours. *Id.* at 4. Accordingly, plaintiff was evaluated on January 4, 2012, by defendant Dr. Jean Berggren, another OMH psychiatrist assigned to the facility. Dkt. No. 50 at 1, 3. Based upon her observations, defendant Berggren discharged plaintiff from the RCTP on that date. *Id.* at 3-4.

Plaintiff, in some contrast, alleges that while confined in an RCTP observation cell after receiving medical treatment and meeting with defendant Gillani on January 3, 2012, he was left naked and "without a[] mattress, mats, smock, clothes, shoes, blanket, nor any shelter of warmth" for twenty-two hours in an "extremely cold cell." Dkt. No. 1 at 9-10, 13; Dkt. No. 57-1 at 16. In support of their motion, however, defendants have submitted evidence demonstrating that the temperatures in the CNYPC satellite unit, where the RCTP observation cells are located, are controlled by a Siemens computerized heating and cooling system designed to maintain a temperature of between 68 and 72 degrees Fahrenheit. Dkt. No. 49-7 at 2. The computers used in connection with the heating and cooling system are located in the main maintenance office at Clinton and a maintenance office located in the basement of Building 156, the building in which the CNYPC satellite unit is located. *Id.* Those computers are accessible only to maintenance workers at Clinton. *Id.* While there are

6

thermometers in Building 156 that corrections officers and other staff members may use to verify and record temperatures, there are no manually adjustable thermostats located in the building to permit adjustment of the computer-controlled temperatures. *Id.* Accordingly, OMH employees have no ability to control ambient temperatures within the CNYPC satellite unit at Clinton. Dkt. No. 50 at 4; Dkt. No. 50-1 at 4.

Defendants have also submitted excerpts of logbook entries recording readings taken from thermometers located in the CNYPC satellite unit, and specifically the RCTP observation cell in which plaintiff was confined at the relevant times. Dkt. No. 49-6 at 2. According to those logbooks, the temperature recorded at the beginning of the 3:00 p.m. to 11:00 p.m. shift on January 3, 2012, was 70 degrees. Dkt. No. 49-6 at 7. At the beginning of the next shift, commencing at 11:00 p.m., the temperature was recorded at 72 degrees. Dkt. No. 49-6 at 8. At 6:55 a.m. on January 4, 2012, the temperature of the observation cells was recorded at 70 degrees. *Id.* at 9-10.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on March 8, 2012 . Dkt. No. 1. Plaintiff's complaint was accompanied by an application for leave to proceed *in forma pauperis* ("IFP"), a motion for preliminary injunction, and a

request for appointment of counsel. Dkt. Nos. 2, 4, 5. Named as defendants in plaintiff's complaint are Corrections Officers Bruce Plumley and Jeffrey Spears; Drs. Jean Berggren and S. Gillani; Joanne Waldron, a DOCCS mental health unit chief; Lester Wright, DOCCS Deputy Commissioner and Chief Medical Officer; and Corrections Lieutenant John E. Miller. Dkt. No. 1 at 2-3. Following an initial review of plaintiff's complaint and IFP application, Senior District Judge Thomas J. McAvoy entered an order on June 1, 2012, granting plaintiff IFP status, denying his motions for a preliminary injunction and appointment of counsel, and approving the filing of Nelson's complaint subject to dismissal of his claim asserted against defendants Plumley and Spear for the alleged issuance of false misbehavior reports. Dkt. No. 9.

As a result of a subsequent dismissal motion filed by the defendants, my issuance of a report and recommendation concerning that motion, and a decision and order from Senior District Judge McAvoy, issued on March 18, 2013, adopting the report, plaintiff's claims have been further narrowed. Dkt. Nos. 25, 32, 34. By virtue of those decisions and plaintiff's subsequent filing of an affidavit abandoning any claims associated with the duration of his confinement arising from the disciplinary proceeding conducted by defendant Miller, Dkt. No. 35, the claims that remain pending are (1) an excessive force cause of action asserted against defendants Plumley and

Spear; (2) a conditions of confinement claim asserted against defendants Berggren and Gillani; and (3) a procedural due process cause of action asserted against defendant Miller.

On November 25, 2013, following the close of discovery, defendants moved for the entry of summary judgment. Dkt. No. 49. In their motion, defendants request (1) dismissal of plaintiff's excessive force and conditions of confinement claims based upon his alleged failure to exhaust available remedies before commencing suit, and (2) dismissal of plaintiff's conditions of confinement and procedural due process claims on the merits. *See generally* Dkt. No. 49-1. Plaintiff has since responded in opposition to defendants' motion. Dkt. Nos. 55, 57. Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553;

*Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

      B.      <u>Exhaustion of Administrative Remedies</u>

In support of their motion, defendants contend that plaintiff is procedurally barred from pursuing his excessive force and conditions of confinement causes of action based upon his alleged failure to exhaust all available administrative remedies before commencing this action. Dkt. No. 49-1 at 6-9.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also*

*Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,* No. 04-CV-4587, 2007 WL 389003, at \*5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983.").[5] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*,

---

[5]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

495 F.3d 37, 43 (2d Cir. 2007).[6]

In accordance with the PLRA, the DOCCS has instituted a grievance procedure, called the Inmate Grievance Program ("IGP"), and made it available to inmates. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson*, No. 96-CV-5396, 2004 WL 234898, at *4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* A representative of the facility's inmate grievance resolution committee ("IGRC") has up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written

---

[6]     While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "'in a substantive sense,'" an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[7] *Id.* at § 701.5(c)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be entered within a specified time period. Significantly, "[a]ny failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can – and must – be appealed to the next level, including CORC, to complete the grievance process." *Murray v. Palmer*, No. 03-CV-1010, 2010 WL 1235591, at *2 (N.D.N.Y. Mar. 31, 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing, *inter alia*, 7 N.Y.C.R.R. § 701.6(g)(2)).

Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed

---

[7]    Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c)(i), (ii).

to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

In this case, plaintiff does not contend that he fully exhausted the available administrative remedies with respect to his excessive force and conditions of confinement claims. Rather, he maintains that his efforts to fully exhaust were thwarted by corrections officials at Clinton and at the Upstate Correctional Facility ("Upstate") following his transfer into that facility. Because there is no record evidence to suggest that plaintiff did fully exhaust the administrative remedies, I have examined only whether plaintiff's failure to exhaust may be excused.

In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See*, *e.g.*, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004); *see also Macias*, 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative

remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through their own actions preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense. *Id.* If the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

A review of the record in this case reveals a genuine dispute of material fact as to whether plaintiff's efforts to file grievances concerning the incidents at Clinton on January 3, 2012, were obstructed by DOCCS officials. According to plaintiff, he filed two grievances against defendants Plumley, Spear, Gillani, and Berggren while at Clinton on January 9, 2012, and January 10, 2012. Dkt. No. 57-1 at 2; Dkt. No. 55-3 at 2-3. Although the photocopies of the grievances submitted by plaintiff in opposition to the pending motion are difficult to decipher, it appears that they contain allegations that he was subjected to excessive force and cold temperatures on January 3, 2012. Dkt. No. 55-3 at 2-4. Plaintiff alleges that he provided

the two grievances, which were inside a sealed envelope, to an unidentified corrections officer at Clinton responsible for collecting the mail. Dkt. No. 57-1 at 2. According to plaintiff, Christine Gregory, the Inmate Grievance Program Supervisor at Clinton, "decline[d] to respond and did not process" his grievances filed in January.[8] *Id.* at 3.

In contrast to plaintiff's contentions, defendants have submitted an affidavit from Gregory, in which she states that there is no record at Clinton of plaintiff filing any grievances dated January 9, 2012, or January 10, 2012. Dkt. No. 49-5 at 2. Instead, Gregory notes that, on February 15, 2012, following plaintiff's transfer into Upstate, she received a letter from plaintiff requesting the status of the two grievances allegedly filed in January 2012, while he was still confined at Clinton. *Id.* Gregory responded to him by memorandum, advising him that there was no record of plaintiff filing grievances dated January 9, 2012, or January 10, 2012. Dkt. No. 49-5 at 7. She further advised plaintiff that any complaints must be processed through

---

[8]     Plaintiff also alleges that, in addition to submitting the grievances through the IGP, he sent letters concerning the incidents on January 3, 2012, to the DOCCS Inspector General and other officials. Dkt. No. 57-1 at 2-3. As noted above, while placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "'in a substantive sense,'" an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson*, 380 F.3d at 697-98 (emphasis omitted)). Accordingly, to the extent that plaintiff submitted letters to DOCCS officials outside the formal IGP, those efforts are not relevant to the exhaustion analysis.

the IGP at Upstate, the facility in which he was then confined. *Id.*

In apparent compliance with Gregory's instruction, on or about February 16, 2012, plaintiff attempted to file his grievances concerning the incident at Clinton on January 3, 2012, to Brandi White, the Inmate Grievance Program Supervisor at Upstate. Dkt. No. 49-4 at 7-9. In a cover letter, plaintiff advised White that he had attempted to file the grievances at Clinton but "that prison made the remedy unavailable by obstructing access to the grievance process." *Id.* at 7. Without addressing plaintiff's allegation of obstruction to the IGP at Clinton, White wrote plaintiff a memorandum, dated February 17, 2012, advising that his grievances submitted to her at Upstate were untimely, and, in accordance with DOCCS policies, she returned the grievances to plaintiff. *Id.* at 13. Plaintiff again attempted to file his grievances at Upstate on February 22, 2012, and White again rejected them as untimely.[9] *Id.* at 3, 15. In his affidavit submitted in opposition to the pending motion, plaintiff insists that Gregory and White "intentionally inhibited and obstructed [him] from using and availing himself of the

---

[9]     Notwithstanding White's insistence that "[g]rievances that are returned [to inmates] as untimely are not logged in at the grievance office with a date or grievance number" and that the grievances are "returned to the inmate," she attached copies of plaintiff's cover letter and grievances, each dated February 17, 2012, to her affidavit submitted in support of defendants' pending motion. Dkt. No. 49-4 at 7-9. White did not, however, attach a copy of the grievances submitted to her by plaintiff on February 22, 2012.

facilities['] administrative grievance program by not processing [his] two timely filed grievance complaints." Dkt. No. 57-1 at 3.

In light of the foregoing record evidence, I find that a dispute of fact exists as to whether special circumstances exist justifying plaintiff's failure to fully exhaust the available administrative remedies prior to commencing this action.[10] The Second Circuit has said that "non-exhaustion is an affirmative defense subject to estoppel in cases where prison officials inhibit an inmate's ability to utilize administrative grievance procedures." *Giano*, 380 F.3d at 677 (citing *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004)). Although courts in this circuit have interpreted this holding to mean that only a named-defendant may be *estopped* from asserting the exhaustion defense,[11] other courts have extended the spirit of the holding by applying special circumstances where a non-defendant prison official interferes with an inmate-plaintiff's ability to file a grievance. *See, e.g., Murray*, 2010 WL 1235591, at *6 (finding an allegation "that an unspecified

---

[10]    Plaintiff does not allege that the IGP was unavailable to him, nor does he contend that any of the named defendants attempted to thwart his efforts to process his grievances. Accordingly, the first two exceptions to the exhaustion rule under *Macias* and *Hemphill* are not applicable in this action. *See, e.g., Collins v. Caron*, No. 10-CV-1527, 2014 WL 296859, at *5-6 (N.D.N.Y. Jan. 27, 2014) (Suddaby, J.) ("A defendant in a prisoner civil rights action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies . . . based on the actions or inactions of *other* individuals." (citing cases) (emphasis in original)).

[11]    *See, e.g., Collins*, 2014 WL 296859, at *5-6 (citing cases).

number of unidentified corrections officers (who are not [named-defendants]) somehow interfered with the delivery of [the plaintiff's] grievance and appeals . . . could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations"); *Sandin v. Poole*, 575 F. Supp. 2d 484, 488 (W.D.N.Y. 2008) (finding that the plaintiff's allegation that a prison official's "refusal to accept or forward plaintiff's appeals. . . effectively rendered the grievance process unavailable to [the plaintiff]" and would also constitute special circumstances). Because plaintiff has alleged that DOCCS officials (including the unidentified corrections officer at Clinton responsible for collecting mail, as well as Gregory and White) interfered with his ability to file the grievances concerning the incident at Clinton on January 3, 2012, and defendants have not provided the court with evidence to the contrary, I find that a dispute of material fact exists precluding the granting of defendants' motion with respect to their contention that plaintiff failed to exhaust the available administrative remedies prior to commencing this action. Accordingly, I recommend that the court conduct an evidentiary hearing to evaluate the issues of fact and assess plaintiff's credibility.[12] *See*

---

[12]     Because I recommend that plaintiff's conditions of confinement claim be dismissed on the merits, *see* Part III.C., *post*, however, during the evidentiary hearing, the court need only inquire into whether plaintiff is excused for failing to exhaust

*Messa v. Goord*, 652 F.3d 305, 310 (2d Cir. 2011) ("[T]he Seventh Amendment does not guarantee a jury trial on factual disputes regarding administrative exhaustion under the PLRA.").

C.    <u>Conditions of Confinement</u>

Although defendants seek dismissal of plaintiff's conditions of confinement claim, asserted against defendants Berggren and Gillani, based on plaintiff's failure to exhaust administrative remedies, they also contend the claim is ripe for dismissal on the merits. Specifically, defendants maintain that, based on the record evidence, no reasonable factfinder could conclude that plaintiff was subjected to cruel and unusual punishment under the Eighth Amendment. [Dkt. No. 49-1 at 7-13](). Defendants also contend that defendant Berggren was not personally involved in the alleged constitutional violation, and defendant Gillani, who is allegedly responsible for plaintiff remaining naked in the RCTP observation cell for twenty-two hours, is entitled to qualified immunity from suit. *Id.* at 13-15.

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or 'involve[s] the unnecessary and wanton infliction of

---

administrative remedies in connection with his excessive force claim asserted against defendants Plumley and Spear.

pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (citations omitted)). While the Eighth Amendment "'does not mandate comfortable prisons,' neither does it permit inhumane ones*."* *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). A claim alleging that prison conditions have violated the Eighth Amendment must satisfy both an objective and subjective requirement. *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996). As to the objective requirement, "the plaintiff must demonstrate that the conditions of his confinement result in 'unquestioned and serious deprivations of basic human needs.'" *Jolly*, 76 F.3d at 480 (quoting *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 2985)); *see also Walker v. Schult*, 717 F.3d. 119, 125 (2d Cir. 2013) ("To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health."). As to the subjective requirement, "the plaintiff must demonstrate that the defendants imposed those conditions with 'deliberate indifference,'" *Jolly*, 76 F.3d at 480 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *see also Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., *adopting report and recommendation by* Homer, M.J.). Deliberate

indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; [he] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Waldo*, 1998 WL 713809, at *2; *Davidson*, 920 F. Supp. at 308.

Without question, exposure to extreme temperatures in a prison setting can constitute cruel and unusual punishment as proscribed under the Eighth Amendment. *See Benjamin v. Fraser*, 343 F.3d 35, 52 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir 2009), (affirming the district court's conclusion that "exposure to extremes of temperature violated the detainees' constitutional rights"); *Gatson v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (finding that the plaintiff's allegation that he was exposed to freezing temperatures from November 1990 through March 1991 stated a claim under the Eighth Amendment); *Corselli v. Coughlin*, 842 F.2d 23, 27 (2d Cir. 1988) (reversing the district court's grant of summary judgment where there was evidence that the plaintiff had been deliberately exposed to bitter cold in his cell block for three months).

In this instance, plaintiff maintains that, by virtue of defendant Gillani's orders to DOCCS corrections officers, he was left naked in his RCTP

observation cell and subjected to "extreme[] cold" for a period of "twenty-two hours" between January 3, 2012, and January 4, 2012. Dkt. No. 1 at 9-10, 13; Dkt. No. 57-1 at 16. In support of their motion for summary judgment, however, defendants have submitted evidence demonstrating that (1) the temperature in Building 156, where the CNYPC satellite unit is located, is controlled by a computer system located separate from the unit, and set to between 68 and 72 degrees at all times; (2) during the twenty-two hours in question, DOCCS corrections officers independently confirmed that the temperature in the unit was within the specified range; (3) only maintenance staff is authorized and able to access the computer system controlling the temperature in Building 156, and, accordingly, neither defendant Berggren nor defendant Gillani could have altered the temperature in plaintiff's cell; and (4) after he received medical treatment following the alleged assault by defendants Plumley and Spear, plaintiff expressed suicidal ideation to defendant Gillani, who subsequently issued an order that plaintiff be denied a blanket and anything other than a smock in order to prevent any attempted self-harm. Dkt. No. 49-6 at 2, 7, 8, 9-10; Dkt. No. 49-7 at 2; Dkt. No. 50 at 4; Dkt. No. 50-1 at 4.

While the court acknowledges the parties' conflicting accounts regarding the temperature in plaintiff's cell on January 3, 2012, and whether

he was provided any clothing at all on that date, even assuming plaintiff's version of the events are accurate, I find that no reasonable factfinder could conclude that plaintiff was subjected to cruel and unusual punishment by defendants Berggren and Gillani.[13] *See Trammell v. Keane*, 338 F.3d 155, 164-65 (2d Cir. 2003) (concluding that the plaintiff "no doubt" experienced uncomfortable conditions of confinement, including, according to the plaintiff, being kept naked for a "'prolonged period in bitter cold,'" but finding no constitutional violation where there was no evidence "that the cell in which he was housed was open to the elements, that it lacked adequate heat, or. . . that the cell was 'bitter cold'"); *Flake v. Peck*, No. 12-CV-0517, 2014 WL 1289582, at *21 (N.D.N.Y. Mar. 31, 2014) (D'Agostino, J., *adopting report and recommendation by* Baxter, M.J.) (finding that the plaintiff's allegations that he was subjected to bitter cold in various cells from July 2010 until January 2011 was not sufficient to defeat the defendants' motion for summary judgment where the defendants had submitted

---

[13]       In his affidavit, plaintiff also states that an unidentified corrections sergeant told him that he was secured in his cell without a mattress, mats, or a smock based on a "'doctor[']s orders.'" Dkt. No. 57-1 at 15-16. Setting aside the fact that the identity of both the corrections sergeant and doctor referenced are unknown, the corrections sergeant's statement constitutes inadmissible hearsay. Consequently, plaintiff cannot be rely on the statement to create a genuine dispute of material fact. *See Burlington Coat Factory Warehouse Corp. v. Espirit de Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) ("[A party] cannot rely on inadmissible hearsay in opposing a motion for summary judgment."); *accord, Chansamone v. IBEW Local 97*, 523 F. App'x 820, 822 n.4 (2d Cir. 2013).

evidence that the plaintiff was given one blanket when he asked for it and maintenance checked the temperature of his cells when he complained of the temperature); *Borge v. McGinnis*, No. 03-CV-6375, 2007 WL 1232227, at *5-6 (W.D.N.Y. Apr. 26, 2007) (dismissing the plaintiff's conditions of confinement claim where he alleged that, for three days, he was provided only a paper gown, paper slippers, and a thin mattress in a cell maintained at approximately fifty degrees). Moreover, plaintiff's mere allegations that he was left naked in an "extremely cold cell," without any supporting evidence, are insufficient to defeat defendants' motion, which includes evidentiary support demonstrating that plaintiff's RCTP observation cell was maintained at a reasonably warm temperature on January 3, 2012, and January 4, 2012. *See BellSouth Telecomm., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) ("An adverse party may not rest upon mere conclusory allegations or denials. The party opposing the motion for summary judgment must set for concrete particulars. It is not sufficient merely to assert a conclusion without supplying supporting arguments or facts." (quotation marks, alterations omitted); *Wilson Jones v. Gilbert & Bennette Mfg. Co.*, 332 F.2d 216, 219 (2d Cir. 1964) ("Mere conclusory affidavits that an issue exists no longer suffice to defeat well[-]grounded motions for summary judgment."). Accordingly, I recommend that the court

grant defendants' motion for summary judgment with respect to plaintiff's conditions of confinement claim asserted against defendants Berggren and Gillani.

C.    Procedural Due Process

Defendants also seek dismissal of plaintiff's due process claim, based on their contention that plaintiff received the full panoply of rights guaranteed under the Fourteenth Amendment during the Tier III disciplinary hearing conducted by defendant Miller. Dkt. No. 49-1 at 16-21.

Under the Fourteenth Amendment, a prison inmate who is deprived of a protected liberty interest must be afforded due process of law.[14] *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, and include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense,

---

[14]    Because the penalty imposed by defendant Miller, following plaintiff's Tier III hearing, included eighteen months of disciplinary SHU confinement, plaintiff has satisfied the element of a due process claim requiring that he be deprived a protected liberty interest. *See Colon v. Howard,* 215 F.3d 227, 231 (2d Cir. 2000) (finding that, even under normal SHU conditions, confinement for more than 305 days implicates a prisoner's liberty interests); *accord*, *Palmer v. Richards*, 364 F.3d 60, 65 (2d Cir. 2004).

subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff v. McDonnell*, 418 U.S. 539, 564-69 (1974); *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487-88.

The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to. . . an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing *Wolff*, 418 U.S. 570-71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say . . . how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen*, 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in

other contexts." *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles*, No. 06-CV-0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (quoting *Hill*, 472 U.S. at 455).

Here, plaintiff alleges that he was denied due process when defendant Miller refused to call several witnesses requested by plaintiff, including defendants Berggren and Gillani, twenty-three other OMH staff, and the nurse that treated plaintiff following the alleged assault by defendants Plumley and Spear. Dkt. No. 1 at 13-16; Dkt. No. 57-1 at 19-24. According to plaintiff, those individuals may have witnessed the alleged assault. *Id.* Plaintiff also accuses defendant Miller of being impartial during the disciplinary hearing, and failing to afford him the opportunity to present a proper defense.[15] *Id.*

To refute plaintiff's allegations, defendants have submitted several documents related to the disciplinary hearing, including a full transcript of the hearing that commenced on January 9, 2012. Dkt. No. 49-3 at 3.

_____

[15] Plaintiff also complains that his disciplinary hearing was not timely commenced. Dkt. No. 1 at 16. That argument, however, is based upon New York State regulations governing disciplinary hearings. *See, e.g.*, 7 N.Y.C.R.R. § 251-5.1. It is well settled, however, that "violations of state law that do not deprive the plaintiff of a right 'secured by the Constitution and laws' are insufficient to support a claim under [section] 1983." *Allred*, 2010 WL 3911414, at *5 (quoting *Baker v. McCollan*, 443 U.S. 137, 139-40 (1979)); *see also Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990).

Although plaintiff initially refused assistance in preparing for the hearing, once it commenced, he reconsidered and requested assistance. Dkt. No. 49-3 at 15, 61-62. Defendant Miller adjourned the hearing at that time to permit plaintiff to meet with his assistant and prepare a defense. Dkt. No. 49-3 at 62. The assigned assistant, A. Bezzio, met with plaintiff on January 10, 2012, and submitted a request for any unusual incident report concerning the altercation between defendants Plumley and Spear and plaintiff, as well as the opportunity to review the videotape recording of plaintiff's escort to medical personnel for treatment. Dkt. No. 49-3 at 16. The assistance form filed by Bezzio did not list any potential witnesses to be interviewed. *Id.*

At the continuation of the hearing, on January 18, 2013, although plaintiff requested testimony from two inmates who were confined in adjoining RCTP observation cells at the time of the alleged assault, those inmates refused to testify. Dkt. No. 49-3 at 18-19, 69-71. Defendant Miller reviewed the videotape depicting plaintiff's escort to the prison hospital following the incident, and then plaintiff testified in his own defense. *Id.* at 63-72. After determining that live testimony should be elicited from defendants Plumley and Spear, defendant Miller again adjourned the hearing. *Id.* at 70.

Plaintiff's Tier III disciplinary hearing resumed on January 20, 2012. Dkt. No. 49-3 at 73. During that session, defendants Plumley and Spear testified that the incident occurred in the RCTP observation cell area and there were no staff members other than themselves in the vicinity. Dkt. No. 49-3 at 74-80. Plaintiff's disciplinary hearing was again adjourned and resumed on January 23, 2012, based on plaintiff's request that Sergeant W. Bissell, the area supervisor on the date of the incident, be called to testify. Dkt. No. 49-3 at 84-86.

During the hearing, defendant Miller addressed plaintiff's request for additional unidentified witnesses and determined that no one was present during the incident, as alleged by plaintiff. Defendant Miller based his determination, in part, on the testimony of Sergeant Bissell, who stated that when he arrived after the incident, "there was nobody on that company." Dkt. No. 49-3 at 86. Defendant Miller also reviewed the logbook for the unit where plaintiff was housed on January 3, 2012, and concluded that no one had entered the area at or around the time of the incident, and up until after the incident.[16] *Id.* at 80-81. Although plaintiff requested the testimony of the nurse that treated him after the incident, defendant Miller denied that

---

[16] According to defendant Miller, anyone entering the unit, whether an employee or otherwise, is required to sign the logbook in accordance with facility policy. Dkt. No. 49-3 at 6.

request because the nurse had not been present during the incident and therefore could not provide any relevant testimony. *Id.* at 87. At the conclusion of the hearing, defendant Miller provided plaintiff with a written disposition finding him guilty of all of the charges listed in the two misbehavior reports issued by defendants Plumley and Spear. *Id.* at 88-89. Defendant Miller based his findings based on several pieces of evidence, including the misbehavior reports authored by defendants Plumley and Spear, the unusual incident report, the use of force paperwork, employee injury reports and photos, the testimonies of defendants Plumley and Spear, and the testimony of OMH staff regarding plaintiff's mental health status at the time of the incident. *Id.*

In light of the foregoing evidence, I conclude that plaintiff was not deprived any due process. With respect to plaintiff's request to call two inmates that may have seen or heard the altercation on January 3, 2012, "[a] hearing officer has no power to force an inmate to testify, and when the inmate refuses, the hearing officer need not call that witness." *Dumpson v. Rourke*, No. 96-CV-0621, 1997 WL 610652 at *5 (N.D.N.Y. Sept. 26, 1997) (Pooler, J., *adopting report and recommendation by* DiBianco, M.J.) (citing *Silva v. Casey*, 992 F.2d 20, 21-22 (2d Cir. 1993)); *see also Wolff*, 418 U.S. at 568-69 (recognizing prison officials' discretion to call inmates as

witnesses). In addition, defendant Miller's decision not to call plaintiff's treating nurse, as requested by plaintiff, was also reasonable. It is clear from plaintiff's testimony that the nurse was not present during the alleged assault, and the record of plaintiff's injuries and treatment, coupled with the videotape reviewed by defendant Miller, adequately addressed their scope and extent. *See Wolff*, 418 U.S. at 566 (citing "lack of necessity" as a proper ground for refusing to call a potential witness at a disciplinary hearing). Defendant Miller's failure to call several other unidentified individuals to determine whether they had any additional information was also reasonable based on the testimonies of defendants Plumley and Spear and Sergeant Bissell, to the effect that no one else was present at the time of the altercation. *See Silva*, 992 F.3d at 21-22 ("[I]f a prison official, presiding over a prison disciplinary hearing, reasonably concludes that it would be futile to call a witness to testify, his refusal to do so will not constitute a violation of the prisoner's constitutional rights."). Finally, a careful review of the hearing record reveals that defendant Miller's determination was well supported by the evidence presented.

In sum, the record evidence in this case discloses that plaintiff was afforded the full extent of the procedural process due him under *Wolff* and its progeny, and no reasonable factfinder could conclude otherwise.

Accordingly, I recommend dismissal of plaintiff's due process cause of action asserted against defendant Miller.

IV.    SUMMARY AND RECOMMENDATION

Defendants' arguments concerning plaintiff's alleged failure to exhaust available administrative remedies before commencing suit present issues of fact that must be addressed during an evidentiary hearing before the question of exhaustion can be decided by the court as a matter of law. Turning to the merits of plaintiff's conditions of confinement and due process claims, I conclude that no reasonable factfinder could find that plaintiff was exposed to conditions tantamount to cruel and unusual punishment or was denied procedural due process in connection with his Tier III disciplinary hearing. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 49) be GRANTED, in part, and that plaintiff's Eighth Amendment conditions of confinement and Fourteenth Amendment procedural due process claims be DISMISSED; and it is further hereby

RECOMMENDED that an evidentiary hearing be conducted pursuant to *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011), to address whether, with respect to his Eighth Amendment excessive force claim, plaintiff's failure to exhaust administrative remedies prior to commencing this action may be

excused.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     August 13, 2014
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge


Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

*1 Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

**FN3.** Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

**FN4.** According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

**FN5.** Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

### NCCF's Inmate Grievance Procedure

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

**(4)**

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth*, 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford*, 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock*, 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero*, 467 F.3d at 176 (quoting *Woodford*, 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams*, 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero*, 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford*, 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs.' Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

*10 Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " Hemphill, 380 F.3d at 688 (quoting Giano, 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." Giano, 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. See Sloane, 2006 WL 3096031, at *8;Freeman v. Goord, No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

(5)

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." Woodford, 126 S.Ct. at 2385. See also Ruggiero, 467 F.3d at 178 (citing Porter, 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." Berry, 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. Berry, 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

*11 Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. Shangold v. The Walt Disney Co., No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir.1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn,* 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

### Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))



**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
**No. 9:04-CV-0471.**

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

## I. FACTS[FN1]

> FN1. The following facts are taken from
> Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in _Neal v. Goord,_ 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." _Id._ at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." _Id._

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. _Mojias v. Johnson,_ 351 F.3d 606, 610 (2d Cir.2003); _see also_ 7. N.Y.C.R.R. § 701.1, _et seq._ Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. _Neal,_ 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))



**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ⊸ 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

> FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

> FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

> FN3. The amended complaint reads as follows:
>
> That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

> FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, also dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e(a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996. FN6 On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See,* *Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g.,* *Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y.Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**\*5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER, Corrections Officer, Great Meadow
Correctional Facility; S. Griffin, Corrections Officer,
Great Meadow Correctional Facility; M. Terry,
Corrections Officer, Great Meadow Correctional
Facility; F. Englese, Corrections Officer, Great Meadow
Correctional Facility; Sergeant Edwards, Great Meadow
Correctional Facility; K. Bump, Sergeant, Great
Meadow Correctional Facility; K.H. Smith, Sergeant,
Great Meadow Correctional Facility; A. Paolano,
Facility Health Director: and Ted Nesmith, Physicians
Assistant, Defendants.
No. 9:03-CV-1010 (DNH/GLS).

June 20, 2008.
James Murray, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, James Seaman, Esq., Asst. Attorney General,
of Counsel, Albany, NY, for Defendants.

### ORDER

DAVID N. HURD, District Judge.

**\*1** Plaintiff, James Murray, brought this civil rights
action pursuant to 42 U.S.C. § 1983. In a 51 page Report
Recommendation dated February 11, 2008, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted in part (i.e., to the extent that it
requests the dismissal with prejudice of plaintiff's claims
against defendant Paolano and Nesmith); and denied in
part (i.e., to the extent that it requests dismissal of
plaintiff's claims against the remaining defendants on the
grounds of plaintiff's failure to exhaust available
administrative remedies) for the reasons stated in the

Report Recommendation. Lengthy objections to the
Report Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the
Report-Recommendation to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is
GRANTED in part and DENIED in part;

2. Plaintiff's complaint against defendants Paolano
and Nesmith is DISMISSED with prejudice;

3. Defendants' motion for summary judgment is
DENIED, to the extent that their request for dismissal of
plaintiff's assault claims under the Eighth Amendment
against the remaining defendants on the grounds of
plaintiff's failure to exhaust available administrative
remedies as stated in the Report-Recommendation.

IT IS SO ORDERED.

JAMES MURRAY, Plaintiff,

-v.-

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow
C.F.; F. ENGLESE, Corrections Officer, Great Meadow
C.F.; P. EDWARDS, Sergeant, Great Meadow C.F.; K.
BUMP, Sergeant, Great Meadow C.F.; K.H. SMITH,
Sergeant, Great Meadow C.F.; A. PAOLANO, Health
Director, Great Meadows C.F.; TED NESMITH,
Physicians Assistant, Great Meadows C.F., Defendants.

R. PALMER, Corrections Officer, Great Meadow
C.F.; S. GRIFFIN, Corrections Officer, Great Meadow
C.F.; M. TERRY, Corrections Officer, Great Meadow

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

C.F.; Counter Claimants,

-v.-

JAMES MURRAY, Counter Defendant.

### ORDER and REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 78.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Plaintiff's Second Amended Complaint

In his Second Amended Complaint, James Murray ("Plaintiff") alleges that nine correctional officials and health care providers employed by the New York State Department of Correctional Services ("DOCS") at Great Meadow Correctional Facility ("Great Meadow C.F .") violated his rights under the Eighth Amendment on August 17, 2000, when (1) Defendants Palmers, Griffin, Terry, and Englese assaulted him without provocation while he was incapacitated by mechanical restraints, (2) Defendants Edwards, Bump, and Smith witnessed, but did not stop, the assault, and (3) Defendants Paolano and Nesmith failed to examine and treat him following the assault despite his complaints of having a broken wrist. (Dkt. No. 10, ¶¶ 6-7 [Plf.'s Second Am. Compl.].)

### B. Defendants' Counterclaim

*2 In their Answer to Plaintiff's Second Amended Complaint, three of the nine Defendants (Palmer, Griffin and Terry) assert a counterclaim against Defendant for personal injuries they sustained as a result of Plaintiff's assault and battery upon them during the physical struggle that ensued between them and Plaintiff due to his threatening and violent behavior on August 17, 2000, at Great Meadow C.F. (Dkt. No. 35, Part 1, ¶¶ 23-30 [Defs.'

Answer & Counterclaim].)

I note that the docket in this action inaccurately indicates that this Counterclaim is asserted also on behalf of Defendants Englese, Edwards, Bump, Smith, Paolano, and "Nejwith" (later identified as "Nesmith"). (*See* Caption of Docket Sheet.) As a result, at the end of this Report-Recommendation, *I direct the Clerk's Office to correct the docket sheet to remove the names of those individuals as "counter claimants" on the docket.*

I note also that, while such counterclaims are unusual in prisoner civil rights cases (due to the fact that prisoners are often "judgment proof" since they are without funds), Plaintiff paid the $150 filing fee in this action (Dkt. No. 1), and, in his Second Amended Complaint, he alleges that he received a settlement payment in another prisoner civil rights actions in 2002. (Dkt. No. 10, ¶ 10 [Plf.'s Second Am. Compl.].) Further investigation reveals that the settlement resulted in a payment of $20,000 to Plaintiff. *See Murray v. Westchester County Jail,* 98-CV-0959 (S .D.N.Y.) (settled for $20,000 in 2002).

## II. DEFENDANTS' MOTION AND PLAINTIFF'S RESPONSE

### A. Defendants' Motion

In their motion for summary judgment, Defendants argue that Plaintiff's Second Amended Complaint should be dismissed for four reasons: (1) Plaintiff has failed to adduce any evidence establishing that Defendant Paolano, a supervisor, was personally involved in any of the constitutional violations alleged; (2) Plaintiff has failed to adduce any evidence establishing that Defendant Nesmith was deliberately indifferent to any of Plaintiff's serious medical needs; (3) at the very least, Defendant Nesmith is protected from liability by the doctrine of qualified immunity, as a matter of law; and (4) Plaintiff has failed to adduce any evidence establishing that he exhausted his available administrative remedies with respect to his assault claim, before filing that claim in federal court. (Dkt. No. 78, Part 13, at 2, 4-13 [Defs.' Mem. of Law].)

In addition, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

to honor non-life-sustaining medical prescriptions written at a former facility. (*Id.* at 3.) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

**\*3** Defendants' motion is accompanied by a Statement of Material Facts, submitted in accordance with Local Rule 7.1(a)(3) ("Rule 7.1 Statement"). (Dkt. No. 78, Part 12.) Each of the 40 paragraphs contained in Defendants' Rule 7.1 Statement is supported by an accurate citation to the record evidence. (*Id.*) It is worth mentioning that the record evidence consists of (1) the affirmations of Defendants Nesmith and Paolano, and exhibits thereto, (2) the affirmation of the Inmate Grievance Program Director for DOCS, and exhibits thereto, (3) affirmation of the Legal Liaison between Great Meadow C.F. and the New York State Attorney General's Office during the time in question, and exhibits thereto, and (4) a 155-page excerpt from Plaintiff's deposition transcript. (Dkt. No. 78.)

**B. Plaintiff's Response**

After being specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and after being granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83), Plaintiff submitted a barrage of documents: (1) 49 pages of exhibits, which are attached to neither an affidavit nor a memorandum of law (Dkt. No. 84); (2) 113 pages of exhibits, attached to a 25-page affidavit (Dkt. No. 85); (3) 21 pages of exhibits, attached to a 12-page supplemental affidavit (Dkt. No. 86); and (4) a 29-page memorandum of law (Dkt. No. 86); and a 13-page supplemental memorandum of law (Dkt. No. 88).

Generally in his Memorandum of Law and Supplemental Memorandum of Law, Plaintiff responds to

the legal arguments advanced by Defendants. (*See* Dkt. No. 86, Plf.'s Memo. of Law [responding to Defs.' exhaustion argument]; Dkt. No. 88, at 7-13 [Plf.'s Supp. Memo. of Law, responding to Defs.' arguments regarding the personal involvement of Defendant Paolano, the lack of evidence supporting a deliberate indifference claim against Defendant Nesmith, the applicability of the qualified immunity defense with regard to Plaintiff's claim against Defendant Nesmith, and the sufficiency and timing of Plaintiff's prescription-review claim against Defendant Paolano].) Those responses are described below in Part IV of this Report-Recommendation.

However, unfortunately, not among the numerous documents that Plaintiff has provided is a *proper* response to Defendants' Rule 7.1 Statement. (*See* Dkt. No. 85, Part 2, at 45-52 [Ex. N to Plf.'s Affid.].) Specifically, Plaintiff's Rule 7.1 Response (which is buried in a pile of exhibits) fails, with very few exceptions, to "set forth ... specific citation[s] to the record," as required by Local Rule 7.1(a)(3). (*Id.*) I note that the notary's "sworn to" stamp at the end of the Rule 7.1. Statement does not transform Plaintiff's Rule 7.1 Response into record evidence so as to render that Response compliant with Local Rule 7.1. First, Local Rule 7.1 expressly states, "The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits." N.D.N.Y. L.R. 7.1(a)(3). In this way, the District's Local Rule, like similar local rules of other districts, contemplates citations to a record that is independent of a Rule 7.1 Response. *See, e.g., Vaden v. GAP, Inc.,* 06-CV-0142, 2007 U.S. Dist. LEXIS 22736, at \*3-5, 2007 WL 954256 (M.D.Tenn. March 26, 2007) (finding non-movant's verified response to movant's statement of material facts to be deficient because it did cite to affidavit or declaration, nor did it establish that non-movant had actual knowledge of matters to which he attested); *Waterhouse v. District of Columbia,* 124 F.Supp.2d 1, 4-5 (D.D.C.2000) (criticizing party's "Verified Statement of Material Facts," as being deficient in citations to independent record evidence, lacking "firsthand knowledge," and being purely "self-serving" in nature). Moreover, many of Plaintiff's statements in his Rule 7.1 Response are either argumentative in nature or lacking in specificity and personal knowledge, so as to disqualify those statements from having the effect of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

sworn testimony for purposes of a summary judgment motion. *See, infra,* notes 10-12 of this Report-Recommendation.

### III. GOVERNING LEGAL STANDARD

*\*4* Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists,[FN1] the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN2]

> FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN2. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [FN3] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN4] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN5]

> FN3. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary

judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN5. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

What this burden-shifting standard means when a plaintiff has failed to *properly* respond to a defendant's Rule 7.1 Statement of Material Facts is that the facts as set forth in that Rule 7.1 Statement will be accepted as true [FN6] to the extent that (1) those facts are supported by the evidence in the record,[FN7] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.[FN8]

> FN6. See N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."*) [emphasis in original].

> FN7. See *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted].

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

FN8. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

Implied in the above-stated standard is the fact that a district court has no duty to perform an *independent* review of the record to find proof of a factual dispute, even if the non-movant is proceeding *pro se.*[FN9] In the event the district court chooses to conduct such an independent review of the record, any affidavit submitted by the non-movant, in order to be sufficient to create a factual issue for purposes of a summary judgment motion, must, among other things, not be conclusory.[FN10] (An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.)[FN11] Finally, even where an affidavit is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN12]

FN9. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN10. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN11. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN12. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

## IV. ANALYSIS

## A. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Paolano Was Personally Involved in the Constitutional Violations Alleged

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN13] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN14] If the defendant is a supervisory official, such as a correctional facility superintendent or a facility health services director, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN15] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN16] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN17]

FN13. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN14. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN15. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN16. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN17. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

**\*5** Defendants argue that Plaintiff has not adduced evidence establishing that Defendant Paolano, the Great Meadow C.F. Health Services Director during the time in question, was personally involved in the constitutional violations alleged. (Dkt. No. 78, Part 13, at 2 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that, during the time in which Plaintiff was incarcerated at Great Meadow C.F. (i . e., from early August of 2000 to late November of 2000), Defendant Paolano never treated Plaintiff for any medical condition, much less a broken wrist on August 17, 2000. (*Id.; see also* Dkt. No. 78, Part 4, ¶¶ 7-8 [Paolano Affid.]; Dkt. No. 78, Part 5 [Ex. A to Paolano Affid.]; Dkt. No. 78, Part 11, at 32-33 [Plf.'s Depo.].)

Plaintiff responds that (1) Defendant Paolano was personally involved since he "treated" Plaintiff on August 17, 2000, by virtue of his supervisory position as the Great Meadow C.F.'s Health Services Director, and (2) Defendant Paolano has the "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F. (Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites a paragraph of his Supplemental Affidavit, and an administrative decision, for the proposition that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care." (*Id.; see also* Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14.)

**1. Whether Defendant Paolano Was Personally Involved in Plaintiff's Treatment on August 17, 2000**

With respect to Plaintiff's first point (regarding Defendant Paolano's asserted "treatment" of Plaintiff on August 17, 2000), the problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants' assert, Defendant Paolano did not, in fact, treat Plaintiff on August 17, 2000 (or at any time when Plaintiff was incarcerated at Great Meadow C.F.). This was the fact asserted by Defendants in Paragraphs 38 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶ 38 [Defs.' Rule 7.1 Statement].) Defendants supported this

factual assertion with record evidence. (*Id.* [providing accurate record citations]; *see also* Dkt. No. 78, Part 12, ¶¶ 37-38 [Defs.' Rule 7.1 Statement, indicating that it was Defendant Nesmith, not Defendant Paolano, who treated Plaintiff on 8/17/00].) Plaintiff has failed to specifically controvert this factual assertion, despite having been given an adequate opportunity to conduct discovery, and having been specifically notified of the consequences of failing to properly respond to Defendants' motion (*see* Dkt. No. 78, Part 1), and having been granted *three* extensions of the deadline by which to do so (*see* Dkt. Nos. 79, 80, 83). Specifically, Plaintiff fails to cite any record evidence in support of his denial of Defendants' referenced factual assertion. (*See* Dkt. No. 85, Part 2, at 50 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

**\*6** The Court has no duty to perform an independent review of the record to find proof disputing this established fact. *See, supra,* Part III and note 9 of this Report-Recommendation. Moreover, I decline to exercise my discretion, and I recommend that the Court decline to exercise its discretion, to perform an independent review of the record to find such proof for several reasons, any one of which is sufficient reason to make such a decision: (1) as an exercise of discretion, in order to preserve judicial resources in light of the Court's heavy caseload; (2) the fact that Plaintiff has already been afforded considerable leniency in this action, including numerous deadline extensions and liberal constructions; and (3) the fact that Plaintiff is fully knowledgeable about the requirements of a non-movant on a summary judgment motion, due to Defendants' notification of those requirements, and due to Plaintiff's extraordinary litigation experience.

With regard to this last reason, I note that federal courts normally treat the papers filed by *pro se* civil rights litigants with special solicitude. This is because, generally, *pro se* litigants are unfamiliar with legal terminology and the litigation process, and because the civil rights claims they assert are of a very serious nature. However, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" that is normally afforded *pro se* litigants.[FN18] Generally, the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

rationale for diminishing special solicitude (at least in the Second Circuit) is that the *pro se* litigant's extreme litigiousness demonstrates his *experience,* the lack of which is the reason for extending special solicitude to a *pro se* litigant in the first place.[FN19] The Second Circuit has diminished this special solicitude, and/or indicated the acceptability of such a diminishment, on several occasions.[FN20] Similarly, I decide to do so, here, and I recommend the Court do the same.

> FN18. *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3 & n. 17 (N.D.N.Y. Sept.26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted].

> FN19. *Koehl,* 2007 WL 2846905, at *3 & n. 18 [citations omitted].

> FN20. *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *see also Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977)[citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

Plaintiff is no stranger to the court system. A review of the Federal Judiciary's Public Access to Court Electronic Records ("PACER") System reveals that Plaintiff has filed at least 15 other federal district court actions, [FN21] and at least three federal court appeals.[FN22] Furthermore, a review of the New York State Unified Court System's website reveals that he has filed at least 20 state court actions,[FN23] and at least two state court appeals.[FN24] Among these many actions he has had at least one victory, resulting in the payment of $20,000 to him in settlement proceeds.[FN25]

> FN21. *See Murray v. New York,* 96-CV-3413 (S.D.N.Y.); *Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y.); *Murray v. McGinnis,* 99-CV-1908 (W.D.N.Y.); *Murray v. McGinnis,* 99-CV-2945 (S.D.N.Y.); *Murray v. McGinnis,* 00-CV-3510 (S.D.N.Y.); *Murray v. Jacobs,* 04-CV-6231 (W.D.N.Y.); *Murray v. Bushey,* 04-CV-0805 (W.D.N.Y.); *Murray v. Goord,* 05-CV-1113 (N.D.N.Y.); *Murray v. Wissman,* 05-CV-1186 (N.D.N.Y.); *Murray v. Goord,* 05-CV-1579 (N.D.N.Y.); *Murray v. Doe,* 06-CV-0205 (S.D.N.Y.); *Murray v. O'Herron,* 06-CV-0793 (W.D.N.Y.); *Murray v. Goord,* 06-CV-1445 (N.D.N.Y.); *Murray v. Fisher,* 07-CV-0306 (W.D.N.Y.); *Murray v. Escrow,* 07-CV-0353 (W.D.N.Y.).

> FN22. *See Murray v. McGinnis,* No. 01-2533 (2d Cir.); *Murray v. McGinnis,* No. 01-2536 (2d Cir.); *Murray v. McGinnis,* No. 01-2632 (2d Cir.).

> FN23. *See Murray v. Goord,* Index No. 011568/1996 (N.Y. Sup.Ct., Westchester County); *Murray v. Goord,* Index No. 002383/1997 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002131/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002307/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002879/1998 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002683/2004 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002044/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. McGinnis,* Index No. 002099/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Sullivan,* Index No. 002217/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002421/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002495/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002496/2006 (N.Y. Sup.Ct., Chemung County); *Murray v. Goord,* Index No. 002888/2006 (N.Y. Sup.Ct., Chemung

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

County); *Murray v. LeClaire,* Index No. 002008/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002009/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002010/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. LeClaire,* Index No. 002011/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. Fisher,* Index No. 002762/2007 (N.Y. Sup.Ct., Chemung County); *Murray v. New York,* Claim No. Claim No. 108304, Motion No. 67679 (N.Y.Ct.Cl.); *Murray v. New York,* Motion No. M-67997 (N.Y.Ct.Cl.).

FN24. *See Murray v. Goord,* No. 84875, 709 N.Y. S.2d 662 (N.Y.S.App.Div., 3d Dept.2000); *Murray v. Goord,* No. 83252, 694 N.Y.S .2d 797 (N.Y.S.App.Div., 3d Dept.1999).

FN25. *See Murray v. Westchester County Jail,* 98-CV-0959 (S.D.N.Y .) (settled for $20,000 in 2002).

I will add only that, even if I were inclined to conduct such an independent review of the record, the record evidence that Plaintiff cites regarding this issue in his Supplemental Memorandum of Law does not create such a question of fact. (*See* Dkt. No. 88, at 7-8 [Plf.'s Supp. Memo. of Law, citing Dkt. No. 86, Suppl. Affid., ¶ 5 & Ex. 14].) It appears entirely likely that Defendant Paolano had the ultimate responsibility for providing medical treatment to the inmates at Great Meadow C.F.FN26 However, this duty arose solely because of his supervisory position, i.e., as the Facility Health Services Director. It is precisely this sort of supervisory duty that does *not* result in liability under 42 U.S.C. § 1983, as explained above.

FN26. To the extent that Plaintiff relies on this evidence to support the proposition that Defendant Paolano had the "sole" responsibility for such health care, that reliance is misplaced. Setting aside the loose nature of the administrative decision's use of the word "sole," and the different context in which that word was used (regarding the review of Plaintiff's grievance about having had his prescription

discontinued), the administrative decision's rationale for its decision holds no preclusive effect in this Court. I note that this argument by Plaintiff, which is creative and which implicitly relies on principles of estoppel, demonstrates his facility with the law due to his extraordinary litigation experience.

**\*7** As for the other ways through which a supervisory official may be deemed "personally involved" in a constitutional violation under 42 U.S.C. § 1983, Plaintiff does not even argue (or allege facts plausibly suggesting) FN27 that Defendant Paolano *failed to remedy* the alleged deliberate indifference to Plaintiff's serious medical needs on August 17, 2000, after learning of that deliberate indifference through a report or appeal. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano created, or allowed to continue, *a policy or custom* under which the alleged deliberate indifference on August 17, 2000, occurred. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano had been *grossly negligent* in managing subordinates (such as Defendant Nesmith) who caused the alleged deliberate indifference. Nor does Plaintiff argue (or allege facts plausibly suggesting) that Defendant Paolano exhibited *deliberate indifference* to the rights of Plaintiff by failing to act on information indicating that Defendant Nesmith was violating Plaintiff's constitutional rights.

FN27. *See Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (holding that, for a plaintiff's complaint to state a claim upon which relief might be granted under Fed.R.Civ.P. 8 and 12, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," or, in other words, there must be "plausible grounds to infer [actionable conduct]"), *accord, Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

original].

In the alternative, I reach the same conclusion (that Plaintiff's claim against Defendant Paolano arising from the events of August 17, 2000, lacks merit) on the ground that there was no constitutional violation committed by Defendant Nesmith on August 17, 2000, in which Defendant Paolano could have been personally involved, for the reasons discussed below in Part IV.B. of this Report-Recommendation.

**2. Whether Defendant Paolano Was Personally Involved in the Review of Plaintiff's Prescriptions in Early August of 2000**

With respect to Plaintiff's second point (regarding Defendant Paolano's asserted "final say" regarding what medications inmates shall be permitted to retain when they transfer into Great Meadow C.F.), there are three problems with this argument.

First, the argument regards a claim that is not properly before this Court for the reasons explained below in Part IV.E. of this Report-Recommendation.

Second, as Defendants argue, even if the Court were to reach the merits of this claim, it should rule that Plaintiff has failed to adduce evidence establishing that Defendant Paolano was personally involved in the creation or implementation of DOCS' prescription-review policy. It is an uncontroverted fact, for purposes of Defendants' motion, that (1) the decision to temporarily deprive Plaintiff of his previously prescribed pain medication (i.e., pending the review of that medication by a physician at Great Meadow C.F.) upon his arrival at Great Meadow C.F. was made by an "intake nurse," not by Defendant Paolano, (2) the nurse's decision was made pursuant to a policy instituted by DOCS, not by Defendant Paolano, and (3) Defendant Paolano did not have the authority to alter that policy. These were the facts asserted by Defendants in Paragraphs 6 through 9 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 6-9 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits two of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at

46-47 [Ex. N to Plf.'s Affid.].)

**\*8** For example, in support of his denial of Defendants' factual assertion that "[t]his policy is not unique to Great Meadow, but applies to DOCS facilities generally," Plaintiff says that, at an unidentified point in time, "Downstate CF honored doctors proscribed [sic] treatment and filled by prescriptions from Southport Correctional Facility .... Also I've been transferred to other prisons such as Auburn [C.F.] in which they honored doctors prescribe[d] orders." (*Id.*) I will set aside the fact that Defendants' factual assertion is not that the policy applies to every single DOCS facility but that it applies to them as a general matter. I will also set aside the fact that Plaintiff's assertion is not supported by a citation to independent record evidence. The main problem with this assertion is that it is not specific as to what year or years he had these experiences, nor does it even say that his prescriptions were immediately honored without a review by a physician at the new facility.

The other piece of "evidence" Plaintiff cites in support of this denial is "Superintendent George B. Duncan's 9/22/00 decision of Appeal to him regarding [Plaintiff's Grievance No.] GM-30651-00." (*Id.*) The problem is that the referenced determination states merely that Defendant Paolano, as the Great Meadow C.F. Health Services Director, had the "sole responsibility for providing treatment to the inmates under [the Facility's] care, and has the final say regarding all medical prescriptions." (Dkt. No. 86, at 14 [Ex. 14 to Plf.'s Suppl. Affid.].) For the sake of much-needed brevity, I will set aside the issue of whether an IGP Program Director's broadly stated *rationale* for an appellate determination with respect to a prisoner's grievance can ever constitute evidence sufficient to create proof of a genuine issue of fact for purposes of a summary judgment motion. The main problem with this "evidence" is that there is absolutely nothing inconsistent between (1) a DOCS policy to temporarily deprive prisoners of non-life-sustaining prescription medications upon their arrival at a correctional facility, pending the review of those medical prescriptions by a physician at the facility, and (2) a DOCS policy to give Facility Health Service Directors the "final say" regarding the review of those medical prescriptions.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Because Plaintiff has failed to support his denial of these factual assertions with citations to record evidence that actually controverts the facts asserted, I will consider the facts asserted by Defendants as true. N.D.N.Y. L.R. 7.1(a)(3). Under the circumstances, I decline, and I recommend the Court decline, to perform an independent review of the record to find proof disputing this established fact for the several reasons described above in Part IV.A.1. of this Report-Recommendation.

Third, Plaintiff has failed to adduce evidence establishing that the policy in question is even unconstitutional. I note that, in his Supplemental Memorandum of Law, Plaintiff argues that "deliberate indifference to serious medical needs is ... shown by the fact that prisoners are denied access to a doctor and physical examination upon arrival at [Great Meadow] C.F. to determine the need for pain medications which aren't life sustaining ...." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) As a threshold matter, Plaintiff's argument is misplaced to the extent he is arguing about the medical care other prisoners may not have received upon their arrival at Great Meadow C.F. since this is not a class-action. More importantly, to the extent he is arguing about any medical care that he (allegedly) did not receive upon his arrival at Great Meadow C.F., he cites no record evidence in support of such an assertion. (*Id.*) Indeed, he does not even cite any record evidence establishing that, upon his arrival at Great Meadow C.F. in early 2000, either (1) he asked a Defendant in this action for such medical care, or (2) he was suffering from a serious medical need for purposes of the Eighth Amendment. (*Id.*)

**\*9** If Plaintiff is complaining that Defendant Paolano is liable for recklessly causing a physician at Great Meadow C.F. to excessively delay a review Plaintiff's pain medication upon his arrival at Great Meadow C.F., then Plaintiff should have asserted that allegation (and some basic facts supporting it) in a pleading in this action so that Defendants could have taken adequate discovery on it, and so that the Court could squarely review the merits of it. (Dkt. No. 78, Part 11, at 53 [Plf.'s Depo.].)

For all of these reasons, I recommend that Plaintiff's claims against Defendant Paolano be dismissed with prejudice.

**B. Whether Plaintiff Has Adduced Evidence Establishing that Defendant Nesmith Was Deliberately Indifferent to Plaintiff's Serious Medical Needs**

Generally, to state a claim for inadequate medical care, a plaintiff must allege facts plausibly suggesting two things: (1) that he had a sufficiently serious medical need; and (2) that the defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Defendants argue that, even assuming that Plaintiff's broken wrist constituted a sufficiently serious medical condition for purposes of the Eighth Amendment, Plaintiff has not adduced evidence establishing that, on August 17, 2000, Defendant Nesmith acted with deliberate indifference to that medical condition. (Dkt. No. 78, Part 13, at 4-9 [Defs.' Memo. of Law].) In support of this argument, Defendants point to the record evidence establishing that Defendant Nesmith sutured lacerations in Plaintiff's forehead, ordered an x-ray examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. (*Id.* at 7-9 [providing accurate record citations].) Moreover, argue Defendants, Plaintiff's medical records indicate that he did not first complain of an injury to his wrist until hours after he experienced that injury. (*Id.* at 8 [providing accurate record citation].)

Plaintiff responds that "[he] informed P.A. Nesmith that his wrist felt broken and P.A. Nesmith ignored plaintiff, which isn't reasonable. P.A. Nesmith didn't even care to do a physical examination to begin with[,] which would've revealed [the broken wrist] and is fundamental medical care after physical trauma." (Dkt. No. 88, at 11 [Plf.'s Supp. Memo. of Law].) In support of this argument, Plaintiff cites *no* record evidence. (*Id.* at 11-12.)

The main problem with Plaintiff's argument is that the uncontroverted record evidence establishes that, as Defendants have argued, Defendant Nesmith (1) sutured lacerations in Plaintiff's forehead within hours if not minutes of Plaintiff's injury and (2) ordered an x-ray

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

examination of Plaintiff's wrist, and placed that wrist in a splint (with an intention to replace that splint with a cast once the swelling in Plaintiff's wrist subsided) within 24 hours of the onset of Plaintiff's injuries. These facts were asserted by Defendants in Paragraphs 27 through 32 of their Rule 7.1 Statement. (*See* Dkt. No. 78, Part 12, ¶¶ 27-32 [Defs.' Rule 7.1 Statement].) Defendants supported these factual assertions with record evidence. (*Id.* [providing accurate record citations].) Plaintiff expressly admits most of these factual assertions, and fails to support his denial of the remaining factual assertions with citations to record evidence that actually controverts the facts asserted. (Dkt. No. 85, Part 2, at 48-50 [Ex. N to Plf.'s Affid.].)

**\*10** The only denial he supports with a record citation is with regard to when, within the referenced 24-hour period, Defendant Nesmith ordered his wrist x-ray. This issue is not material, since I have assumed, for purposes of Defendants' motion, merely that Defendant Nesmith ordered Plaintiff's wrist x-ray within 24 hours of the onset of Plaintiff's injury.[FN28] (Indeed, whether the wrist x-ray was ordered in the late evening of August 17, 2000, or the early morning of August 18, 2000, would appear to be immaterial for the additional reason that it would appear unlikely that any x-rays could be conducted in the middle of the night in Great Meadow C.F.)

FN28. Furthermore, I note that the record evidence he references (in support of his argument that the x-ray was on the morning of August 18, 2000, not the evening of August 17, 2000) is "Defendants exhibit 20," which he says "contains [an] 11/20/00 Great Meadow Correctional Facility Investigation Sheet by P. Bundrick, RN, NA, and Interdepartmental Communication from defendant Ted Nesmith P.A. that state [that the] X ray was ordered on 8/18/00 in the morning." (*Id.*) I cannot find, in the record, any "exhibit 20" having been submitted by Defendants, who designated their exhibits by letter, not number. (*See generally* Dkt. No. 78.) However, at Exhibit G of Defendant Nesmith's affidavit, there is the "Investigation Sheet" to which Plaintiff refers. (Dkt. No. 78, Part 3, at 28 [Ex. G to Nesmith Affid.].) The problem is that document does not say what Plaintiff says. Rather, it says, "Later that evening [on August 17, 2000] ... [a]n x-ray was ordered for the following morning ...." (*Id.*) In short, the document says that the x-ray was not ordered *on* the morning of August 18, 2007, but *for* that morning. Granted, the second document to which Plaintiff refers, the "Interdepartmental Communication" from Defendant Nesmith, does say that "I saw him the next morning and ordered an xray ...." (*Id.* at 29.) I believe that this is a misstatement, given the overwhelming record evidence to the contrary.

Moreover, in confirming the accuracy of Defendants' record citations contained in their Rule 7.1 Statement, I discovered several facts further supporting a finding that Defendant Nesmith's medical care to Plaintiff was both prompt and responsive. In particular, the record evidence cited by Defendants reveals the following specific facts:

(1) at approximately 10:17 a.m. on August 17, 2000, Plaintiff was first seen by someone in the medical unit at Great Meadow C.F. (Nurse Hillary Cooper);

(2) at approximately 10:40 a.m. on August 17, 2000, Defendant Nesmith examined Plaintiff; during that examination, the main focus of Defendant Nesmith's attention was Plaintiff's complaint of the lack of feeling in his lower extremities; Defendant Nesmith responded to this complaint by confirming that Plaintiff could still move his lower extremities, causing Plaintiff to receive an x-ray examination of his spine (which films did not indicate any pathology), and admitting Plaintiff to the prison infirmary for observation;

(3) at approximately 11:00 a.m. on August 17, 2000, Defendant Nesmith placed four sutures in each of two 1/4" lacerations on Plaintiff's left and right forehead;

(4) by 11:20 a.m. Plaintiff was given, or at least prescribed, Tylenol by a medical care provider;

(5) Plaintiff's medical records reflect no complaint by Plaintiff of any injury to his wrist at any point in time other than between 4:00 p.m. and midnight on August 17,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

2000;

(6) at some point after 9:00 p.m. on August 17, 2000, and 9:00 a.m. on the morning of August 18, 2000, Defendant Nesmith ordered that Plaintiff's wrist be examined by x-ray, in response to Plaintiff's complaint of an injured wrist; that x-ray examination occurred at Great Meadow C.F. at some point between 9:00 a.m. on August 17, 2000, and 11:00 a.m. on August 18, 2000, when Defendant Nesmith personally performed a "wet read" of the x-rays before sending them to Albany Medical Center for a formal reading by a radiologist;

(7) at approximately 11:00 a.m. on August 18, 2000, Defendant Nesmith placed a splint on Plaintiff's wrist and forearm with the intent of replacing it with a cast in a couple of days; the reason that Defendant Nesmith did not use a cast at that time was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith believed, based on 30 years experience treating hundreds of fractures, that it was generally not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides;

**\*11** (8) on August 22, 2000, Defendant Nesmith replaced the splint with a cast;

(9) on August 23, 2000, Plaintiff was discharged from the infirmary at Great Meadow C.F.; and

(10) on August 30, 2000, Defendant Nesmith removed the sutures from Plaintiff's forehead. (*See generally* Dkt. No. 78, Part 2, ¶¶ 3-15 [Aff. of Nesmith]; Dkt. No. 78, Part 3, Exs. A-E [Exs. to Aff. of Nesmith].)

"[D]eliberate indifference describes a state of mind more blameworthy than negligence," [FN29] one that is "equivalent to criminal recklessness." [FN30] There is no evidence of such criminal recklessness on the part of Defendant Nesmith, based on the uncontroverted facts before the Court, which show a rather prompt and responsive level of medical care given by Defendant Nesmith to Plaintiff, during the hours and days following the onset of his injuries.

FN29. *Farmer v. Brennan,* 511 U.S. 825, 835,

114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle,* 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J.) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

FN30. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *cf. Farmer,* 511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment.").

In his argument that his treatment in question constituted deliberate indifference to a serious medical need, Plaintiff focuses on the approximate 24-hour period that appears to have elapsed between the onset of his injury and his receipt of an x-ray examination of his wrist. He argues that this 24-hour period of time constituted a delay that was unreasonable and reckless. In support of his argument, he cites two cases. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). However, the facts of both cases are clearly distinguishable from the facts of the case at hand.

In *Brown v. Hughes,* the Eleventh Circuit found a genuine issue of material fact was created as to whether a correctional officer knew of a prisoner's foot injury during the four hours in which no medical care was provided to the prisoner, so as to preclude summary judgment for that officer. *Brown,* 894 F.2d at 1538-39. However, the Eleventh Circuit expressly stated that the question of fact was created because the prisoner had "submitted affidavits stating that [the officer] was called to his cell because there had been a fight, that while [the officer] was present [the prisoner] began to limp and then hop on one leg, that his foot began to swell severely, that he told [the officer] his foot felt as though it were broken, and that [the officer] promised to send someone to look at it but never did." *Id.* Those are *not* the facts of this case.

In *Loe v. Armistead,* the Fourth Circuit found merely that, in light of the extraordinary leniency with which *pro se* complaints are construed, the court was unable to conclude that a prisoner had failed to state a claim upon which relief might be granted for purposes of a motion to dismiss pursuant to Fed.R.Civ.P. 12(b) (6) because the prisoner had alleged that the defendants-*despite being (at some point) "notified" of the prisoner's injured arm*-had inexplicably delayed for 22 hours in giving him medical treatment for the injury. *Loe,* 582 F.2d at 1296. More specifically, the court expressly construed the prisoner's complaint as alleging that, following the onset of the plaintiff's injury at 10:00 a.m. on the day in question, the plaintiff was immediately taken to the prison's infirmary where a nurse, while examining the prisoner's arm, heard him complain to her about pain. *Id.* at 1292. Furthermore, the court construed the prisoner's complaint as alleging that, "[t]hroughout the day, until approximately 6:00 p.m., [the prisoner] repeatedly requested that he be taken to the hospital. He was repeatedly told that only the marshals could take him to a hospital and that they had been notified of his injury." *Id.* at 1292-93. Again, those are *not* the facts of this case.

*12 Specifically, there is no evidence in the record of which I am aware that at any time before 4:00 p.m. on August 17, 2000, Defendant Nesmith either (1) heard Plaintiff utter a complaint about a wrist injury sufficient to warrant an x-ray examination or (2) observed physical symptoms in Plaintiff's wrist (such as an obvious deformity) that would place him on notice of such an injury. As previously stated, I decline, and I urge the Court to decline, to tediously sift through the 262 pages of documents that Plaintiff has submitted in the hope of finding a shred of evidence sufficient to create a triable issue of fact as to whether Plaintiff made, and Defendant Nesmith heard, such a complaint before 4:00 p.m. on August 17, 2000.

I note that, in reviewing Plaintiff's legal arguments, I have read his testimony on this issue. That testimony is contained at Paragraphs 8 through 12, and Paragraph 18, of his Supplemental Affidavit. (*See* Dkt. No. 86, at ¶¶ 8-10, 18 [Plf.'s Supp. Affid., containing two sets of Paragraphs numbed "5" through "11"].) In those Paragraphs, Plaintiff swears, in pertinent part, that "[w]hile I was on the x-ray table I told defendant Ted Nesmith, P.A. and/or Bill Redmond RN ... that my wrist felt broken, and was ignored." (*Id.* at ¶ 9.) Plaintiff also swears that "I was [then] put into a room in the facility clinic[,] and I asked defendant Ted Nesmith, PA[,] shortly thereafter for [an] x-ray of [my] wrist[,] pain medication and [an] ice pack but wasn't given it [sic]." (*Id.* at ¶ 10.) Finally, Plaintiff swears as follows: "At one point on 8/17/00 defendant Nesmith told me that he didn't give a damn when I kept complaining that my wrist felt broken and how I'm going to sue him cause I'm not stupid

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

[enough] to not know he's supposed to do [a] physical examination [of me], [and not] to ignore my complaints about [my] wrist feeling broke and feeling extreem [sic] pain. He told me [to] stop complaining [and that] he's done with me for the day." (*Id.* at ¶ 18.)

This last factual assertion is important since a response of "message received" from the defendant appears to have been critical in the two cases cited by Plaintiff. It should be emphasized that, according to the undisputed facts, when Plaintiff made his asserted wrist complaint to Defendant Nesmith during the morning of August 17, 2000, Defendant Nesmith was either suturing up Plaintiff's forehead or focusing on Plaintiff's complaint of a lack of feeling in his lower extremities. (This complaint of lack of feeling, by the way, was found to be inconsistent with Defendant Nesmith's physical examination of Plaintiff.)

In any event, Defendant Nesmith can hardly be said to have, in fact, "ignored" Plaintiff since he placed him under *observation* in the prison's infirmary (and apparently was responsible for the prescription of Tylenol for Plaintiff).[FN31] Indeed, it was in the infirmary that Plaintiff was observed by a medical staff member to be complaining about his wrist, which resulted in an x-ray examination of Plaintiff's wrist.

> FN31. In support of my conclusion that this fact alone is a sufficient reason to dismiss Plaintiff's claims against Defendant Nesmith, I rely on a case cited by Plaintiff himself. *See Brown,* 894 F.2d at 1539 ("Although no nurses were present [in the hospital] at the jail that day, the procedure of sending [the plaintiff] to the hospital, once employed, was sufficient to ensure that [the plaintiff's broken] foot was treated promptly. Thus, [the plaintiff] has failed to raise an issue of deliberate indifference on the part of these defendants, and the order of summary judgment in their favor must be affirmed.").

**\*13** Even if it were true that Plaintiff made a wrist complaint directly to Defendant Nesmith (during Defendant Nesmith's examination and treatment of Plaintiff between 10:40 a.m. and 11:00 a.m. on August 17,

2000), and Defendant Nesmith heard that complaint, and that complaint were specific and credible enough to warrant an immediate x-ray examination, there would be, at most, only some *negligence* by Defendant Nesmith in not ordering an x-ray examination until 9:00 p.m. that night.

As the Supreme Court has observed, "[T]he question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.[FN32] For this reason, this Court has actually held that a *17-day* delay between the onset of the prisoner's apparent wrist fracture and the provision of an x-ray examination and cast did not constitute deliberate indifference, as a matter of law. *Miles v. County of Broome,* 04-CV-1147, 2006 U.S. Dist. LEXIS 15482, at \*27-28, 2006 WL 561247 (N.D.N.Y. Mar. 6, 2006) (McAvoy, J.) (granting defendants' motion for summary judgment with regard to prisoner's deliberate indifference claim).

> FN32. *See also Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001) (prisoner's "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention [with regard to the treatment of his broken finger], are not adequate grounds for a section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.") [citation omitted]; *cf. O'Bryan v. Federal Bureau of Prisons,* 07-CV-0076, 2007 U.S. Dist. LEXIS 65287, at \*24-28 (E.D.Ky. Sept. 4, 2007) (holding no deliberate indifference where prisoner wore wrist brace/bandage on his broken wrist for two months even though he had asked for a cast; finding that "the type of wrap would only go the difference of opinion between a patient and doctor about what should be done, and the Supreme Court has stated that a difference of opinion regarding the plaintiff's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

diagnosis and treatment does not state a constitutional claim.").

As I read Plaintiff's complaints about the medical care provided to him by Defendant Nesmith in this action, I am reminded of what the Second Circuit once observed:

It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls. [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated. Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[ ] understandably seeks .... We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution.... The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves ....

*Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) [internal quotations and citations omitted].

For all of these reasons, I recommend that Plaintiff's claims against Defendant Nesmith be dismissed with prejudice.

### C. Whether Defendant Nesmith Is Protected from Liability by the Doctrine of Qualified Immunity, As a Matter of Law

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " [FN33] In determining whether a particular right was *clearly established,* courts in this Circuit consider three factors:

FN33. *Williams,* 781 F.2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ).

*14 (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful. [FN34]

FN34. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted).

Regarding the issue of whether *a reasonable person would have known* he was violating a clearly established right, this "objective reasonableness" [FN35] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." [FN36] As the Supreme Court explained,

FN35. See *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

FN36. *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law .... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

should be recognized.[FN37]

> FN37. *Malley,* 475 U.S. at 341.

Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law."[FN38]

> FN38. *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases].)

Here, I agree with Defendants that, based on the current record, it was not clearly established that, between August 17, 2000, and August 22, 2000, Plaintiff possessed an Eighth Amendment right to receive an x-ray examination and casting of his wrist any sooner than he did. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].) I note that neither of the two decisions cited by Plaintiff (discussed earlier in this Report-Recommendation) were controlling in the Second Circuit. *See Brown v. Hughes,* 894 F.2d 1533, 1538-39 (11th Cir.), *cert. denied,* 496 U.S. 928, 110 S.Ct. 2624, 110 L.Ed.2d 645 (1990); *Loe v. Armistead,* 582 F.2d 1291, 1296 (4th Cir.1978), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). I also note that what was controlling was the Supreme Court's decision in *Estelle v. Gamble,* holding that "the question of whether an X-ray-or additional diagnostic techniques or forms of treatment-is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice....." *Estelle,* 429 U.S. at 107.

Furthermore, I agree with Defendants that, at the very least, officers of reasonable competence could have believed that Defendant Nesmith's actions in conducting the x-ray examination and casting when he did were legal.[FN39] In his memorandum of law, Plaintiff argues that Defendant Nesmith *intentionally* delayed giving Plaintiff an x-ray for 12 hours, and that the four-day delay of placing a hard cast on Plaintiff's wrist caused Plaintiff *permanent injury to his wrist.* (Dkt. No. 88, at 12-13 [Plf.'s Supp. Memo. of Law].) He cites no portion of the

record for either assertion. (*Id.*) Nor would the fact of permanent injury even be enough to propel Plaintiff's Eighth Amendment claim to a jury.[FN40] I emphasize that it is an undisputed fact, for purposes of Defendants' motion, that the reason that Defendant Nesmith placed a splint and not a cast on Plaintiff's wrist and arm on the morning of August 18, 2000, was that Plaintiff's wrist and forearm were swollen, and Defendant Nesmith's medical judgment (based on his experience) was that it was not good medical practice to put a cast on a fresh fracture, because the cast will not fit tightly once the swelling subsides.[FN41] Officers of reasonable competence could have believed that decision was legal.

> FN39. (*Id.*)

> FN40. This particular point of law was recognized in one of the cases Plaintiff himself cites. *Loe,* 582 F.2d at 1296, n. 3 ("[Plaintiff's] assertion that he suffered pain two and one-half weeks after the injury and that the fracture had not healed do not establish deliberate indifference or lack of due process. Similarly, his allegation that he has not achieved a satisfactory recovery suggests nothing more than possible medical malpractice. It does not assert a constitutional tort.").

> FN41. (Dkt. No. 78, Part 12, ¶¶ 31-33 [Defs.' Rule 7.1 Statement]; *see also* Dkt. No. 78, Part 2, ¶¶ 11-13 [Affid. of Nesmith]; Dkt. No. 78, Part 3, Ex. C [Exs. to Affid. of Nesmith] )

**\*15** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Nesmith based on the doctrine of qualified immunity.

**D. Whether Plaintiff Has Adduced Evidence Establishing that He Exhausted His Available Administrative Remedies with Respect to His Assault Claim**

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

or other correctional facility until such administrative remedies as are available are exhausted." [FN42] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN43] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN44]

> FN42. 42 U.S.C. § 1997e.

> FN43. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

> FN44. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure.[FN45] *First,* an inmate must file a complaint with the facility's IGP clerk within fourteen (14) calendar days of the alleged occurrence. A representative of the facility's inmate grievance resolution committee ("IGRC") has seven working days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within seven (7) working days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within four (4) working days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within ten (10) working days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within four (4) working days of receipt of the superintendent's written decision. CORC is to render a written decision within twenty (20) working days of receipt of the appeal. It is important to emphasize that *any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.* [FN46]

> FN45. 7 N.Y.C.R.R. § 701.7; *see also White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

> FN46. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g ., Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. [FN47] However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA.[FN48] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN49] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN50] *Third,* if the remedies were available and some of the defendants did not forfeit, and

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [FN51]

> FN47. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

> FN48. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).

> FN49. *Hemphill,* 380 F.3d at 686 (citation omitted).

> FN50. *Id.* [citations omitted].

> FN51. *Id.* [citations and internal quotations omitted].

**\*16** Defendants argue that Plaintiff never exhausted his available administrative remedies with regard to his claim arising out of the assault that allegedly occurred on August 17, 2000. (Dkt. No. 78, Part 13, at 9-11 [Defs.' Memo. of Law].)

Plaintiff responds with four different legal arguments. First, he appears to argue that he handed a written grievance to an unidentified corrections officer but never got a response from the IGRC, and that filing an appeal under such a circumstance is merely optional, under the PLRA (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) Second, he argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (*Id.* at 25-29.) In support of this argument, he cites unspecified record evidence that, although he sent a letter to one "Sally Reams" at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) Third, he argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (*Id.* at 30-38.) Fourth, he argues that Defendants rendered any

administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (*Id.* at 39-45.) [FN52]

> FN52. I note that the breadth of Plaintiff's creative, thoughtful and well-developed legal arguments further demonstrates his extraordinary experience as a litigant.

For the reasons set forth below, I reject each of these arguments. However, I am unable to conclude, for another reason, that Plaintiff has failed to exhaust his administrative remedies as a matter of law, based on the current record.

**1. Plaintiff's Apparent Argument that an Appeal from His Lost or Ignored Grievance Was "Optional" Under the PLRA**

Plaintiff apparently argues that filing an appeal to CORC when one has not received a response to one's grievance is merely optional under the PLRA. (Dkt. No. 86, at 23-25, 44 [Plf.'s Memo. of Law].) If this is Plaintiff's argument, it misses the point.

It may be true that the decision of whether or not to file an appeal in an action is always "optional"-from a metaphysical standpoint. However, it is also true that, in order to satisfy the PLRA's exhaustion requirement, one *must* file an appeal when one has not received a response to one's grievance (unless one of the exceptions contained in the Second Circuit's three-party inquiry exists). *See, supra,* note 46 of this Report-Recommendation.

**2. Plaintiff's Argument that Defendants "Can't Realistically Show" that Plaintiff Never Sent any Grievances or Appeals to the Great Meadow C.F. Inmate Grievance Clerk**

Plaintiff also argues that Defendants "can't realistically show" that Plaintiff never sent any grievances or appeals to the Great Meadow C.F. Inmate Grievance Clerk since that facility did not (during the time in question) have a grievance "receipt system." (Dkt. No. 86,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

at 25-29 [Plf.'s Memo. of Law].) This argument also fails.

**\*17** Plaintiff appears to misunderstand the parties' respective burdens on Defendants' motion for summary judgment. Even though a failure to exhaust is an affirmative defense that a defendant must plead and prove, once a defendant has met his initial burden of establishing the absence of any genuine issue of material fact regarding exhaustion (which initial burden has been appropriately characterized as "modest"),[FN53] the burden then shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial regarding exhaustion. *See, supra,* Part III of this Report-Recommendation.

> FN53. *See Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at \*9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at \*17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.).

Here, it is an uncontrovered fact, for purposes of Defendants' motion, that (1) grievance records at Great Meadow C.F. indicate that Plaintiff never filed a timely grievance alleging that he had been assaulted by corrections officers at Great Meadow C.F. in 2000, and (2) records maintained by CORC indicate that Plaintiff never filed an appeal (to CORC) regarding any grievance alleging that he had been so assaulted. (*See* Dkt. No. 78, Part 12, ¶¶ 39-40 [Defs.' Rule 7.1 Statement, providing accurate record citations].) Plaintiff has failed to properly controvert these factual assertions with specific citations to record evidence that actually creates a genuine issue of fact. (*See* Dkt. No. 85, Part 2, at 50-51 [Ex. N to Plf.'s Affid.].) As a result, under the Local Rules of Practice for this Court, Plaintiff has effectively "admitted" Defendants' referenced factual assertions. N.D.N.Y. L.R. 7.1(a)(3).

With respect to Plaintiff's argument that the referenced factual assertions are basically meaningless because Great Meadow C.F. did not (during the time in question) have a grievance "receipt system," that argument also fails. In support of this argument, Plaintiff cites unspecified record evidence that, although he sent a letter to Sally Reams (the IGP Supervisor at Great Meadow C.F. in May 2003) at some point and received a letter back from her on May 5, 2003, she later claimed that she had never received a letter from Plaintiff. (*Id.* at 29.) (*See* Dkt. No. 86, at 29 [Plf.'s Memo. of Law].) After examining Plaintiff's original Affidavit and exhibits, I located and carefully read the documents in question. (Dkt. No. 85, Part 1, ¶ 23 [Plf.'s Affid.]; Dkt. No. 85, Part 2 [Exs. F and G to Plf.'s Affid.].)

These documents do not constitute sufficient evidence to create a triable question of fact on the issue of whether, in August and/or September of 2000, Great Meadow C.F. did not have a grievance "receipt system." At most, they indicate that (1) at some point, nearly three years after the events at issue, Plaintiff (while incarcerated at Attica C.F.) wrote to Ms. Reams complaining about the alleged assault on August 17, 2000, (2) she responded to Plaintiff, on May 5, 2003, that he must grieve the issue at Attica C .F., where he must request permission to file an untimely grievance, and (3) at some point between April 7, 2003, and June 23, 2003, Ms. Reams informed Mr. Eagen that she did not "remember" receiving "correspondence" from Plaintiff. (*Id.*) The fact that Ms. Reams, after the passing of several weeks and perhaps months, did not retain an independent memory (not record) of receiving a piece of "correspondence" (not grievance) from Plaintiff (who was not an inmate currently incarcerated at her facility) bears little if any relevance on the issue of whether Great Meadow C.F. had, in April and/or May of 2003, a mechanism by which it recorded its receipt of *grievances.* Moreover, whether or not Great Meadow C.F. had a grievance "receipt system" in April and/or May of 2003 bears little if any relevance to whether it had a grievance "receipt system" in August and/or September of 2000.

**\*18** It should be emphasized that Defendants have adduced record evidence specifically establishing that, in August and September 2000, Great Meadow C.F. had a *functioning* grievance-recording process through which,

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

when a prisoner (and specifically Plaintiff) filed a grievance, it was "assign[ed] a number, title and code" and "log[ged] ... into facility records." (Dkt. No. 78, Part 6, ¶¶ 7-9 [Bellamy Decl.]; Dkt. No. 78, Part 7, at 2 [Ex. A to Bellamy Decl.] Dkt. No. 78, Part 8, ¶ 4 [Brooks Decl.]; Dkt. No. 78, Part 9, at 6 [Ex. B to Brooks Decl.].)

Finally, even if Great Meadow C.F. did not (during the time in question) have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level. *See, supra,* note 46 of this Report-Recommendation.

### 3. Plaintiff's Argument that the Determination He Received from CORC Satisfied the PLRA's Exhaustion Requirement

Plaintiff argues that the determination he received from CORC (at some point) satisfied the PLRA's exhaustion requirement. (Dkt. No. 86, at 30-38 [Plf.'s Memo. of Law].) This argument also fails.

Plaintiff does not clearly articulate the specific portion of the record where this determination is located. (*See id.* at 30 [Plf.'s Affid., referencing merely "plaintiff's affidavit and exhibits"].) Again, the Court has no duty to *sua sponte* scour the 209 pages that comprise Plaintiff's "affidavit and exhibits" for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed what I believe to be the material portions of the documents to which Plaintiff refers. I report that Plaintiff appears to be referring to a determination by the Upstate C.F. Inmate Grievance Program, dated June 20, 2003, stating, "After reviewing [your June 11, 2003, Upstate C.F.] grievance with CORC, it has been determined that the grievance is unacceptable. It does not present appropriate mitigating circumstances for an untimely filing." (Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.]; *see also* Dkt. No. 85, Part 1, ¶¶ 22-34 [Plf.'s Affid.].)

There are two problems for Plaintiff with this document. First, this document does *not* constitute a written determination by *CORC* on a written appeal by

Plaintiff to *CORC* from an Upstate C.F. written determination. (*See* Dkt. No. 85, Part 2, at 37 [Ex. J to Plf.'s Affid.].) This fact is confirmed by one of Plaintiff's own exhibits, wherein DOCS IGP Director Thomas Eagen advises Plaintiff, "Contrary to the IGP Supervisor's assertion in his memorandum dated June 20, 2003, the IGP Supervisor's denial of an extension of the time frames to file your grievance from Great Meadow in August 2000 has not been reviewed by the Central Office Review Committee (CORC). The IGP Supervisor did review the matter with Central Office staff who is [sic] not a member of CORC." (*See* Dkt. No. 85, Part 2, at 39 [Ex. K to Plf.'s Affid.].) At best, the document in question is an indication by Upstate C.F. that the success of an appeal by Plaintiff to CORC would be unlikely.

**\*19** Second, even if the document does somehow constitute a written determination by CORC on appeal by Plaintiff, the grievance to which the determination refers is a grievance filed by Plaintiff on June 11, 2003, at Upstate C.F., not a grievance filed by Plaintiff on August 30, 2000, at Great Meadow C.F. (Dkt. No. 85, Part 2, at 32-35 [Ex. I to Plf.'s Affid.].) Specifically, Plaintiff's June 11, 2003, grievance, filed at Upstate C.F., requested permission to file an admittedly *untimely* grievance regarding the injuries he sustained during the assault on August 17, 2000. (*Id.*)

A prisoner has not exhausted his administrative remedies with CORC when, years after failing to file a timely appeal with CORC, the prisoner requests *and is denied* permission to file an untimely (especially, a two-year-old) appeal with CORC due to an unpersuasive showing of "mitigating circumstances." *See Burns v. Zwillinger,* 02-CV-5802, 2005 U.S. Dist. LEXIS 1912, at *11 (S.D.N .Y. Feb. 8, 2005) ("Since [plaintiff] failed to present mitigating circumstances for his untimely appeal to the IGP Superintendent, the CORC, or this Court, [defendant's] motion to dismiss on the grounds that [plaintiff] failed to timely exhaust his administrative remedies is granted."); *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004) ("Without mitigating circumstances, courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies.") [collecting cases]. If the rule were to the contrary, then, as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

a practical matter, no prisoner could ever be said to have failed to exhaust his administrative remedies because, immediately before filing suit in federal court, he could perfunctorily write to CORC asking for permission to file an untimely appeal, and whatever the answer, he could claim to have completed the exhaustion requirement. The very reason for requiring that a prisoner obtain permission before filing an untimely appeal presumes that the permitted appeal would be required to complete the exhaustion requirement. Viewed from another standpoint, a decision by CORC to refuse the filing of an untimely appeal does not involve a review of the merits of the appeal.

**4. Plaintiff's Argument that Defendants Rendered any Administrative Remedies "Unavailable" to Plaintiff**

Plaintiff also argues that Defendants rendered any administrative remedies "unavailable" to Plaintiff, for purposes of the Second Circuit's above-described three-part exhaustion inquiry, by (1) failing to cause DOCS to provide proper "instructional provisions" in its directives, (2) failing to cause Great Meadow C.F. to have a grievance "receipt system," and (3) "trash [ing]" Plaintiff's grievances and appeals. (Dkt. No. 86, at 39-45 [Plf.'s Memo. of Law].) This argument also fails.

In support of this argument, Plaintiff "incorporates by reference all the previously asserted points, Plaintiff's Affidavit in Opposition with supporting exhibits, as well as[ ] the entire transcripts of Defendants['] deposition on [sic] Plaintiff ...." (*Id.* at 40, 45.) Again, the Court has no duty to *sua sponte* scour the 265 pages that comprise Plaintiff's Affidavit, Supplemental Affidavit, exhibits, and deposition transcript for proof of a dispute of material fact, and I decline to do so (and recommend the Court decline to do so) for the reasons stated above in Part IV.A.1. of this Report-Recommendation. I have, however, in analyzing the various issues presented by Defendants' motion, reviewed the documents to which Plaintiff refers, and I report that I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.

**\*20** For example, Plaintiff has adduced no evidence

that he possesses any *personal knowledge* (only speculation) of any Defendant in this action having "trashed" his alleged grievance(s) and appeal(s),[FN54] nor has he even adduced evidence that it was *one of the named Defendants in this action* to whom he handed his alleged grievance(s) and appeal(s) for delivery to the Great Meadow C.F. Inmate Grievance Program Clerk on August 30, 2000, September 13, 2000, and September 27, 2000.[FN55] Similarly, the legal case cited by Plaintiff appears to have nothing to do with any Defendant to this action, nor does it even have to do with Great Meadow C.F.[FN56]

FN54. (*See* Dkt. No. 85, Part 1, ¶¶ 13-14, 16-17 [Plf.'s Affid., asserting, "Prison officials trashed my grievances and appeals since they claim not to have them despite [the] fact I sent them in a timely manner. It's [the] only reason they wouldn't have them.... Prison officials have a history of trashing grievances and appeals.... I've been subjected to having my grievances and appeals trashed prior to and since this matter and have spoken to alot [sic] of other prisoners whom [sic] said that they were also subjected to having their grievances and appeals trashed before and after this incident, in alot [sic] of facilities.... Suspecting foul play with respect to my grievances and appeals, I wrote, and spoke to[,] prison officials and staff that did nothing to rectify the matter, which isn't surprising considering [the] fact that it's an old problem ...."].)

FN55. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk ... which contained the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail, in F-Block

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

SHU [at] Great Meadow CF ...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid., asserting only that "[o]n September 27th, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

FN56. (*See* Dkt. No. 85, Part 1, ¶ 15 [Plf.'s Affid., referencing case]; Dkt. No. 85, Part 2, at 16-17 [Ex. B to Plf.'s Affid., attaching a hand-written copy of case, which mentioned a prisoner's grievances that had been discarded in *1996* by an *unidentified* corrections officer at *Sing Sing Correctional Facility* ].)

**5. Record Evidence Creating Genuine Issue of Fact**

Although I decline to *sua sponte* scour the lengthy record for proof of a triable issue of fact regarding exhaustion, I have, while deciding the many issues presented by Defendants' motion, had occasion to review in detail many portions of the record. In so doing, I have discovered evidence that I believe is sufficient to create a triable issue of fact on exhaustion.

Specifically, the record contains Plaintiff's testimony that (1) on August 30, 2000, he gave a corrections officer a grievance regarding the alleged assault on August 17, 2000, but he never received a response to that grievance, (2) on September 13, 2000, he gave a corrections officer an appeal (to the Superintendent) from that non-response, but again did not receive a response, and (3) on September 27, 2000, he gave a corrections officer an appeal (to CORC) from that non-response, but again did not receive a response.[FN57]

FN57. (*See* Dkt. No. 85, Part 1, ¶ 6 [Plf.'s Affid., asserting only that "[o]n August 30th, 2000 plaintiff handed the correction officer collecting the mail in F Block SHU in the Great Meadow Correctional Facility an envelope addressed to the inmate grievance clerk in which contained [sic] the grievances relative to this action at hand ...."]; Dkt. No. 85, Part 1, ¶ 9 [Plf.'s Affid., asserting only that "[o]n September 13, 2000, I appealed said grievances to [the] Superintendent

by putting them in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail; in F-Block SHU [at] Great Meadow CF...."]; Dkt. No. 85, Part 1, ¶ 11 [Plf.'s Affid ., asserting only that "[o]n September 27h, 2000, I appealed said grievance ... to C.O.R.C. by putting them [sic] in [an] envelope addressed to [the] inmate grievance clerk and handing it to [the] correction officer collecting the mail in F-Block SHU [at] Great Meadow CF ...."].)

The remaining issue then, as it appears to me, is whether or not this affidavit testimony is so self-serving and unsubstantiated by other direct evidence that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [FN58] Granted, this testimony appears self-serving. However, based on the present record, I am unable to find that the testimony is so wholly unsubstantiated by other direct evidence as to be incredible. Rather, this testimony appears corroborated by two pieces of evidence. First, the record contains what Plaintiff asserts is the grievance that he handed to a corrections officer on August 30, 2000, regarding the alleged assault on August 17, 2000. (Dkt. No. 85, Part 2, at 65-75 [Ex. Q to Plf.'s Affid.].) Second, the record contains two pieces of correspondence between Plaintiff and legal professionals *during or immediately following the time period in question* containing language suggesting that Plaintiff had received no response to his grievance. (Dkt. No. 85, Part 2, at 19-21 [Exs. C-D to Plf.'s Affid .].)

FN58. *See, supra,* note 12 of this Report-Recommendation (collecting cases).

Stated simply, I find that sufficient record evidence exists to create a genuine issue of fact as to (1) whether Plaintiff's administrative remedies were, with respect to his assault grievance during the time in question, "available" to him, for purposes of the first part of the Second Circuit's three-part exhaustion inquiry, and/or (2) whether Plaintiff has shown "special circumstances" justifying his failure to comply with the administrative procedural requirements, for purposes of the third part of the Second Circuit's three-part exhaustion inquiry.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

**\*21** As a result, I recommend that the Court deny this portion of Defendants' motion for summary judgment.

**E. Whether Plaintiff Has Sufficiently Alleged, or Established, that Defendants Were Liable for the Policy to Review the Non-Life-Sustaining Medical Prescriptions of Prisoners Upon Arrival at Great Meadow C.F.**

As explained above in Part II.A. of this Report-Recommendation, Defendants argue that, during his deposition in this action, Plaintiff asserted, for the first time, a claim that the medical staff at Great Meadow C.F. violated his rights under the Eighth Amendment by failing to honor non-life-sustaining medical prescriptions written at a former facility. (Dkt. No. 78, Part 13, at 3 [Defs.' Mem. of Law].) As a threshold matter, Defendants argue, this claim should be dismissed since Plaintiff never included the claim in his Second Amended Complaint, nor did Plaintiff ever file a motion for leave to file a Third Amended Complaint. (*Id.*) In any event, Defendants argue, even if the Court were to reach the merits of this claim, the Court should dismiss the claim because Plaintiff has failed to allege facts plausibly suggesting, or adduce evidence establishing, that Defendants were personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided such allegations or evidence indicating the policy is even unconstitutional. (*Id.*)

Plaintiff responds that "[he] didn't have to get in particular [sic] about the policy [of] discontinuing all incoming prisoners['] non[-]life[-]sustaining medications without examination and indiscriminently [sic] upon arrival at [Great Meadow] C.F. in [his Second] Amended Complaint. Pleading[s] are just supposed to inform [a] party about [a] claim[,] and plaintiff informed defendant [of] the nature of [his] claims including [the claim of] inadequate medical care. And discovery revealed [the] detail[s] [of that claim] as [Plaintiff had] intended." (Dkt. No. 88, at 10 [Plf.'s Supp. Memo. of Law].) In addition, Plaintiff responds that Defendant Paolano must have been personally involved in the creation and/or implementation of the policy in question since he was the Great Meadow Health Services Director. (*Id.* at 10.)

I agree with Defendants that this claim is not properly

before this Court. Plaintiff's characterization of the notice-pleading standard, and of the contents of his Amended Complaint, are patently without support (both legally and factually). It has long been recognized that a "claim," under Fed.R.Civ.P. 8, denotes "the aggregate of operative facts which give rise to a right enforceable in the courts." [FN59] Clearly, Plaintiff's Second Amended Complaint alleges no facts whatsoever giving rise to an asserted right to be free from the application of the prescription-review policy at Great Meadow C.F. Indeed, his Second Amended Complaint-which asserts Eighth Amendment claims arising *solely* out of events that (allegedly) transpired on August 17, 2000-says nothing at all of the events that transpired immediately upon his arrival at Great Meadow C.F. in early August of 2000, nor does the Second Amended Complaint even casually mention the words "prescription," "medication" or "policy." (*See generally* Dkt. No. 10 [Second Am. Compl.].)

FN59. *Original Ballet Russe, Ltd. v. Ballet Theatre, Inc.,* 133 F.2d 187, 189 (2d Cir.1943); *United States v. Iroquois Apartments, Inc.,* 21 F.R.D. 151, 153 (E.D.N.Y.1957); *Birnbaum v. Birrell,* 9 F.R.D. 72, 74 (S.D.N.Y.1948).

**\*22** Furthermore, under the notice-pleading standard set forth by Fed.R.Civ.P. 8(a)(2), to which Plaintiff refers in his Supplemental Memorandum of Law, Defendants are entitled to *fair notice* of Plaintiff's claims.[FN60] The obvious purpose of this rule is to protect defendants from undefined charges and to facilitate a proper decision on the merits. [FN61] A complaint that fails to provide such fair notice "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN62] This fair notice does not occur where, as here, news of the claim first springs up in a deposition more than two years after the action was commenced, approximately seven months after the amended-pleading deadline expired, and approximately two weeks before discovery in the action was scheduled to close. (*Compare* Dkt. No. 1 [Plf.'s Compl., filed 8/14/03] *with* Dkt. No. 42, at 1-2 [Pretrial Scheduling Order setting amended-pleading deadline as 2/28/05] *and* Dkt. No. 78, Part 11, at 52-53 [Plf.'s Depo.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

Transcript, dated 9/30/05] *and* Dkt. No. 49 [Order setting discovery deadline as 10/14/05].)

FN60. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (the statement required by Fed.R.Civ.P. 8 [a][2] must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

FN61. *Ruffolo v. Oppenheimer & Co., Inc.,* 90-CV-4593, 1991 WL 17857, at *2 (S.D.N.Y. Feb.5, 1991); *Howard v. Koch,* 575 F.Supp. 1299, 1304 (E.D.N.Y.1982); *Walter Reade's Theatres, Inc. v. Loew's Inc.,* 20 F.R.D. 579, 582 (S.D.N.Y.1957).

FN62. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

Under the circumstances, the mechanism by which to assert such a late-blossoming claim was a motion to reopen the amended-pleading filing deadline (the success of which depended on a showing of cause), coupled with a motion for leave file a Third Amended Complaint (the success of which depended, in part, on a showing of lack of prejudice to Defendants, as well as a lack of futility). Plaintiff never made such motions, nor showed such cause.

I acknowledge that, generally, the liberal notice-pleading standard set forth by Fed.R.Civ.P. 8 is applied with even greater force where the plaintiff is proceeding *pro se.* In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are

generally construed with an *extra* degree of liberality. As an initial matter, I have already concluded, based on my review of Plaintiff's extensive litigation experience, that he need not be afforded such an extra degree of leniency since the rationale for such an extension is a *pro se* litigant's inexperience with the court system and legal terminology, and here Plaintiff has an abundance of such experience. *See, supra,* notes 21-25 of this Report-Recommendation. Moreover, even if he were afforded such an extra degree of leniency, his phantom prescription-review claim could not be read into his Second Amended Pleading, for the reasons discussed above. (I note that, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended.") FN63

FN63. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

Nor could Plaintiff's late-blossoming prescription-review claim properly be read into his papers in opposition to Defendants' motion for summary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)

(Cite as: 2008 WL 2522324 (N.D.N.Y.))

judgment. Granted, a *pro se* plaintiff's papers in opposition to a *motion to dismiss* may sometimes be read as effectively amending a pleading (e.g., if the allegations in those papers are consistent with those in the pleading). However, a *pro se* plaintiff's papers in opposition to a *motion for summary judgment* may not be so read, in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment.[FN64]

FN64. *See Auguste v. Dept. of Corr.,* 424 F.Supp.2d 363, 368 (D.Conn.2006) ("Auguste [a *pro se* civil rights plaintiff] cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment.") [citations omitted].

**\*23** Finally, in the event the Court decides to construe Plaintiff's Second Amended Complaint as somehow asserting this claim, I agree with Defendants that the Court should dismiss that claim, also for the reasons discussed above in Part IV.A.2. of this Report-Recommendation. Specifically, Plaintiff has failed to adduce evidence establishing that Defendant Paolano (or any named Defendant in this action) was personally involved in the creation or implementation of DOCS' prescription-review policy, nor has Plaintiff provided evidence establishing that the policy is even unconstitutional. *See, supra,* Part IV.A.2. of this Report-Recommendation.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk's Office shall, in accordance with note 1 of this Order and Report-Recommendation, correct the docket sheet to remove the names of Defendants Englese, Edwards, Bump, Smith, Paolano, and Nesmith as "counter claimants" in this action; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 78) be ***GRANTED* in part** (i.e., to the extent that it requests the dismissal with prejudice of Plaintiff's claims against Defendants Paolano and Nesmith) and ***DENIED* in part** (i.e., to the extent that it requests dismissal of Plaintiff's claims against the remaining Defendants on the grounds of Plaintiff's failure to exhaust available administrative remedies) for the reasons stated above.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.

Murray v. Palmer
Not Reported in F.Supp.2d, 2008 WL 2522324 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER <sup>FN1</sup>

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.<sup>FN2</sup> In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. Compare *Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

## IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

## V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989);* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2014 WL 1289582 (N.D.N.Y.)
**(Cite as: 2014 WL 1289582 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Justin FLAKE, Plaintiff,
v.
Howard PECK, et al., Defendants.

No. 9:12–cv–00517 (MAD/ATB).
Signed March 31, 2014.

Justin Flake, Attica, NY, pro se.

Lemire, Johnson & Higgins, LLC, Gregg T. Johnson, Esq., of Counsel, Malta, NY, for Defendant.

**ORDER**

MAE A. D'AGOSTINO, District Judge.

**\*1** Plaintiff, formerly a pretrial detainee at the Washington County Jail, brings this action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his constitutional rights under the First, Eighth, and Fourteenth Amendments of the United States Constitution. *See* Dkt. No. 1. Presently before the Court is Defendants' motion for summary judgment. *See* Dkt. No. 34. In a Report–Recommendation and Order dated February 21, 2014, Magistrate Judge Andrew T. Baxter recommended that the Court grant Defendants' motion for summary judgment. *See* Dkt. No. 43. None of the parties has objected to Magistrate Judge Baxter's Report–Recommendation and Order.

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error.

*O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec 'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36–37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its plead-

ings. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)(e)).

**\*2** In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers,* 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2502, 2513–14, 91 L.Ed.2d 202 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) ) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond,* 00 CIV. 3725, 2001 WL 527484, \*1 (S.D.N.Y. May 16, 2001)). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence" is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin,*

902 F.Supp. 424, 429 (S.D.N.Y.1995) (citing *Cary v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

Having carefully reviewed Magistrate Judge Baxter's February 21, 2014 ReportRecommendation and Order, the parties' submissions and the applicable law, the Court finds that Magistrate Judge Baxter correctly recommended that the Court should grant Defendants' motion for summary judgment, and dismiss this case. *See* Dkt. No. 43.

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Baxter's February 21, 2014 Report–Recommendation and Order is **ADOPTED in its entirety** for the reasons set forth therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 34) is **GRANTED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**\*3 IT IS SO ORDERED.**

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In his civil rights complaint plaintiff alleged that, while he was incarcerated in the Washington County Jail ("WCJ") as a pretrial detainee, defendants used excessive force against him, confined him in unconstitutional conditions, denied him access to the law library, denied him his right to freely practice his religion, improperly searched his cell and deprived him of his property, denied him equal protection, filed false disciplinary reports against him,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

and denied him due process. (Compl.) (Dkt. No. 1).

After the court's initial review of the complaint, Judge Mae A. D'Agostino dismissed some of plaintiff's claims and ordered defendants to respond to the others.[FN1] (Dkt. No. 7). There are three claims remaining in this action: (1) the use of excessive force on two occasions; (2) unconstitutional conditions of confinement; and (3) denial of the right to attend religious services on two occasions.[FN2] (Id. at 20).

> FN1. Judge D'Agostino dismissed the complaint in its entirety as against defendants Trip and Breeyear and as against the Washington County Sheriff's Department. (Dkt. No. 7 at 19–20). She ordered the Clerk to replace the Washington County Sheriff's Department with Washington County in the caption. (Dkt. No. 7 at 6 n. 3).

> FN2. Although Judge D'Agostino dismissed plaintiff's other claims without prejudice and with the opportunity to amend, (Dkt. No. 7 at 7 n. 5), plaintiff did not attempt to file an amended complaint. Rather, in his response to defendants' motion for summary judgment, plaintiff simply added the old claims back into his argument. This is not sufficient to revive the dismissed claims.

Presently before the court is defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 34). Plaintiff has responded in opposition to the motion. (Dkt. No. 37). Defendants have filed a reply. (Dkt. Nos.40). For the following reasons, this court agrees with defendants and will recommend dismissal of the complaint in its entirety as against all remaining defendants.

**I.** *Facts*

**A. Excessive Force**[FN3]

> FN3. At his deposition, plaintiff was asked

to identify which defendants were associated with each of plaintiff's remaining claims. With respect to excessive force, plaintiff named defendants Elliott, Little, M. Minor, White, Tripp, and VanArnum. (Pl.'s Dep. at 93, 95–97, 99). Although the complaint is clear that defendant Fisher participated in one of the incidents, at his deposition, plaintiff testified that he was not too sure why he sued Fisher. (Id. at 100).

**1. Cell Incident—November 10, 2010**

Plaintiff states that he was incarcerated in the WCJ from July 17, 2010 until January 25, 2011. Plaintiff states that on September 24, 2010, he was assigned to a cell in "B–Pod," where he remained until October 30, 2010. (Compl. at 19, ¶ 1).[FN4] On October 30, 2010, plaintiff was moved to cell # 11 in D–Pod ("D–11"),[FN5] and on November 4, 2010, he was moved to D–8. Plaintiff states that on November 4, 2010, he was told that he was being moved to make room for Protective Custody inmates. (Id.)

> FN4. The court will cite to the complaint by its CM/ECF page number, together with the number that plaintiff has assigned to the paragraph on the page. The reason for the double citation is that plaintiff has numbered each claim beginning with paragraph 1. Thus, there are multiple paragraphs with the same number.

> FN5. For ease of identification, the court will refer to the cells with the letter identifying the "Pod" and then the number of the cell (i.e. "D–8" refers to cell number 8 in D–Pod).

Plaintiff alleges that on November 10, 2010, he was asked to move back to cell D–11, but that he was concerned about this move because D–11 "was cold and there was no heat." (Compl. at 19, ¶ 2). Plaintiff claims that he asked Officer Tripp if he knew why plaintiff was being moved again, but Of-

ficer Tripp did not know the answer, and plaintiff asked to speak with a sergeant. (*Id.*) Plaintiff states that he made sure to tell Officer Tripp to let the Sergeant know that plaintiff was not "refusing" to move, he only wished to "discuss" the issue. Officer Tripp told plaintiff that a sergeant would be down to speak with him soon. (*Id.*)

Sergeant VanArnum came down to D–Pod with Officers Fisher and Elliot. Plaintiff states that when he tried to speak with defendant VanArnum, the defendant refused and told plaintiff to pack his things. (Compl. at 19, ¶ 3). Plaintiff began packing, while defendants VanArnum, Elliot, and Fisher all stood in his cell. (Compl. at 20, ¶ 3). Plaintiff states that he began moving his property to a table outside of the cell, but that it was crowded in his cell with all the defendants standing inside. Plaintiff states that on the fourth trip back into the cell from the table, he walked between Sergeant VanArnum and Officer Elliot. (Compl. at 20, ¶ 4) As plaintiff walked by Sergeant VanArnum, plaintiff's shoulder "did contact Sergeant VanArnum's arm." (*Id.*)

**\*4** Plaintiff alleges that although the contact was "inadvertent," and occurred only because plaintiff had to squeeze in between the two officers, Sergeant VanArnum reacted by wrapping his arms around plaintiff's upper body, and Officer Elliot grabbed plaintiff's legs, pulling plaintiff down to the floor. (Compl. at 20, ¶ 6). Plaintiff states that as the defendants were trying to pull plaintiff down to the floor, he tried to "back out of the cell so that this could all be captured on video camera." (*Id.*) Officer Fisher pulled plaintiff back into the cell, and as he did, plaintiff turned, tripped over someone's foot, and fell to the ground, hitting his back on the "cell's seat." Sergeant VanArnum fell to the floor "at the same time," causing him extreme pain. Plaintiff alleges that Officer Elliot continued to hold his legs, while Officer Fisher held on to plaintiff's waist area. Plaintiff claims that Sergeant VanArnum placed his knee on plaintiff's chest, his right hand holding plaintiff's forearm, and his left hand was placed on plaintiff's neck, causing

plaintiff to choke. (*Id.*)

Plaintiff states that as the defendants held plaintiff down, Sergeant VanArnum told plaintiff that he was "tired of plaintiff submitting grievances and that plaintiff was going to follow the rules." However, after they held plaintiff down for "a while," they told plaintiff they were going to let him up. After he got up, plaintiff continued to move his property, without incident. Plaintiff alleges that he asked Sergeant VanArnum if he could see a doctor because of his back injury, but defendant VanArnum refused. However, another sergeant, who came on duty for the next shift, escorted plaintiff to the medical department. Plaintiff was examined and prescribed Ibuprofen and another medication that he could not remember. (Compl. at 20–21, ¶¶ 7–8).

During plaintiff's deposition, he testified that he mistakenly bumped into Sergeant VanArnum as plaintiff lowered his shoulder in an attempt to maneuver around the guards. Plaintiff stated that he tried to apologize, but that the defendants reacted before he was able to speak. (Pl.'s Dep. at 29, 33–34).[FN6] Plaintiff testified that as he was falling to the floor, he hit his back on the metal seat in the cell, and that Sergeant VanArnum fell on top of him. (Pl.'s Dep. at 29–30). At the deposition, plaintiff stated that after they fell, Sergeant VanArnum was holding plaintiff's neck so tightly that plaintiff felt like he was choking.[FN7] However, when plaintiff told the Sergeant that he was choking, the defendant let go immediately. (Pl.'s Dep. at 30). Plaintiff also admitted that he was swearing at the guards during the entire incident, and that he was squirming, but only because he needed to breathe, not because he was resisting. (Pl.'s Br. at 31–32). Plaintiff also testified that after the defendants told plaintiff to "calm down," they let him up, and he continued to move his belongings without further incident. (Pl.'s Dep. at 32).

FN6. The citations are to the original page numbers at the top right-hand corner of the deposition pages. The pages are not all

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

numbered consecutively because defendants filed only excerpts of the deposition.

FN7. This detail was not in the complaint.

**\*5** Plaintiff testified that, although defendant VanArnum initially denied plaintiff's request to see the doctor after the incident, plaintiff ultimately waited only "a couple of hours" to get medical attention. When he did see the doctor, he told her that "he fell on stool hitting his back and was choked...." (Def.s' Ex. M at 19) (Dkt. No. 34–14). There were "no bruises," just two "small scratches" on his neck, and no open areas or wounds. (*Id* .) He was prescribed Motrin. (*Id.*) On December 15, 2010, a doctor also prescribed Motrin for plaintiff's back pain. (*Id.* at 18). On December 17, 2010, plaintiff refused his Motrin. (*Id.* at 17).

Defendant VanArnum has submitted an affidavit in support of defendants' summary judgment motion. ("VanArnum Aff.") (Dkt. No. 34–30). Defendant VanArnum is a Corrections Sergeant, whose responsibility is maintaining the safety and security of both the inmates and the staff at WCJ. (VanArnum Aff. ¶ 2). In addition, defendant VanArnum is responsible for inmate movement and activities; making periodic rounds of assigned areas of the jail; conducting searches for contraband; overseeing WCJ's "internal grievance procedures;" and preparing reports as necessary. (*Id.*)

Defendant VanArnum's description of the incident is slightly different than plaintiff's, but has many of the same elements. Defendant VanArnum first points out that, because of plaintiff's bad behavior and unwillingness to follow facility rules, he spent most of his time in the Special Housing Unit ("SHU") at WCJ. (*Id* . ¶ 5). On November 10, 2010, Officer Tripp called Sergeant VanArnum to assist in moving plaintiff back to D–11. (*Id.* ¶ 6). Defendant VanArnum went to plaintiff's cell with Officers Elliot and Fisher. At that time, plaintiff told defendant VanArnum that he wanted to stay in cell D–8, which had a view of the communal television.FN8

FN8. Plaintiff did not mention this detail either in his complaint or during the deposition. According to the plaintiff, his reason for wanting to stay in cell D–8 was that D–11 was too cold.

Defendant VanArnum stated that, after he gave plaintiff the opportunity to speak, he directed him to pack up his things and move to D–11, which incidentally did not have a view of the television. (*Id.* ) Defendant VanArnum stated that, although he continued to move his property, plaintiff became increasingly loud and verbally combative. Plaintiff "intentionally" brushed up against defendant VanArnum's shoulder. Defendant VanArnum instructed plaintiff that if he did that again, the conduct would be viewed as a sign of aggression. Despite this warning, a few minutes later, plaintiff bumped into defendant VanArnum again. At that point, defendant VanArnum states that the officers brought plaintiff to the ground in a controlled manner. When plaintiff stated that he would comply with further orders, the officers let him stand under his own power. As plaintiff walked down to D–11, "he threatened to sue all WCJ staff present." (*Id.*)

Defendants Elliott and Fisher have also submitted affidavits in support of their motion. ("Elliott Aff.", "Fisher Aff.") (Dkt.Nos.34–17, 34–18). Defendant Elliott stated that he witnessed plaintiff bump defendant VanArnum a second time after being told that a second bump would be considered an act of aggression. (Elliott Aff. ¶ 6). Defendant Elliott states that he does not recall seeing plaintiff hit his back on the stool, and he does not recall seeing defendant VanArnum with his knee on plaintiff's chestFN9 or choking him.FN10 (*Id.*)

FN9. Plaintiff did not mention the knee on his chest during the deposition.

FN10. Defendant Elliott also filed a contemporaneous report regarding the incident. (Def.'s Ex. C; Dkt. No. 34–4 at 11). In that report, defendant Elliott also noted that plaintiff had been told that his stay in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

D–8 would only be temporary, and that he would be moved back to D–11 after other inmates had been moved out. (*Id* .) This is consistent with the statement in the complaint that plaintiff was told that he was initially moved to D–8 "to make room for Protective Custody Inmates." (Compl. at 19, ¶ 1).

**\*6** Defendant Fisher's affidavit gives the same description of the November 10, 2010 incident as that given by defendants VanArnum and Elliott. (Fisher Aff.) (Dkt. No. 38–18). He states that plaintiff was brought to the floor in a "controlled manner." He also did not recall plaintiff hitting his back on a metal chair on the way to the floor, nor did he recall defendant VanArnum with his knee on plaintiff's chest or choking him. (Fisher Aff. ¶ 4) (Dkt. No. 34–18). After the officers gained control of plaintiff, and he agreed to comply with further orders, he gathered the rest of his belongings and moved to the new cell "under his own power and without further incident." (*Id.*) Defendant Fisher sustained an injured knee and had to seek medical attention as a result of the incident.

Defendant Fisher completed a report, contemporaneous to the incident. (Def.s' Ex. C at 10). In his report, defendant Fisher states that plaintiff bumped into defendant VanArnum after being told that a second bump would be considered an act of aggression "and responded to as such." (*Id.*) When plaintiff bumped into Sergeant VanArnum a second time, defendants Fisher and Elliott assisted in taking plaintiff to the ground, where they "gained control of the situation," and then "Sgt. VanArnum instructed [plaintiff] to get the remainder of his belongings out of cell 8." (*Id.*) Sergeant VanArnum instructed Officer Tripp to place plaintiff in Administrative Segregation in D–11. Defendant Fisher noted that plaintiff was placed into D–11 with no further incident, and that Fisher was going to be examined by medical personnel due to a knee injury sustained during the incident. (*Id.*)

**2. Law Library Incident—December 22, 2010**

Plaintiff states that on December 22, 2010, he went to the Law Library at 9:30–10:00 a.m. (Compl. at 21, ¶ 9). When he arrived, he returned one book and asked if he could borrow a copy of the Jailhouse Lawyer Manual ("JLM"). Defendant Peck denied this request, and as a result, plaintiff asked defendant Peck to print out a section of the minimum standards for County Jails. (*Id.*) When defendant Peck complied with plaintiff's request, plaintiff took the page, and circled where it stated that inmates from SHU were allowed to borrow material from the law library. (Compl. at 21, ¶ 10; Pl.'s Dep. at 41). Plaintiff then handed the marked document back to defendant Peck in order to prove that plaintiff was correct. (*Id.*)

In the complaint, plaintiff alleged that he "asked [Peck] why he was denying plaintiff's request for the JLM." Plaintiff told Peck that he wished to speak with a sergeant. (Compl. at 21, ¶ 10). Sergeant Little arrived to speak with him. After plaintiff tried to explain to Sergeant Little that plaintiff should be able to take the book back to his cell, Sergeant Little said that she did not care what the rules said, because Officer Peck had determined that plaintiff could not have the book. (*Id.* ¶ 11). Sergeant Little also told plaintiff that his time in the library was "up" because Officer Peck wanted plaintiff to go back to his housing unit. (*Id.* ¶¶ 11–12).

**\*7** During his deposition, plaintiff testified that defendant Peck became angry when plaintiff showed him these "minimum standards," and Peck told plaintiff to pack up his things and go back to his cell. (Pl.'s Dep. at 42). Plaintiff admitted that he "denied going back because [he] didn't do nothing [sic]." (*Id.*) In the complaint, plaintiff alleged that he tried to explain to defendant Little that plaintiff had just arrived and "shouldn't be going back [to his cell]." Defendant Little then "pushed the pin," and Officer M. Minor and T. White responded FN11 (Compl. at 22, ¶ 12). In the complaint, plaintiff alleges that Officer Peck "forced" plaintiff's hands into the handcuffs, and Sergeant

Little ordered plaintiff back to his cell. (Compl. at 21–22, ¶ 12). Plaintiff states that he "protested" because he needed his library time, however, Officer White forced plaintiff up out of his seat.[FN12] (Compl. ¶ 13; Pl.'s Dep. at 42).

> FN11. Defendant Jansson was the third officer who arrived at the law library and was involved in carrying plaintiff back to his cell. (Jansson Aff. ¶ 3) (Dkt. No. 34–22). The complaint does not mention this defendant in its description of the law library incident.

> FN12. During his deposition, plaintiff testified that when Officer Peck refused to allow plaintiff to borrow the JLM, plaintiff left Peck's office and went back to sit down at the computer to look up more cases, and it was then that Peck came out of his office, and the other officers arrived to help take plaintiff back to his cell. (Pl.'s Dep. at 54). The exact details of the incident regarding who showed up and when are not material. All parties agree that plaintiff argued about going back to his cell, and defendant Little called the rover guards to assist her in getting plaintiff back to his unit.

Plaintiff claims that the officers forced him to walk faster than he could with the "ankle brace,"[FN13] and that he fell because of that. In the complaint, plaintiff alleges that defendants White and Minor picked plaintiff up and carried him the rest of the way to his cell. During his deposition, plaintiff testified that they "basically drag me a little bit ... [a]nd they pick me up in the hallway," carrying him all the way back to his cell. (Compl. ¶ 13; Pl.'s Dep. at 42). During his deposition, plaintiff admitted that he was cursing at the officers when they were carrying him back to the cell. (Pl.'s Dep. at 56).

> FN13. Plaintiff never mentions anyone putting ankle restraints on him, and there is

no indication that he had ankle restraints on prior to the arrival of the other officers.

When they got back to his cell, the officers propped plaintiff up with his face against the bars, and Officer White forced his forearm into plaintiff's neck while they took off his shackles. (Compl. at 22, ¶¶ 13–14; Pl.'s Dep. at 43). In the complaint, plaintiff stated that he tried to move his head because the bars were hurting his face. (Compl. at 22, ¶ 14). Plaintiff testified that defendant White had his "left arm on the top of my back," and that he punched plaintiff "one good time" in the lower back with his right hand. (Pl.'s Dep. at 43). Plaintiff asked Sergeant Little if she saw "that," but she told him she did not notice the blow.[FN14] (*Id.*) Plaintiff asked to go the medical department, and the nurse came to see him an hour later.[FN15] (*Id.* at 44). Plaintiff claims that he was in extreme pain, but he had no bruises on his back from the alleged punch. (*Id.*) Plaintiff alleged that the punch aggravated the injury that he received on November 10, 2010. (Compl. at 22, ¶ 16).

> FN14. During his deposition, after denying that he called Sergeant Little a "fat slob" and Officer Minor a "bitch with a badge," plaintiff admitted that he called Officer White a "faggot" and an "A hole." (Pl.'s Dep. at 57–58).

> FN15. In the complaint, plaintiff states that about *10–15 minutes* after he was locked in, Officers Minor, White and Little came to his cell with a nurse so that plaintiff could be examined. (Compl.¶ 15).

Again, defendants' version of what happened is slightly different than plaintiff's explanation. When defendant Peck refused to allow plaintiff to take the JLM out of the library, plaintiff became combative and asked to speak with a Sergeant. (Peck Aff. ¶ 5). Defendant Little arrived and informed plaintiff that he would not be able to borrow the book. Plaintiff became loud, and defendants Peck and Little asked plaintiff to leave the library, but he refused. (*Id.*)

Defendant Little then called three corrections officers, known as "rovers" for assistance. Officers White, M. Minor, FN16 and Jansson arrived to assist. Plaintiff sat in a chair and refused to move. Defendant Peck stated that he placed one handcuff on plaintiff while plaintiff held onto the chair. The officers lifted plaintiff to his feet, but he went limp, dropped to the ground, and refused to move, so they had to carry him out of the library. (*Id* .) Defendant Peck did not see what happened after they left the library because he could not leave his post. (*Id.*)

> FN16. Defendant "M." Minor is a female officer (Michele).

**\*8** Defendant White stated in his affidavit that he heard plaintiff say that the officers were going to have to use force to get him to leave. (White Aff. ¶ 7) (Dkt. No. 3). The plaintiff was lifted out of his chair, but willfully dropped to the ground on his stomach. The officers carried plaintiff back to his cell. When they arrived at the cell, plaintiff was ordered to face the wall so that his restraints could be removed, but plaintiff suddenly jerked his head back in an attempt to strike defendant White. (*Id.*) In response, defendant White placed his forearm to the back of the plaintiff's head to prevent injury. When plaintiff's handcuffs were eventually removed, he refused orders to enter his cell and held onto the "cage" near his cell. Plaintiff was "removed" from the cage and placed in his cell. However, once he was in the cell, he removed his shirt and charged toward defendant White, while continuing to threaten all the officers. Defendant White states that he never struck or punched plaintiff during this incident. (*Id.*)

Defendant Little has also filed her affidavit in support of summary judgment, describing the law library incident. (Little Aff.) (Dkt. No. 34–24). She stated that when she arrived at the law library, plaintiff was agitated and would not listen to the officers. (Little Aff. ¶ 5). Defendant Little stated that, after defendant Peck placed one handcuff on plaintiff's wrist, she placed the handcuff on plaintiff's other wrist. Plaintiff began to scream "

'use of force! use offorce!' " (*Id.*) (italics in original). When plaintiff continued to resist, defendant Little called the rovers. Plaintiff was verbally combative with the officers. Officers White and M. Minor lifted plaintiff out of his chair, but after a few steps, plaintiff intentionally dropped to the ground. Officers White and Minor then lifted plaintiff from under each shoulder while Officer Jansson lifted plaintiff's legs and carried him back to the cell, with Officer Little following them. When they arrived at plaintiff's cell, he continued to be verbally abusive, and he was placed facing the wall, where his restraints were removed. He then refused to walk into his cell and held onto the cage. He was removed from the cage and placed into his cell by the officers, but took off his shirt, and turned toward Officer White, threatening to " 'fuck him up.' " (*Id.*) (italics in original). Defendant Little states that she never saw Officer White strike plaintiff. (*Id.*)

In her affidavit, defendant Rivers/Schuyler FN17 states that she was monitoring the control room on December 22, 2010 and witnessed plaintiff's escort from the law library to his cell. (Rivers/Schuyler Aff. ¶ 4). The defendant states that she never saw the staff use more force than minimally necessary to physically restrain plaintiff, and that she did not see defendant White strike plaintiff as he claims. (*Id.*)

> FN17. This defendant "A. Rivers" has submitted an affidavit explaining that her name is now "Schuyler," and that Rivers is her maiden name. (Schuyler Aff. ¶ 1) (Dkt. No. 34–29).

After the law library incident on December 22, 2010, plaintiff complained of back pain again and was seen by the nurse. (*Id.* at 16). On January 3, 2011, plaintiff was examined by a physician, who noted some lower back tenderness, but negative straight leg raising and intact deep tendon reflexes. (*Id.* at 14). The doctor prescribed Motrin and Flexeril, but stated that he did not believe that any additional medication or a second mattress was indic-

ated. (*Id.* at 10–11, 14) At his deposition, plaintiff testified that he was still taking medication for his back two years later. (Pl.'s Dep. at 36–37).

**B. Conditions of Confinement**[FN18]

> **FN18.** Plaintiff testified at his deposition that the defendants associated with the unconstitutional conditions of confinement were: Officers Jackson and Sergeant Lascar. (Pl.'s Dep. at 101, 104). His complaint indicates that he was denied the shower by Officer Rivers/Schuyler and Sergeant VanArnum. (Compl. at 28, ¶ 8 (top of page)). The complaint also alleges that the individuals responsible for denying him extra blankets were: Officers Jackson, R. Minor, M. Minor; A. Rivers, and Sergeants Dougherty, Jamieson (plaintiff misspelled this defendant's name, but the court will refer to him by the correct spelling—"Jamieson"), and Lascar.

**\*9** Plaintiff alleges that from November 10, 2010, until he left WCJ in January of 2011, his cell was "extremely cold." (Compl. at 22–23, ¶¶ 1–4). Plaintiff alleges that the clothing that he was provided was insufficient to keep him warm, and that it was impossible for him to write, do legal work, and sleep. (Compl. at 23, ¶ 2). Plaintiff stated that even if he bundled up in all the clothing that he had, it was still not sufficient to keep him warm. ( *Id.*) Plaintiff claims that he requested heat and extra blankets "several times a day from November 10, 2011 until ... January 25, 2011." (Compl. at 23, ¶ 3). Plaintiff states that he filed two grievances, one on November 11, 2010, and another on December 6, 2010, but was unable to obtain relief. (Compl. at 22, 23, ¶¶ 1, 4).

Plaintiff also alleges that on December 14, 2010, Sergeant Jamieson told plaintiff that he would be moving from SHU C–6 to SHU C–10. (Compl. at 26, ¶ 1 (bottom of page)). When plaintiff returned from the barber shop, his property had already been moved, and when plaintiff was es-

corted to C–10, he noticed that his belongings were all on the "dirty" floor. The cell was extremely dirty, there were urine and feces stains around the toilet and sink, and the mattress was soiled. Plaintiff states that he asked Sergeant Jamieson and Officer Jackson whether plaintiff could clean his cell, but the Sergeant refused. (*Id.*)

Plaintiff alleges that after Sergeant Jamieson and Officer Jackson refused to allow plaintiff to clean his cell, the Sergeant turned the water off to plaintiff's sink and toilet. (Compl. at 27, ¶ 2). Plaintiff alleges that he filed a grievance on December 17. He asked for his water to be turned on again on December 18, but his request was denied. (Compl. at 27, ¶ 3). Plaintiff also claims that he was denied his personal property during this period of time, including his legal work, and re-alleges that this cell was cold.[FN19] Plaintiff claims that the water to his toilet and sink was turned off for 8 days, and that when he reminded Sergeant Jamieson, the sergeant said "well, too bad." (Compl. at 27, ¶ 4). Plaintiff states that he filed grievances on December 20 and 27, 2010 because his water had been off since December 14, 2010. (Compl. at 27, ¶ 5). Plaintiff also alleges that he filed another grievance on December 28, 2010 because he was denied a blanket by "jail officials on the 8am–3pm shift...." (Compl. at 27, ¶ 6). During his deposition, plaintiff first testified that the water was off for two weeks. (Pl.'s Dep. at 62). However, plaintiff then conceded that the water was turned on occasionally so that he could flush the toilet, but he maintained that he did not "drink" for a couple of weeks. (Pl.'s Dep. at 63).

> **FN19.** The court notes that any personal property and access to court claims were dismissed by Judge D'Agostino.

Defendants added some pertinent facts to the issue of plaintiff's water and cell location. In a statement submitted to the Commission on Correction after the appeal of one of plaintiff's grievances, defendant Lascar stated that on December 11, 2010, plaintiff, while still in C–6, began a "screaming

match" with an inmate from the minimum security dormitory. (Def.'s Ex. H at 14) (Dkt. No. 34–9). Defendant Lascar resolved the situation, but on December 12, 2010, he received another call, stating that plaintiff had flooded his cell and was in the process of flooding the hallway by filling cups of water and throwing them under the cell door. (Def.'s Ex. I at 4) (Dkt. No. 34–10).

**\*10** Defendant Lascar and defendant Breeyear went to plaintiff's cell, and defendant Breenyear turned off the water. Officer Bump applied hand restraints on plaintiff and brought him outside the cell while defendants Lascar and Breeyear put his belongings in plastic bags so they would not get wet. FN20 (*Id.*) Plaintiff was told that after he mopped and dried the area, he would get his property back. (*Id.*) While plaintiff initially agreed, he suddenly began to insist on the return of his property and getting the water turned on. When defendant Elliott attempted to reason with plaintiff, he tipped an entire bucket of water over onto the floor. Plaintiff ultimately got his property back later the same day. (*Id.*)

> FN20. Plaintiff subsequently filed a grievance complaining about the deprivation of his property during this incident.

On December 14, 2010, plaintiff began shouting at the minimum security inmates again, creating another disturbance. (Jackson Aff. ¶ 5) (Dkt. No. 34–20). It was decided that plaintiff would be moved away from the inmates with whom he was arguing. (*Id.*) Plaintiff's property was moved while plaintiff was out of the cell, getting his hair cut. When plaintiff was escorted to the new cell (C–10), he requested a spray bottle with cleanser, but defendant Jackson observed that the cell was clean and denied the request. (*Id.*) Defendant Jackson stated that at approximately 10:45 p.m., he noticed water running into the hall in front of plaintiff's cell. Plaintiff had plugged his toilet and flooded his cell. Defendant Jackson contacted Sergeant Jamieson, who ordered the plaintiff's water be temporarily turned off at 10:50 p.m. (*Id.*)

Plaintiff claims that on December 15, 2010, he was denied a shower by Officer A. Rivers/Schuyler. Plaintiff claims that defendant Rivers/Schuyler told plaintiff that he was being refused a shower because Sergeant VanArnum informed her that "plaintiff does not get anything while plaintiff is in SHU." (Compl. at 28, ¶ 1 (top of page)). Plaintiff claims that he told defendant Rivers/Schuyler that he had not had a shower in four days. (Compl. at 28, ¶ 2 (top of page)). During his deposition, plaintiff stated that he was not denied a shower "too many times," FN21 and that he was aware that in order to get a shower, he was required to ask at the appropriate time. (Pl.'s Dep. at 66–67). He maintained that he asked for a shower properly, but was still denied. (*Id.*) Defendant Rivers/Schuyler states in her affidavit that she has no specific recollection of denying plaintiff a shower, but notes that it was her practice to afford all inmates a shower, who made their requests by 8:00 a.m. (Rivers/Schuyler Aff. ¶ 3).

> FN21. The complaint only alleges the denial of a shower on one date by two defendants. (Compl. at 28, ¶ 1 (top of page)).

**C. Religious Services**

Plaintiff claims that on December 19, 2010, he was denied the opportunity to attend Bible Study by Officer Neil Hafner. (Compl. at 28, ¶ 1 (bottom of page)). On January 8, 2011, plaintiff was allegedly denied the right to attend his religious service by Officer Richard Minor. FN22 (Compl. at 28, ¶ 2 (bottom of page)). Plaintiff states that defendant R. Minor told him that "religious service is considered a program," and therefore, he did not have to let plaintiff attend. (*Id.*) Plaintiff asked to speak with a Sergeant, and defendant Minor called Sergeant Lascar, who also told plaintiff that "religious service" was considered a program, and he was not required to let plaintiff attend. (Compl. at 28, ¶ 3 (bottom of page)).

> FN22. This is a different "Minor" that the defendant discussed above. M. Minor is Officer Michele Minor, and R. Minor is

Officer Richard Minor.

**\*11** Defendant Hafner states in his affidavit that he does not "have a specific recollection" of denying plaintiff the ability to attend Bible Study. (Hafner Aff. ¶ 5). However, defendant Hafner states that plaintiff intentionally ignored numerous orders and announcements for a number of programs, only later to request to attend them. (*Id.*) In those circumstances, plaintiff was denied attendance because of his late responses. He was instructed that in order to attend any of the WCJ programs, including Bible Study, he would have to promptly respond to the CO's request for participation. Defendant states that after plaintiff was denied access to the programs, he would threaten to file a lawsuit for discrimination, leading defendant to believe that plaintiff was acting intentionally to fabricate legal claims. (*Id.*)

Plaintiff filed grievances regarding all of his claims, and defendants have filed those grievances as exhibits, together with any appeals taken by plaintiff. The court notes that the final step in the grievance process for WCJ was to send the grievance to the Citizens' Policy and Complaint Review Council ("CPCRC"). In several of plaintiff's appeals, the CPCRC requested that the WCJ submit further evidence in support of its denial. The CPCRC letters and the evidence submitted in response to those letters have also been filed with defendants' exhibits. In all but one case, after reviewing the additional evidence, the CPCRC sustained the denial of the plaintiff's grievances.

## II. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc. .,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

## III. *Excessive Force*

## A. Legal Standards

**\*12** Although the parties have analyzed the excessive force and the conditions of confinement issues under the Eighth Amendment, plaintiff was a pretrial detained while he was incarcerated in WCJ. The right of a pretrial detainee to be free from excessive force *amounting to punishment,* is protected by the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment, which relates only to convicted prisoners. *Murray v. Johnson No. 260,* 367 F. App'x 196, 198 (2d Cir.2010); *Vazquez v. Curcione,* No. 11–CV–443, 2013 WL 5408858, at \*3 (W.D.N.Y. Sept.25, 2013) (citing inter alia *Caiozzo v. Koreman,* 581 F.3d 63 (2d Cir.2009)).

Even though pretrial detainees are protected by Due Process, the Second Circuit has equated the legal standard for excessive force claims brought by pretrial detainees under the Fourteenth Amendment with the standard used to analyze convicted inmates' Eighth Amendment claims. *Id.* (citing *United States v. Walsh,* 194 F.3d 37 (2d Cir.1999)). The Second Circuit has held that a pretrial detainee may also set forth a constitutional due process violation by showing that the defendants conduct constituted "pre-conviction 'punishment' or involved an 'intent to punish.' " *Id.* (quoting *Benjamin v. Fraser,* 264 F.3d 175, 188 (2d Cir.2001)).

In *Murray v. Johnson,* the Second Circuit stated that the due process inquiry is articulated in the excessive force analysis under the Eighth Amendment in *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). *Id. Hudson* provides that both an objective and a subjective element must be satisfied to establish an excessive force claim. *Id.* at 49. To satisfy the objective element, the plaintiff must show that the resulting harm or deprivation was sufficiently serious. *Id.* (citing *Walsh,* 194 F.3d at 50). With respect to this element, the law is clear that "a claim of excessive force may be established even if the victim does not suffer 'serious' ... or 'significant' injury, ... provided that the amount of force used is more than 'de minimis,' or involves force that is 'repugnant to the conscience of mankind.' " *Walsh,* 194 F.3d at 47–48 (quoting *Hudson,* 503 U.S. at 7–10) (citations omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000) (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id* . (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the

extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

**B. Application**

**1. Cell Incident—November 10, 2010**

**\*13** After considering plaintiff's deposition, the affidavits of all the defendants involved, the exhibits, and the five factors outlined in *Hudson, supra,* this court finds that no rational jury could find that defendants used excessive force during the November 10, 2010 incident. There are no genuine issues of material fact in dispute. With respect to the defendants' mental state, they allege that plaintiff bumped defendant VanArnum twice with his shoulder and was warned after the first bump that a second bump would be considered "aggression." (VanArnum Aff. ¶ 5; Elliott Aff. ¶ 6). Plaintiff stated in his complaint, and admitted at his deposition, that he bumped defendant VanArnum, even though he claims he only accidentally bumped the defendant once. (Compl. at 20, ¶ 4). Plaintiff admittedly was unhappy about being directed to move back to a cell that he did not like. He admits that he initially questioned the move. (Compl. at 19, ¶ 2). Even if defendant VanArnum mistook plaintiff's initial bump as being aggressive,FN23 given plaintiff's initial expression of displeasure at moving to another cell and his history of difficult behavior,FN24 the resulting conduct was justified because defendant VanArnum "reasonably" perceived a threat, and defendants wanted to prevent any potentially violent conduct by plaintiff.

> FN23. Plaintiff stated that his shoulder was lowered in order to maneuver around defendant VanArnum, due to the size of the cell, however, the lowering of plaintiff's shoulder could also have been interpreted as an aggressive posture.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN24. Defendant Gene McKenna, the WCJ administrator has submitted an affidavit, in which he states that plaintiff spent most of his time in SITU while incarcerated in WCJ. (McKenna Aff. ¶ 5) (Dkt. No. 34–25). Defendant McKenna indicates that the disciplinary infractions causing plaintiff's confinement to SITU included numerous counts of disobeying staff; numerous counts of insolence toward corrections officers; numerous counts of disruptive conduct; numerous counts of making threats toward others; and numerous counts of engaging in violence or threats of violence. (*Id.*) Plaintiff also admitted that he had many disciplinary problems, and that he was ultimately transferred to Mid–State SITU because he had too many disciplinary tickets. (Pl.'s Dep. at 105).

Defendants' perception is further justified by plaintiff's statement that, as defendants were trying to take him to the floor, he was trying to back out of the cell so that the incident would be "captured" on video. (Compl. at 20, ¶ 6). Plaintiff states that defendant Fisher pulled plaintiff back into the cell. (*Id.*) The defendants could reasonably have perceived plaintiff's conduct in trying to back out of the cell as resistance, or worse, than an attempt to escape the officers. Plaintiff then states that as he was being pulled back into the cell, he

> turned and *fell on someone's foot,* and fell to the floor. As plaintiff fell, plaintiff struck his back on the cell's seat, Sergeant VanArnum fell to the floor also at the same time, causing plaintiff extreme pain.

(*Id.*) (emphasis added). Plaintiff claims that the defendants did not wait for him to apologize after he bumped into defendant VanArnum, however, given the perceived threat, the defendants would not have been unreasonable in failing to wait for plaintiff to "apologize," as he later claimed that he intended to do.FN25

FN25. This is assuming that plaintiff only bumped defendant VanArnum once as plaintiff claims. The court is making no such finding as all the evidence generated contemporaneously to the incident supports the defendants allegation that plaintiff bumped defendant VanArnum twice.

With respect to the amount of force used, defendants state that the extent of the force was only enough to bring plaintiff to the floor in an effort to gain control of a potentially violent situation. Plaintiff states that the defendants "took him" to the floor, but also claims to have tripped over someone's foot on the way down. Plaintiff alleges that after he and defendant VanArnum fell, defendant VanArnum placed his knee on plaintiff's chest and placed his hand on plaintiff's neck, causing him to choke. (*Id.*) Defendant Elliott and Fisher do not recall seeing defendant VanArnum with his knee on plaintiff's chest or his hand on plaintiff's neck. (Elliott Aff. ¶ 5; Fisher Aff. ¶ 4). Even assuming that somehow when defendant VanArnum fell, he hit plaintiff with his knee or his hand went to his neck, plaintiff admitted at his deposition, that when he told defendant VanArnum that he was choking, the defendant let plaintiff go.

**\*14** Plaintiff also admitted struggling and cursing at the officers, but that when he calmed down, he was let up off the floor and continued moving his belongings without further incident. Defendants Elliott and Fisher were only alleged to have held plaintiff as he fell. Thus, all the evidence suggests that the defendants used only the amount of force necessary to take plaintiff to the ground and only to maintain order.FN26 They did not maliciously intend to harm the plaintiff, and they ceased any use of force when plaintiff agreed to calm down.

FN26. Defendant VanArnum's warning to plaintiff was clearly an effort to avoid the use of any force at all.

While plaintiff still claimed that he was denied

the opportunity to see the nurse immediately, he admitted that he was examined within a few hours of the incident, and that, other than his alleged back pain, and some alleged "throat" pain, there were no bruises or other injuries sustained as a result of the incident. The medical examination showed two scratches on plaintiff's neck, and no bruises on his back or his body. He was prescribed Motrin and later, Flexiril. By his own admission, plaintiff's back injury, or the exacerbation of his pre-existing back injury,[FN27] was caused by striking the chair on the way down to the floor in what he admits was a small cell, not by defendants' allegedly "malicious" conduct .[FN28] Defendant Fisher suffered a knee injury as a result of the incident.

> FN27. The medical records indicate that plaintiff complained of "recurrent back pain" when he was admitted to the facility in July of 2010, contrary to plaintiff's allegation that he never had back pain before the November 10, 2010 incident. (Def.s' Ex. M at 8, 15) (Dkt. No. 34–14).

> FN28. During his deposition, he stated that he "inadvertently" hit the stool. (Pl.'s Dep. at 83).

As this incident is described by the defendants, they were simply responding to what they believed was an aggressive act by plaintiff, and they applied the force necessary to maintain order. At worst, even assuming many of the facts as alleged by plaintiff, the defendants' actions could be considered negligent.[FN29] A correction officer who negligently causes an unintended injury to an inmate has not engaged in the type of wanton or malicious conduct necessary to support an Eighth Amendment excessive force claim. *Daniels v. Williams,* 474 U.S. 327 (1986) (a state official's negligent act causing unintended loss of or injury to life, liberty, or property does not support a Section 1983 claim). *See also Epps v. City of Schenectady,* 1:10–CV–1101 (MAD/CFH), 2013 WL 717915, at *6 (N.D.N.Y. Feb. 27, 2013) (negligence cannot be a basis for liability for constitutional torts); *Cicio v.*

*Graham,* 9:08–CV–534 (NAM/DEP), 2010 WL 980272, at *13 (N.D.N.Y. Mar. 15, 2010) (citing *Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (liability in a § 1983 excessive force action cannot be founded on mere negligence) (collecting cases)). Thus, plaintiff's claim of excessive force on November 10, 2010 may be dismissed.

> FN29. None of the defendants recall plaintiff hitting the chair on the way to the floor, and defendant VanArnum states that he did not put his knee on plaintiff's chest. The court is not making any factual finding, nor do I need to make any factual finding regarding the details of the fall.

## 2. Law Library Incident—December 22, 2010

Plaintiff's argumentative nature precipitated the law library incident, and the same analysis applies as that used for the November 10, 2010 incident. Plaintiff was told that he had to leave the law library, even though his time was not up. Plaintiff admits arguing with defendant Peck about whether plaintiff could bring the JLM back to his cell, causing defendant Peck to call Sergeant Little .[FN30] When plaintiff became disruptive, defendant Little called for the "rovers" to help escort plaintiff back to his housing unit.

> FN30. Whether defendants Peck was incorrect about the JLM or whether the defendants were incorrect in forcing plaintiff to go back to his cell is not relevant. An inmate is required to follow officers' orders regardless of whether the inmate may believe that he is correct and the officers are wrong.

**\*15** Defendants allege that plaintiff refused to move, and then he intentionally dropped to the ground when the defendants tried to stand him up, while plaintiff claims that he tripped because the defendants made him walk too fast with leg restraints. There is no issue of excessive force at the beginning of the incident. The fact that plaintiff

was "dragged" a short distance and then carried back to his cell also does not rise to the level of excessive force. The defendants' conduct in dragging/carrying plaintiff was directly related to plaintiff's actions and was no more forceful than necessary to get him back to his cell.[FN31]

> FN31. During his deposition, plaintiff stated that the "dragging and carrying was the force used," but it was not "that long," only 3–5 feet, and he was not injured by the dragging. (Pl.'s Dep. at 80–81). Plaintiff also admitted that the defendants "took" plaintiff's actions "as me just trying to like sit down or lay down. Like come on." (*Id.* at 56). He also stated that, while he was not struggling or resisting, he was cursing at the defendants and telling them to "get the F off me." (*Id.*)

Plaintiff alleges that when he and defendants White, Little, M. Minor, and Jannson arrived at his cell, defendant White stood plaintiff up with his face against the bars in order to take off the handcuffs. While plaintiff states that defendant White gave him "a little stiff punch in the back," defendant White states that plaintiff snapped his head back, and White had to place his forearm against plaintiff's head while he was removing the handcuffs so that neither White, nor another officer, would be injured. (White Aff. ¶ 7). White denies punching plaintiff in any way, and defendant Little stated that she did not see defendant White strike plaintiff. Defendant Rivers/Schuyler, who was not involved in this incident states that she was monitoring the control room on December 22 and witnessed plaintiff's escort from the law library to his holding cell, but never saw defendant White strike or punch plaintiff. (Rivers/Schuyler Aff ¶ 4).

In *Vazquez v. Curcione,* No. 11–CV–443, 2013 WL 5408858, at *4–5 (W.D.N.Y. Sept.25, 2013), plaintiff, also a pretrial detainee, refused to leave the visitation room when directed to do so by the defendants. *Id.* at *2. In light of the plaintiff's refusal to leave the area, the court found that the defend-

ants were required to use reasonable force to remove plaintiff. *Id.* at *4. Plaintiff suffered moderate bruising and a "hurt back" as a result of the defendants' conduct, but the court found that these injuries were "de minimis" and did not result in anything more than short-term pain. *Id.* at *5. The court also found that plaintiff had not articulated facts from which it could be concluded that the force used by the defendants was gratuitous.[FN32] *Id.* at *5. The court granted summary judgment for the defendants on the excessive force claim.

> FN32. The court recognized that less serious injuries could support a claim of excessive force where the force used was excessive and gratuitous. *Vazquez,* 2013 WL 5408858, at *4 (citing *Lemmo v. McKoy,* No. 08–CV–4264, 2011 WL 843974, at *5 (E.D.N.Y. March 8, 2011) (twisting of plaintiff's thumbs was entirely gratuitous); *Davenport v. County of Suffolk,* No. 99–CV–3088, 2007 WL 608125, at *11 (E.D.N.Y. Feb.23, 2007) (denying summary judgment where defendant allegedly hit plaintiff's head against the car intentionally and unnecessarily); *Wilkins v. Gaddy,* 559 U.S. 34, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010) (an inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury).

In this case, in plaintiff's memorandum in opposition to defendant summary judgment motion, he has now embellished his allegations to include "shoving, punching, and swinging," but does not indicate to which alleged excessive force incident he is referring. (Pl.'s Mem. at 6) (Dkt. No. 37). Plaintiff never mentioned these actions in his complaint, or more importantly, during his deposition when he had the opportunity to testify regarding these incidents and was questioned closely about the actions taken by defendant White. Although plaintiff now states that he received medical treat-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment from the facility which would specifically show that he was "attacked" by the officers at WCJ, he never alleged an "attack" by officers, and a review of the medical evidence shows that plaintiff had no bruises, some small scratches and was prescribed medication for back pain that could have been exacerbated by falling to the floor during the first incident. (*See* Def.s' Ex. M at 8 (report of "recurrent back pain" on admission to WCJ), 10–11 (prescriptions), 19 (nurses' notes of the 11/10/10 incident)).

**\*16** The only part of plaintiff's factual statement and deposition testimony that could even approach "gratuitous" conduct, as the term was used in *Vasquez,* is the allegation that defendant White gave plaintiff "a little stiff punch" in the lower part of his back.[FN33] The rest of the evidence and plaintiff's inconsistent statements about the incident negates any suggestion that defendant White "punched" plaintiff. No reasonable fact finder could conclude that defendant White used force beyond that necessary to hold plaintiff's head still while plaintiff's handcuffs were being removed in order to prevent injury to himself and/or another officer. Defendants' actions show that they did not act maliciously or sadistically to cause plaintiff harm, but that they took actions that were directly related to plaintiff's behavior, using only force that was necessary to get plaintiff back to, and then into, his cell .[FN34] Plaintiff's excessive force claims may be dismissed.[FN35]

> FN33. The court notes that both plaintiff and defendant White state that White's left forearm was against plaintiff's head. While plaintiff alleges that White gave him a stiff little punch with his right hand, it is clear that defendant White was assisting the other officers in the removal of the handcuffs. The hand cuffs would probably have been at the level of plaintiff's low back. Thus, it is possible that plaintiff felt pressure in that area while defendants were trying to remove the handcuffs so that plaintiff

could be locked back in his cell. Defendant Jansson made a statement in connection with the disciplinary charges against plaintiff resulting from this incident. Defendant Jansson states that he was the officer who began to take the restraints off plaintiff, but that plaintiff was "resisting," and plaintiff was "restrained" by officers White and Minor, while defendant Jansson finished removing his restraints. (Def.s' Ex. B at 40). Sergeant Little and Officer White also made a statement in connection with the disciplinary charges. (*Id.* at 41, 42). The defendants all noted in their statements that plaintiff was verbally abusive during this incident and told defendant White that plaintiff would " 'fuck him up.' " (*See id.* at 41, 44).

> FN34. Finally, defendant McKenna points out that when plaintiff appealed the grievance relating to the law library incident, the New York State Commission of Correction Citizens Policy and Complaint Review Council ("CPCRC") viewed video evidence of the incident, but found that it did not substantiate plaintiff's claims. The CPCRC requested the video taped evidence. (Def. s' Ex. D at 9 (letter from CPCRC requesting additional evidence regarding the incident)). That video taped evidence has not been found. (*See* McKenna Aff. ¶ 7; Def.'s Ex. D at 21 (affirmance of denial of grievance), 22 (letter from counsel for the Commission on Correction, stating that the Commission did receive copies of the video footage, but "[u]nfortunately, said copies have since been lost or misplaced and are no longer maintained in the Commission's files."). The absence of the video footage does not change this court's findings because plaintiff's allegation of excessive force is contradicted by all the evidence, including his own statements. The court also notes

that in *McKinney v. Dzurenda,* No. 13–1901, 2014 WL 642572, at *1 (2d Cir. Feb.20, 2014), the Second Circuit reaffirmed the holding that when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no jury could possibly believe it, the court should not adopt that version for purposes of ruling on a motion for summary judgment.

FN35. The court would point out that plaintiff only alleges that defendant White used any force on him during the law library incident. Defendant Peck did not leave the law library and was not present for the alleged "punch." Defendant Little states that she did not see White strike plaintiff, and plaintiff testified that M. Minor never used any force during the incident. (Pl.'s Dep. at 94). Plaintiff never mentioned the third rover. In order for any officers present at the use of force to be held liable for "failure to intervene," they would have to have had the opportunity to stop the unconstitutional conduct. If at worst plaintiff alleges one "little" punch, none of the other officers would have had the opportunity to stop that conduct because it was over as soon as it happened. Thus, even if the case were to proceed on the law library incident, it would proceed only as against defendant White.

## IV. *Conditions of Confinement*

### A. Legal Standards

As stated above, plaintiff was a pretrial detainee at the time of the incidents in this case. As such, he was protected from unconstitutional living conditions by the Due Process Clause of the Fourteenth Amendment, but the standards for his due process protection are the same as those that protect convicted inmates from Cruel and Unusual Punishment under the 8th Amendment. *LaRock v. Amato,* No.

9:12–CV–503, 2013 WL 5466410, at *9 (N.D.N.Y. Sept.30, 2013) (citations omitted).

The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Prison officials "must 'take reasonable measures to guarantee the safety of inmates.' " *Farmer v. Brennan,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer,* 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway,* 37 F.3d at 66 (quoting *Wilson v. Seiter,* 501 U.S. at 298). A defendant must have known of a substantial risk to inmate safety that he or she could have easily prevented but did not. *Hall v. Bennett,* 379 F.3d 462, 464 (7th Cir.2004).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (citing *Wilson v. Seiter,* 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer,* 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway,* 37 F.3d at 66. The official must both be

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

*17 The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Carlson v. Parry,* No. 06–CV–6621, 2012 U.S. Dist. LEXIS 44292, at *20–21, 2012 WL 1067866 (W.D.N.Y. March 29, 2012) (collecting cases). "A risk can be so obvious that a jury may reasonably infer actual knowledge on the part of the defendant[ ] sufficient to satisfy the subjective component of the deliberateindifference standard. *Id.* (citing *Farmer,* 511 U.S. at 842; *Proffitt v. Ridgeway,* 279 F.3d 503, 506 (7th Cir.2002); *Bagola v. Kindt,* 131 F.3d 632, 646 (7th Cir.1997)). Common sense is relevant to deciding the obviousness of the risk. *See Hall v. Bennett,* 379 F.3d at 465 (citing *Fruit v. Norris,* 905 F.2d 1147, 1150–51 (8th Cir.1990)).

A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

A plaintiff fails to state a valid Eighth Amendment claim when he does not allege that defendant

was personally aware of a dangerous condition or that defendant was deliberately indifferent to the alleged conditions. *Spencer v. Sylvester,* No. 97–CV–5491, 1999 U.S. Dist. LEXIS 1098, at *8–9, 1999 WL 61644 (E.D.N.Y. Feb 2, 1999) (Eighth Amendment claim was dismissed when plaintiff did not allege defendant was personally aware of slippery conditions on stairs or that the defendant was deliberately indifferent to the conditions). A plaintiff states a claim where he alleges that he informed the defendant of a dangerous condition and the defendant ordered plaintiff to ignore it. *See Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (inmate who fell off a ladder during a work assignment stated an Eighth Amendment claim when a defendant correction officer ordered plaintiff to continue working on the latter after being informed that the ladder was unsafe); *see also Baumann v. Walsh,* 36 F.Supp.2d 508, 513–15 (N.D.N.Y.1999) (differing accounts as to whether defendant had notice of an unsafe work condition and whether a ladder was available for plaintiff to use created genuine issues of fact that defeated defendants' motion for summary judgment).

**B. Application**

*18 Plaintiff alleges that he was housed in unconstitutional conditions because defendants moved him back to D–11, which was "extremely" cold, and he was denied an extra blanket. Plaintiff also claims that he was denied a shower once, and that on December 14, 2010, he was moved from SHU C–6 to C–10 that was cold and "extremely dirty," but was denied cleaning supplies. (Compl. ¶ 1 at 26). Plaintiff alleges that after Sergeant Jamieson refused to give plaintiff cleaning supplies, he turned off the water to plaintiff's sink and toilet. At one point, plaintiff alleged that he was without water for two weeks.

**1. Cell Conditions**

Plaintiff claims that cell D–11 was extremely cold, and that he was denied an extra blanket. Plaintiff filed at least three grievances regarding the temperature in his cell. (Def.'s Exs. E–G). The first

grievance was filed the day after plaintiff was moved from D–8 ***back to*** D–11 on November 10, 2010.[FN36](Def.s' Ex. E at 2) (Dkt. No. 34–6). The grievance was investigated, and denied after the maintenance department checked and determined that the temperature in D–11 was "adequate" and "within normal limits." (*Id.* at 2). The investigation documents also indicate that there were no issues of temperature in "one particular cell" as being different than the other cells on the unit.[FN37] (*Id.*) The CPCRC denied plaintiff's appeal. (*Id.* at 7).

> [FN36]. Defendants have also filed a "Cell Movement Log," showing the dates that plaintiff was housed in a particular cell for the entire time that plaintiff was incarcerated at WCJ. (Def.s' Ex. H at 9). Plaintiff was only housed in D–11 for approximately one month. (*Id.*)

> [FN37]. The investigator also found that plaintiff did not like D–11 because it was further away from the television and from other inmates. (Def. s' Ex. E at 5).

Plaintiff's second grievance was filed on December 6, 2010, one month after his first grievance regarding the temperature and four days before he was moved to C–6. (Def.s' Ex. F at 2). Plaintiff states that no other inmate in D pod was complaining about the cold in his cell.[FN38] (*Id.*) On December 9, 2010, the grievance investigator stated that the temperature in plaintiff's cell had been "measured by maintenance" and was in "compliance." (*Id.* at 3). Once again, it was noted that plaintiff was attempting to get his cell moved closer to the television. (*Id.* at 5). Plaintiff's grievance was denied at the facility level and on December 14, 2010, was sent to the CPCRC. (*Id.* at 5, 6). The appeal was denied. (*Id.* at 7).

> [FN38]. Specifically plaintiff stated: "I asks [sic] every inmate in D pod is they [sic] cell cold [sic] they tell me no and always tell me its [sic] cold in your cell I can feel it over here (meaning) out side of my

cell...." (Def.s' Ex. F at 2).

On December 10, 2010, plaintiff was moved to C–6. (Def.s' Ex. H at 9). Plaintiff did not mention asking for an extra blanket until his third grievance, dated December 16, 2010, after he was moved from C–6 to C–10 on December 14, 2010 for disciplinary reasons. (Def.s' Ex. G and H). In this grievance, plaintiff complained that when he got to C–10, at approximately 9:30 to 10:00 p.m., this cell was cold. (Def.'s Ex. G at 2). Plaintiff stated that he asked Officer Jackson for an extra blanket, but the officer would not give him one. (*Id.*) Plaintiff also claimed that C–10 was dirty, and that he asked to clean it, but was denied cleaning supplies. Plaintiff stated in his grievance that the cell was "no were [sic] near clean," and that his sink and toilet water had been shut off. (*Id.*)

**\*19** The grievance investigator indicated that he spoke with staff, and that plaintiff complained about the temperature in every cell. (*Id.* at 4). The investigator also stated that second blankets were only issued if "medically necessary." (*Id.*) It was later determined that this response was incorrect, and plaintiff was issued a second blanket according to the SHU rules, which provide for a second blanket to be issued during the winter months. (*Id.* at 3; *see id.* at 11 (SHU Rule # 8)) (notation signed by Lt. Breeyear on December 28, 2010). (*Id.* at 3) Plaintiff appealed the decision, without noting that the blanket issue had been resolved, and the appeal was sent to the CPCRC. (*Id.* at 6).

On February 2, 2011, the CPCRC asked the facility for more information, explaining the denial of the extra blanket,[FN39] explaining why plaintiff's request for grievance documents was delayed, explaining why the request to clean his cell was denied, and why his cell did not have water. (*Id.* at 7). In response, Officer Jackson submitted a statement, explaining that plaintiff was moved from C–6 to C–10 because he was yelling at, and threatening, the inmates housed in the minimum security dormitory. (*Id.* at 8). During his deposition, plaintiff stated he never threatened other inmates, merely

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

that he had a "verbally ... disrespectful conversation with an inmate saying FU, A hole, and things like that to each other." (Pl.'s Dep. at 70). Although plaintiff stated that he was arguing with only one inmate, the fact that he was cursing at anyone justified moving him for disciplinary purposes.

> FN39. Apparently the CPCRC was not aware that plaintiff was given an extra blanket long before the appeal was sent on January 3, 2011. Officer Jamieson stated that plaintiff was given a blanket on December 15, 2010, even before he filed the grievance on December 16, 2010. (Def.s' Ex. H at 13).

Defendant Jackson further stated that plaintiff's belongings were moved from C–6 to C–10 while he was getting a haircut. (Def.s' Ex. G at 8). Defendant Jackson states that he inspected C–10 and found that it was clean. When plaintiff was escorted to C–10, he was agitated and continued to yell at inmates and officers. He then began to yell that he wished to clean his cell, but was told that the cell was checked and found clean prior to the move, and that while he was continuing to be disruptive, he would not be allowed to clean the cell. (*Id.*) Defendant Jackson states that a short time later, plaintiff asked to use a typewriter, but Sergeant Jamieson denied the request based upon plaintiff's disruptive behavior. (*Id.*) The shift log entry confirms that plaintiff's request for the typewriter at 9:30 p.m. was denied "for the night" because of his disruptive behavior. (*Id.* at 10).

Sergeant Jackson stated at approximately 10:45 p.m., he noticed water running into the hallway in front of C–10. Plaintiff had plugged his toilet causing a flood in his cell and hallway. Officer Jackson contacted Sergeant Jamieson, who ordered that plaintiff's water be turned off "until further notice." (*Id.* at 8). The only reason that plaintiff's water was turned off was because he was flooding his cell with the toilet. The shift log entry confirms these statements. (*Id.* at 9). This response was even more reasonable, given plaintiff's conduct on December

12, 2010, which included flooding his cell by filling cups of water from his sink and throwing them under the door. (*See* Lascar Aff. ¶ 6). After considering the additional information, on July 27, 2011, the CPCRC denied plaintiff's appeal, noting only that the facility rules did not require medical approval for an extra blanket, and that the grievance coordinator either misunderstood the rules or lacked interest in addressing the grievance properly. (*Id.* at 18).

**\*20** Plaintiff filed another grievance on December 17, 2010, relative to the move to C–10. In the second grievance he complained about his property, the cleanliness of the cell, and the water. (Def.s' Ex. H at 2). The grievance investigator interpreted the grievance as a complaint about moving plaintiff to C–10 while he was not present. FN40 (*Id.* at 4). The grievance was denied because plaintiff had engaged in "uncooperative behavior," and housing assignments are at the discretion of facility staff. (*Id.* at 4). The CRCPC responded by outlining plaintiff's five separate issues and requesting additional information because "the grievance officer's response is illustrative of an incomplete understanding of the grievant's complaint and the range of subjects that are not grievable...." (*Id.* at 7–8). The CRCPC then outlined the additional information that it sought. (*Id.*)

> FN40. Plaintiff's belongings were presumably moved while he was not in his cell in order to avoid another incident like the one on November 10, 2010.

Defendants submitted the additional information as requested, including shift log entries from the date in question, reporting plaintiff's yelling threatening remarks to inmates in the minimum security dormitory, and indicating that he was moved to "limit his contact to min[imum security] inmates." (*Id.* at 10–12). Sergeant Jamieson submitted a statement, confirming that plaintiff was moved because of his disruptive behavior, his belongings were placed on the bunk, not on the floor, and the cell was clean. (*Id.* at 13). Finally, Sergeant

Jamieson stated that the water to plaintiff's toilet was turned off because plaintiff flooded the cell. (*Id.*)

Sergeant Jamieson also stated that Sergeant Lascar had informed him on December 15, 2010, that plaintiff wanted an extra blanket, and that plaintiff was given the second blanket. Plaintiff advised Sergeant Lascar that "the grievance was over." Sergeant Jamieson also stated that plaintiff's drinking water was never turned off because the jail staff only has the ability to turn off the water to the toilet. (*Id.* at 13). Sergeant Jamieson did not recall plaintiff asking to have his water restored on December 18, 2010 because Sergeant Jamieson did not know that the water was off at that time. (*Id.*) At his deposition, plaintiff admitted that the water was turned on so that he could flush the toilet every couple of days. (Pl.'s Dep. at 63). Although he states that he did not drink for a couple of weeks, there is no mention of drinking in his grievances. It would have been reasonable for plaintiff to have included that in one of his many grievances regarding these incidents. He would presumably have been able to drink at meals.

Sergeant Lascar also submitted a statement to the CRCPC. (*Id.* at 14). He explained the decision to move plaintiff to C–10 based upon his behavior. Defendant Lascar stated that he spoke with the minimum security inmates and with plaintiff and ordered them to stop yelling at each other. Although the minimum security inmates complied with this order, plaintiff would not be reasonable. (*Id.*) After considering the additional information, the CRCPC voted to deny plaintiff's appeal.

**\*21** The Second Circuit has held that proof that an inmate was subjected "for a prolonged period to bitter cold" will raise a triable issue of fact relative to the objective prong of the constitutional analysis. *Gaston v. Coughlin,* 249 F.3d 156, 164–65 (2d Cir.2001) (citing *inter alia Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988) (inmate deliberately exposed to bitter cold in his cell block for three months); *Wright v. McMann,* 387 F.2d 519, 527 (2d

Cir.1967)). However, summary judgment is appropriate when the inmate has not been exposed to bitter cold for "a prolonged period." *Louis–Charles v. Courtwright,* No. 9:11–CV–147, 2014 WL 457951, at \*7–8 (N.D.N.Y. Feb.4, 2014) (adopting Rep't Rec.) (sua sponte dismissing claims in which the inmate testified that on three occasions, he was subjected to cold conditions for, at most, ten hours) (citing *Trammell v. Keane,* 338 F.3d 155, 159, 165 (2d Cir.2003) (plaintiff was deprived of his clothing and confined to his cell for a few weeks, but the temperature was not such as to pose a threat to his health and safety of the sort that would prevent summary judgment in defendants' favor).

In this case, plaintiff was in the WCJ for approximately five months from July of 2010 until January of 2011. During this time, he was housed in various cells, all in the SHU. Plaintiff was moved to D–11 for the first time on October 30, 2010, and he only stayed there until November 4, 2010. He was moved to D–8 for "reorganization" purposes because prison officials needed D–11 for other inmates. He was then taken back to D–11 and remained there for approximately one month. He claims that D–11 was the only cold cell on the unit because he stated that none of the other inmates had trouble with the temperature.[FN41]

> [FN41]. In his grievance, plaintiff alleged that he asked "every inmate in D Pod." (Def. s' Ex. F at 2).

When he was moved to C–6 on December 10, 2010, he could not behave himself and was disruptive with other inmates, thus, he was moved to C–10. He then complained that C–10 was cold and dirty. Every time he was moved to a cell that he did not like, he complained about the temperature. The defendants have also shown that when plaintiff asked for a blanket, the request was initially denied, but he was ultimately given another blanket. The temperature in plaintiff's cell was checked twice by the maintenance department according to the grievance documents, and each time, it was noted that the temperature was in compliance with the proper

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

standards. Plaintiff has not shown that he was subjected to "bitter cold" for a "prolonged" period of time or that the temperature in his cell posed a threat to his health. *See also Borges v. McGinnis,* No. 03 Civ. 6375, 2007 WL 1232227, at *5 (W.D.N.Y. April. 26, 2007) (an inmate may not establish a constitutional violation merely by showing that he was uncomfortably cold for a short period of time).

Finally, although plaintiff testified that he never flooded his cell, the unit log books contradict plaintiff's allegation. Plaintiff does not contest the accuracy or veracity of the log book entry that clearly shows that plaintiff's water was turned off "due to inmate flooding cell." (Def.s' Ex. H at 12). Plaintiff's conclusory allegations are insufficient to defeat the defendants' motion for summary judgment. *See Inesti v. Hogan,* No. 11 Civ. 2596, 2013 WL 791540, at *23 & n. 39 (S.D.N.Y. March 5, 2013) (although it is unlikely that prison log books would reflect the wrongful denial of a constitutional right, plaintiff did not contest the accuracy of the log books, and his conclusory allegations were insufficient to defeat the defendants' motion for summary judgment), Rep't Rec. *adopted by* 2013 WL 5677046 (S.D.N.Y. Sept.30, 2013); *Headly v. Fisher,* No. 06 Civ 6331, 2010 WL 2595091, at *4 (S.D.N.Y. June 28, 2010) (contemporaneous log book entries eliminate any genuine issue of material fact that plaintiff was not deprived of opportunities to shower or go to recreation while under keeplock status).

**\*22** It has been held that chronic exposure to unsanitary conditions and prolonged cold may establish a constitutional violation. *See Gaston v. Coughlin,* 249 F.3d 156, 165 (2d Cir.2001). In *Gaston,* however, mice were constantly entering the cell, and for several consecutive days, the area in front of plaintiff's cell was filled with human waste, and sewage water, there were broken windows in Gaston's cell block, and despite numerous complaints, the windows were *not* fixed the entire winter, exposing inmates to *sub-zero temperatures.*

*Id.* In this case, as stated above, plaintiff was given an extra blanket; his cells seemed to be the only ones having a temperature problem (a highly unlikely situation);[FN42] and he admits that his water was turned on every couple of days so that he could flush the toilet.[FN43] Plaintiff alleges no ill effects as the result of the allegedly unsanitary or unhealthy condition of his cell.

> [FN42]. Defendant Jamieson states that "all WCJ housing units are controlled by central thermostat, which is regularly monitored by maintenance and set and maintained at temperatures prescribed by New York state law." (Jamieson Aff. ¶ 6). Thus, it is highly unlikely that only one cell on the unit was so unbearably cold.

> [FN43]. Defendants do not concede that plaintiff's water was turned off for an extended period of time. As defendant Jamieson stated, he did not recall plaintiff asking to have his water turned on December 18, nor was defendant Jamieson aware that the water was off because the jail staff did not have access to turn the drinking water off, only the toilet water. (Def.s' Ex. H at 13). In defendant Jamieson's affidavit, he states that as a result of plaintiff's repeated attempts to flood his unit, his water was turned off for short periods of time. During those *short* intervals, plaintiff could request to have his water temporarily turned back on by making this request to the corrections officer who was making rounds to allow him to use the facilities in his cell. (Jamieson Aff. ¶ 7). Defendant Dougherty's affidavit also states that plaintiff's water was never turned off for more than a few hours at a time, and was turned back on so that plaintiff could "use the toilet and/or drinking fountain under direct supervision." (Dougherty Aff. ¶ 7).

Plaintiff's inconsistent allegations do not create material issues of fact sufficient to defeat defend-

ants' summary judgment motion. *See Scott v. Harris,* 550 U.S. 372, 379–81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (when opposing parties tell two different stories, one of which is blatantly contradicted by the record evidence, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment); *McKinney v. Dzurenda, supra; Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account"); *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case"). Thus, plaintiff's claim of cold and unsanitary cell conditions may be dismissed.[FN44]

> **FN44.** In any event, the only defendants that were involved in the plaintiff's challenged conditions of confinement were defendants Lascar; Jamieson; and Jackson.

## 2. Shower

In his complaint, plaintiff alleges only that he was denied a shower once by defendant Rivers/Schuyler and Sergeant VanArnum. (Compl. ¶¶ 1–3 at 28 (top of page)). At his deposition, plaintiff stated that he was not denied a shower "too many times." (Pl.'s Dep. at 66). Even assuming that plaintiff was denied the shower once, this circuit has rejected claims of shower deprivation, lasting up to two weeks. *See Williams v. Ramos,* No. 13 CV 826, 2013 WL 7017674, at *6 (S.D.N.Y. December 23, 2013) (deprivation of shower for nine days) (citing *Banks v. Argo,* No. 11 Civ. 4222, 2012 WL 4471585, at *4 (S.D.N.Y. Sept.25, 2012) ("[E]ven assuming prison officials denied Plaintiff shower access for the entire time alleged in his complaint-thirteen days-his claim still fails as a matter of law.") (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) ("[A] two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs.' ")).

**\*23** The court notes that plaintiff's first grievance regarding shower privileges was dated December 16, 2010[FN45] and stated that "at or around 8:30—9:00 I ask [sic] the officer Ms. 'Rivers' can I get a shower." (Def.s' Ex. K at 2) (Dkt. No. 34–11). Plaintiff states that he was refused his shower because Sergeant VanArnum said that plaintiff was not getting anything. (*Id.*) Plaintiff stated that he had not had a shower in four days.[FN46] (*Id.*) Plaintiff's grievance was denied because he did not follow the SHU rules for requesting a shower which required plaintiff to be at his cell door at 8 a.m. to request a shower. (*Id.*) A copy of the SHU rules was included in the grievance documents. (*Id.* at 6). Rule No. 2 of the "Special Housing Rules for All Inmates" provides that "ALL INMATES WHO WISH TO SHOWER AND SHAVE WILL BE AT THEIR CELL DOOR AT **8 AM** AND REQUEST TO DO SO TO THE UNIT OFFICER." (*Id.*) (emphasis added). By plaintiff's own admission, he was half an hour late to request a shower, thus, even if defendant Rivers/Schuyler did deny plaintiff a shower, she did so according to facility rules.[FN47] Plaintiff's shower claim may be dismissed. This is the only allegation remaining[FN48] against defendant Rivers/Schuyler, and thus, the complaint may be dismissed in its entirety as against this defendant.

> **FN45.** Plaintiff indicated in the grievance that the date of the shower happened on December 15, but that he was not given the grievance form until the next day. (Def. s' Ex. J at 2).

> **FN46.** As stated above, the deprivation of a shower for up to two weeks has been re-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

jected as the basis for a constitutional violation. Thus, defendant Rivers/Schuyler did not violate plaintiff's constitutional rights when she denied him a shower on December 15, 2010.

FN47. On December 22, 2010, the same day as the law library incident described above, plaintiff filed another grievance regarding the denial of a shower. (Def.'s Ex. K at 2) (Dkt. No. 34–12). However, in that grievance, plaintiff admitted being late, but argued that he went to the law library and missed the shower call, not that he failed to get up in time. He stated that he had been told he would get the shower when he got back, but CO "Peck" and Sergeant "Little" "made a problem in the law library because I was right by the Facility Rules...." (*Id.*) Plaintiff requested his shower if that was possible. (*Id.*) The grievance was denied at the facility level and ultimately on appeal to the Commission on Correction. (*Id.* at 4–7). It is clear from the documents that plaintiff concedes that he was not at his cell at the appropriate time in order to request the shower, and he then became disruptive at the law library causing the incident described above. Clearly, the subsequent denial of a shower was justified under the rules and did not violate plaintiff's constitutional rights. In any event, plaintiff did not challenge this denial in his complaint.

FN48. At plaintiff's deposition, he testified that he was not sure why he sued Officer Rivers/ Schuyler. (Pl.'s Dep. at 99). He stated that he thought he named defendant Rivers/Schuyler because she denied him the ability to type up a motion, and he could not recall whether she ever denied him a shower. (*Id.*) The complaint does allege that this defendant denied him a shower on one occasion. Judge D'Agostino

has dismissed any claims regarding access to courts. Thus, any claim that Rivers/ Schuyler denied plaintiff the ability to type a motion has already been dismissed, and I am recommending dismissal of plaintiff's shower claim.

## V. *Religious Services*

### A. Legal Standards

The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). The right is not extinguished simply because the inmate is in SHU or keeplock. *Id.* (citing *Salahudin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993)). However, the right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04–CV–57, 2007 WL 3046703, at *4 (N.D.N.Y. Oct.17, 2007).

To succeed on a claim under the Free Exercise Clause, the plaintiff must show at the threshold, that the defendants' conduct "substantially burdens his sincerely held religious beliefs." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 (S.D.N.Y.2008) (quoting *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). The issue of whether a "substantial burden" is required has been discussed at length, and although not specifically decided, recent cases still apply the requirement to Free Exercise cases. *See Walker v. Artus,* No. 9:10–CV–1431(MAD/DEP), 2013 WL 564909, at *8–9 (N.D.N.Y. Sept. 30, 2013) (citing *Salahuddin,* 467 F.3d at 274–75).

The Religious Land Use and Institutionalized Persons Act ("RLUIPA") also protects inmates' religious rights.FN49 RLUIPA prohibits the govern-

ment from imposing a substantial burden on a pris-oner's religious exercise unless the burden is the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. § 2000cc-l(a). For a burden to be substantial, a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith. In addi-tion, this interference must be more than an incon-venience; the burden must be substantial and an interference with a tenet or belief that is central to re-ligious doctrine. *Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Graham v. Mah-mood,* No. 05–10071, 2008 WL 1849167, at * 14 (S.D.N.Y. Apr.22, 2008); *Gill v. Defrank,* No. 98 Civ. 7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin,* 963 F.Supp.2d 227, 230 (W.D.N.Y.1997)).

> FN49. Plaintiff did not mention RLUIPA in his complaint. However, in his memor-andum in opposition to defendants' motion, plaintiff has included a random article from "Wikipedia" discussing RLUIPA. (Pl .'s Ex. H) (Dkt. No. 37 at 45–50). Plaintiff does not make any arguments relative to this article. He only includes it as an ex-hibit with much of the article underlined, most of which has nothing to do with this case. However, in an attempt to interpret plaintiff's claims as liberally as possible, this court will also analyze plaintiff's reli-gion claim under RLUIPA. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a pro se party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they sug-gest")).

**B. Application**

**\*24** In this case, plaintiff can not establish the first prong of either the Free Exercise or the RLUIPA standard. Plaintiff claims that on two oc-casions, he was denied the ability to attend a bible

study class. First, plaintiff never mentions what re-ligion he follows. While this is not conclusive, plaintiff also does not allege how this denial sub-stantially burdened the exercise of his religion. Plaintiff was incarcerated in WCJ from July of 2010 until late January of 2011, and he only com-plained of missing his bible study on two occasions, once on December 14, 2010 FN50 by defendant Hafner, and the second time on January 8, 2011 by defendants R. Minor and Lascar. Neither defendant Hafner, nor defendant R. Minor recall denying plaintiff the ability to go to Bible Study on Decem-ber 14, 2010. (Hafner Aff. ¶ 5; R. Minor Aff. ¶ 6).

> FN50. Although the complaint states that the date of the first incident was December 19, 2010, the grievance plaintiff filed states that the date was December 14, 2010, and was filed on December 20, 2010. (Def.s' Ex. L at 2). In this grievance, plaintiff never specified who denied him the ability to go to bible study.

The grievance plaintiff filed regarding the December 14, 2010 incident did not indicate which officer denied plaintiff the ability to attend Bible Study, and there is no indication that an investiga-tion was conducted or that any officer was inter-viewed regarding the incident. (Def.s' Ex. L at 2). Plaintiff was more specific in his second grievance and alleged that R. Minor and defendant Lascar denied plaintiff the ability to attend the Bible Study because it was considered "a program" and thus, plaintiff did not have to go. (*Id.* at 3). The only in-vestigation document states that the grievance was denied because plaintiff caused a disturbance on the date in question. (*Id.* at 4). Although plaintiff's grievance was granted regarding this issue, it is not indicative of a constitutional violation on its own.

The court notes that, according to Officer Mari-on Bassett, plaintiff attended "WCJ's Bible Study Program" on December 5, 2010. (Bassett Aff. ¶ 3) (Dkt. No. 34–15). Officer Bassett remembers this because on his way back from bible study, plaintiff punched the window in front of the control room

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

where Officer Bassett was standing "and then flipped [her] his middle finger," and yelled at her " 'you know where I live, come and get me.' " (*Id.*) (emphasis in original).

The court will assume that plaintiff was denied the ability to attend Bible Study on two occasions. In *Gill v. DeFrank,* the court held, agreeing with those courts in the Second Circuit which hold,[FN51] that missing one religious service does not constitute a substantial burden on an inmate's right to the free exercise of his religion. 2000 WL 897152, at *2 (citing *Troy v. Kuhlmann,* No. 96 Civ. 7190, 1999 WL 825622, at *15 (S.D.N.Y. Oct.15, 1999); *Boomer v. Irvin,* 963 F.Supp. at 15). *See also Hanton v. Mathiau,* 29 F. App'x 772, 773 (2d Cir.2002) (affirming district court granting summary judgment based on a denial of religious services on two separate occasions); *Smith v. Graziano,* No. 9:08–CV–469(GLS/RFT), 2010 WL 1330019, at *9 (N.D.N.Y. March 16, 2010) (cancellation of two religious services which appeared to be isolated occurrences, rather than a systemic policy of denying religious services constituted a de minimis or insubstantial burden on plaintiff's ability to freely exercise his religion).

> FN51. There is a split of authority regarding whether missing one religious service can be a substantial burden on an inmate's right to practice his religion. *Robinson v. Jimminez,* No. 08–CV902, 2012 WL 1038917, at *6 (E.D.N.Y. March 6, 2012) (citing *Page v. Breslin,* No. 02–CV–6030, 2004 WL 2713266, at *6 (E.D.N.Y. Nov.29, 2004) (citing cases)), *Rep't Rec. adopted,* 2012 WL 1039825 (E.D.N.Y. March 8, 2012).

**\*25** This court agrees that based on the facts in this case, plaintiff's inability to attend two bible study classes in the six months that he was incarcerated at WCJ did not substantially burden the ability to practice his religion. There is no indication that plaintiff was not able to study the bible on his own during the two incidents in question. Thus,

plaintiff's first amendment claim, and to the extent the court reads a RLIUPA claim into the complaint, may be dismissed.

**VI.** *Municipal Liability*

**A. Legal Standards**

The court notes that Judge D'Agostino dismissed the "Washington County Sheriff's Department as a defendant in her July 16, 2012 decision and ordered the Clerk to replace the Sheriff's Department with "Washington County" in the caption of the complaint. (Dkt. No. 7 at 6 n. 3). Judge D'Agostino also discussed the standard for municipal liability which requires that the municipality adopt a "custom" or "policy" which is the moving force behind plaintiff's constitutional violation. *Id.* at 5 (citing *Zappala v. Albicelli,* 980 F.Supp. 635, 639 (N.D.N.Y.1997) (citing *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 659, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). A municipality may not be held liable on the basis of respondeat superior alone, and a single incident alleged in a complaint, particularly if it involves only actors below the policymaking level, will not suffice to raise an inference of the existence of a custom or policy. *Id.* (citing *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993)). In addition, plaintiff may not simply allege that there was a failure to train municipal employees or assert in a conclusory manner that the municipality has a custom or policy. *Id.*

**B. Application**

Because this court has found no constitutional violations, there is no need to discuss municipal liability, and the complaint may be dismissed as against Washington County. The court would note that plaintiff's assertions of "custom" or "policy" at the end of many of his claims were entirely conclusory. *See e.g.* Compl. at 23, ¶ 5) (stating that it was the WCJ's "policy or custom regarding lack of basic necessities" that caused the violation of plaintiff's Fourteenth Amendment due process rights).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 1289582 (N.D.N.Y.)
**(Cite as: 2014 WL 1289582 (N.D.N.Y.))**

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 34) be **GRANTED,** and the complaint be **DISMISSED IN ITS ENTIRETY AS AGAINST ALL REMAINING DEFENDANTS.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**\*26** Filed Feb. 21, 2014.

N.D.N.Y.,2014.
Flake v. Peck
Slip Copy, 2014 WL 1289582 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1232227 (W.D.N.Y.)

(Cite as: 2007 WL 1232227 (W.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Domingo BORGES, Plaintiff
v.
Superintendent Michael McGINNIS, et al., Defendants.
No. 03-CV-6375 CJS.

April 26, 2007.
Domingo Borges, Marcy, NY, pro se.

Gary M. Levine, New York State Office of the Attorney General, Rochester, NY, for Defendants.

DECISION AND ORDER

CHARLES J. SIRAGUSA, United States District Judge.

**\*1** This is an action in which the plaintiff, a prison inmate, is suing concerning his conditions of confinement, pursuant to 42 U.S.C. § 1983. Now before the Court is defendants' motion [# 45] for summary judgment. For the reasons that follow, the application is granted and this action is dismissed.

BACKGROUND

Unless otherwise noted, the following facts are taken from defendants' Rule 56 Statement of Facts, which is uncontested.[FN1] At all relevant times, plaintiff was an inmate at Southport Correctional Facility ("Southport"). On or about November 24, 2001, corrections staff at Southport observed plaintiff receive from a visitor (his mother) what appeared to be contraband drugs. Suspecting that plaintiff had subsequently ingested the contraband, corrections staff placed him in an observation cell, where he remained from 1:00 p.m. on November 24, 2001 until 12:20 p.m. on November 27, 2001. Plaintiff was videotaped during this entire period, except when he covered the camera, and in support of the instant motion, defendants submitted to the Court 10 VHS videotapes of plaintiff in the cell.

FN1. "All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." Local Rule 56.1(c).

The observation cell was "a strip cell which is used for one on one drug watch." (Pl.Dep.19). According to Department of Correctional Services' ("DOCS") Directive 4910, inmates suspected of ingesting contraband are kept in such observation rooms until they twice pass stools that are negative for contraband. (McGinnis Aff. [# 56], Ex. A). Plaintiff's observation cell contained only a sleeping platform. There was not a functioning toilet, though plaintiff was provided with a bedpan when he needed to urinate or defecate.

When he was placed in the isolation cell, plaintiff was given a paper gown, paper shoes, and a thin mattress. Plaintiff requested that he also be given a blanket, to which he was entitled pursuant to Directive 4910. However, staff refused to provide a blanket, because they were unaware that it was required by Directive 4910. More specifically, Corrections Officer ("C.O.") Scott Marshall ("Marshall") states, in an affidavit, that he inadvertently failed to provide plaintiff with a blanket, because he thought that plaintiff was supposed to be treated similarly to inmates who are on suicide watch, who do not receive blankets. (Marshall Aff. [# 55] ).

On or about November 25th, plaintiff punched a glass window in his cell. Though he did not damage the glass, plaintiff later indicated that he thought his hand was broken. A staff nurse, Carmen Miller, R.N. ("Miller"), examined plaintiff's hand on November 26th and reported "zero swelling, zero deformity. Good range of motion. No apparent distress." (Pl.Dep.71). There is no indication that plaintiff's hand actually was fractured, or that he suffered anything more than temporary discomfort from punching the window.

Early on November 26, 2001, plaintiff covered the video camera monitoring his cell with a piece of his paper

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1232227 (W.D.N.Y.)

(Cite as: 2007 WL 1232227 (W.D.N.Y.))

gown. Corrections staff gave plaintiff several direct orders to remove the obstruction, but he refused. Later that day, plaintiff asked Sergeant Gary Morse ("Morse") for a blanket. Morse spoke with Captain Joseph Bellinier ("Bellnier"), who indicated that, pursuant to Directive 4910, plaintiff was entitled to receive a pillow, sheets, and blanket. Bellnier also issued a written memorandum to that effect. However, as a result of plaintiff covering the video camera and refusing the direct orders to remove the obstruction, another supervisor, Captain William Wilcox ("Wilcox"), placed a deprivation order against plaintiff, depriving him of "bed linen, pillow, [and] blankets," though he was allowed to keep his mattress and gown. (Wilcox Aff. [# 68] Ex. A). In other words, although plaintiff would have received a blanket pursuant to Bellnier's order had he not covered the camera, he did not receive a blanket due to the resulting deprivation order.

**2** Once plaintiff removed the paper obstruction from the camera, Sergeant Morse brought him hot water, a basin, soap, washcloth, toothbrush, and toothpaste. (Pl.Dep.57). Later that day plaintiff returned the hygiene items, and corrections staff found a balloon containing marijuana hidden inside the toothpaste tube. (Bellnier Aff. [# 50], Ex. B, p. 4). Plaintiff was later found guilty of possessing marijuana at a tier disciplinary hearing, and served 12 months in the Segregated Housing Unit. (Pl.Dep.62-63).

In addition to the personal hygiene items detailed above, corrections staff also provided plaintiff with his regular meals during his stay in the observation room, though he alleges that he was denied breakfast on the morning of November 26th. (Pl.Dep.65-66).

During the three-day period that plaintiff was in the isolation cell, outside temperatures at Southport ranged between 62 and 40 degrees Fahrenheit. Plaintiff contends that a window in his cell was open during this period. However, while it is undisputed that plaintiff complained about the cell being cold, there is no indication that he complained specifically about the window being open. Plaintiff does not know what the temperature was in the cell, but he estimates that it was "probably 50 degrees, around there. Probably less." (Pl.Dep.27). In general, he contends that it was "cold." (Pl.Dep.24-26). Defendants,

on the other hand, indicate that the indoor temperature during that period was not extremely cold. (Pl.Dep.26). Plaintiff did not suffer any physical injuries as a result of being kept in the isolation cell, except that he claims to have caught a cold, which lasted "a couple of days." (Pl.Dep.58-60).

Corrections officers observing plaintiff made notes in a log every 15 minutes during his stay in the observation room. (Bellnier Aff. [# 50] Ex. C). Many, if not most, of the entries indicate that plaintiff was lying on the bed, asleep or appearing to be asleep. Other entries indicate that plaintiff was exercising, walking around the cell, sitting on the floor, or looking out the window. (*Id.*). These observations appear accurate, based on the Court's viewing of randomly-selected portions of the videotape exhibits. Plaintiff was removed from the cell temporarily on the morning of November 27th, so that the cell could be cleaned.

Plaintiff had no problems or "bad blood or ill will" with any of the defendants prior to being placed in isolation. (Pl.Dep.8-9). Although plaintiff contends that corrections staff denied his requests for a blanket, he does not contend that they verbally abused him or used any type of epithet toward him.

Defendants filed the subject summary judgment motion on December 28, 2005. In support of the motion, defendants submitted affidavits from the individual defendants, the aforementioned video tapes, photographs of the cell, log notes, climatological data, and plaintiff's deposition transcript. The affidavits of Superintendent Michael McGinnis ("McGinnis"), Deputy Superintendent Michael Corcoran ("Corcoran"), Assistant Deputy Superintendent Lawrence Weingartner ("Weingartner"), Lt. David Augustine ("Augustine"), Lt. Richard Donahue ("Donahue"), and Lt. Charles Marshall ("Marshall") all essentially indicate that they did not personally know that plaintiff was in the observation cell or that he was complaining of being cold. On the other hand, Bellnier, Wilcox, Morse, Miller, Marshall, Sgt. Richard Moriarty ("Moriarty"), Sgt. John Morton ("Morton"), C.O. William Meck ("Meck"), C.O. James O'Herron ("O'Herron"), C.O. Kevin Qualey ("Qualey"), C.O. Lynn Rice ("Rice"), C.O. Douglas Westervelt ("Westervelt"), C.O. Alan Wheeler

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1232227 (W.D.N.Y.)

(Cite as: 2007 WL 1232227 (W.D.N.Y.))

("Wheeler"), and C.O. Byron Potter ("Potter"), all essentially indicate that they knew that plaintiff was in the observation cell, but deny that the cell was dangerously cold, though some acknowledge that plaintiff complained to them of being cold. And finally, defendant Thomas Giltner ("Giltner") indicates that he was not employed at Southport during the relevant three-day period. Defendants contend that: 1) all claims against them in their official capacities must be dismissed; 2) plaintiff has not established a factual basis for imposing supervisory liability; and 3) plaintiff's conditions of confinement did not violate the Eighth Amendment.

**\*3** As part of defendants' motion, they filed and served a "Notice to Pro Se Litigants Opposing Summary Judgment" as required by Local Rule 56.2 and *Irby v. New York City Transit Authority,* 262 F.3d 412 (2d Cir.2001). *See,* Notice [# 71]. The Court subsequently issued a Motion Scheduling Order [# 72], which directed plaintiff to file and serve a response on or before February 28, 2006. Plaintiff has never filed a response to the summary judgment motion, although he has filed an amended complaint, which amended the caption of the action, as well as a motion for appointment of counsel, which was denied.

### ANALYSIS

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's

claim." *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir.1996)(*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied,* 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson,* 477 U.S. at 249; *see also,* FED.R.CIV.P. 56(e)("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED.R.CIV.P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

**\*4** At the outset, the Court notes that, because plaintiff is proceeding *pro se,* the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, plaintiff did not respond to defendants' motion, even though he was specifically advised of the requirements of Rule 56. In that regard, the Court notes that Rule 56(e) is clear that, when a properly supported summary judgment motion is made, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Based upon the entire record, the Court does not believe that plaintiff's failure was inadvertent. Rather, it appears that the facts of his claim

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1232227 (W.D.N.Y.)

(Cite as: 2007 WL 1232227 (W.D.N.Y.))

are truly not in dispute, and that the motion can be resolved as a matter of law.

Turning, then, to the merits of plaintiff's claim, he is suing pursuant to 42 U.S.C. § 1983. The principles of law applicable to such claims are well settled:

In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. See, e.g., Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977).

* * *

An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir.1996). Personal involvement can be shown by: evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring. See Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995).

Back v. Hastings On Hudson Union Free Sch. Dist., 365 F.3d 107, 122, 127 (2d Cir.2004).

Here, plaintiff contends that defendants violated his Eighth Amendment rights by keeping him in a cold cell for three days without a blanket. For claims alleging unconstitutional conditions of confinement, it is clear that

*5 a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994). The Second Circuit has stated the elements of such a claim as follows:

While the Eighth Amendment's prohibition against cruel and unusual punishment does not mandate comfortable prisons, the conditions of confinement must be at least humane. In order to establish a violation of his Eighth Amendment rights, an inmate must show (1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) a sufficiently culpable state of mind on the part of the defendant official, such as deliberate indifference to inmate health or safety. A prison official may be found to have had a sufficiently culpable state of mind if he participated directly in the alleged event, or learned of the inmate's complaint and failed to remedy it, or created or permitted a policy that harmed the inmate, or acted with gross negligence in managing subordinates.

Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir.2001) (citations and internal quotations omitted).

As to the objective prong of the analysis set forth above, "an Eighth Amendment claim may be established by proof that the inmate was subjected for a prolonged period to bitter cold." Id. (citing Corselli v. Coughlin, 842 F.2d 23 (2d Cir.1988)). However, an inmate cannot establish an Eighth Amendment claim merely by establishing that he was uncomfortably cold for a short period. For example, in Grant v. Riley, No. 89 Civ. 0359(MBM), 1993 WL 485600 at *4 (S.D.N.Y. Nov.24, 1993), the court granted summary judgment for defendants, stating:

Plaintiff's Eighth Amendment claim is based on the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1232227 (W.D.N.Y.)

(Cite as: 2007 WL 1232227 (W.D.N.Y.))

allegation that there was no heat in his cell for at least 3 days. Plaintiff asserts that he had no coat, bedding or blankets for over nine hours, and that cold wind blew through the broken windows, which were incompletely covered with loose plastic. This Circuit has found that "deliberate exposure of inmates by prison authorities to bitter cold while in solitary confinement would be evidence of cruel and unusual punishment." *Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988). However, plaintiff does not claim that any defendant deliberately subjected him to the cold, and has alleged only a three-day period of exposure. *See Roach v. Kligman,* 412 F.Supp. 521, 527 (E.D.Pa.1976) (short period in cold, leaky cell does not violate Eighth Amendment). Furthermore, plaintiff did not suffer any harm as a result of these conditions. Plaintiff thus has failed to allege treatment that offends "broad and idealistic concepts of dignity, civilized standards, humanity, and decency," *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and has not stated an Eighth Amendment claim.

**\*6** (Some internal quotation marks omitted); *see also, Smith v. Burge,* No. 9:03-CV-0955 (LEK/GHL), 2006 WL 2805242 at \*7 (N.D.N.Y. Sep.28, 2006) (" "Heat is a basic human need; and claims of lack of heat may state a claim. If, however, the condition is not sufficiently prolonged or severe, it does not rise to the level of an Eighth Amendment violation.") (citations omitted).

In this case, plaintiff was kept in an observation cell for three days, because corrections staff were attempting to recover contraband which plaintiff had ingested during a visit with his mother. Defendants' suspicions in this regard were well-founded, and they eventually recovered a quantity of marijuana inside a balloon, which apparently plaintiff had swallowed. Although plaintiff was not given a blanket, he was given a paper gown, paper slippers, and a thin mattress. In this regard, plaintiff was treated in the same manner as inmates on suicide watch. As to the mattress, the Court notes that it was a thin mattress pad that plaintiff actually used as both a shawl and a blanket. Plaintiff spent much of his time lying on the bed, covered with the "mattress," and apparently asleep. For reasons that no one has explained, a window in the cell was open, and the cell temperature was around 50 degrees, which

undoubtedly and unfortunately made plaintiff uncomfortable. Plaintiff was provided with meals, personal hygiene items, and medical attention. Moreover, it is undisputed that plaintiff would have been provided with a blanket on November 26th if he had not violated facility rules by covering the security camera.

Overall, plaintiff does not allege that he suffered anything more than frustration and discomfort as a consequence of the coldness of his cell. Thus, his claim does not rise to the level of a condition of confinement that violates the Eighth Amendment. Moreover, even if plaintiff could establish the objective element of an Eighth Amendment claim, he has not submitted evidentiary proof in admissible form to refute defendants' affidavits averring that they were not subjectively deliberately indifferent to his condition. Further, even assuming, *arguendo* that plaintiff had established an Eighth Amendment violation as to some defendants, which he has not done, the official capacity claims and supervisory liability claims would nevertheless have to be dismissed, as plaintiff has not established any basis for them. Finally, Giltner would be entitled to summary judgment in any event, because there is no evidence that he was employed at Southport on the relevant dates.

CONCLUSION

For all of the foregoing reasons, defendants' summary judgment motion [# 45] is granted and this action is dismissed.

So Ordered.

W.D.N.Y.,2007.

Borges v. McGinnis
Not Reported in F.Supp.2d, 2007 WL 1232227 (W.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3911414 (W.D.N.Y.)
**(Cite as: 2010 WL 3911414 (W.D.N.Y.))**



Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
W.D. New York.
Jeffrey ALLRED, Plaintiff,
v.
Captain KNOWLES, Hearing Officer Sgt. Noto,
Defendants.

No. 06–CV–0456Sr.
Oct. 5, 2010.

Jeffrey Allred, Queensvillage, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo, NY, for Defendants.

### *DECISION AND ORDER*
H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

**\*1** Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including entry of final judgment. Dkt. # 14.

Plaintiff, Jeffrey Allred, filed this *pro se* action seeking relief pursuant to 42 U.S.C. § 1983. Dkt. # 1. Plaintiff alleges that while an inmate at the Gowanda Correctional Facility ("Gowanda") his rights pursuant to the First, Eighth, and Fourteenth Amendments to the United States Constitution were violated. *Id.* Currently before the Court is defendants' motion for summary judgment. Dkt. # 18. For the following reasons, defendants' motion for summary judgment is granted and the plaintiff's complaint is dismissed in all respects.

### *BACKGROUND*
Plaintiff filed this action on July 11, 2006, against defendants, Michael Knowles and Louis

Noto, pursuant to 42 U.S.C § 1983, seeking monetary damages. *Id.* The action arises from a misbehavior report issued on or about July 27, 2003 by defendant Noto against plaintiff and the resulting Tier III disciplinary hearing conducted by defendant Knowles. *Id.* Specifically, the complaint alleges the issuance of a false misbehavior report, retaliation and violation of plaintiff's due process rights. *Id.*

At the time of the events alleged in the complaint, plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS") housed at Gowanda. Dkt. # 1, p. 2; Dkt. # 20, p. 1. Defendant Knowles was a Captain at Gowanda and his duties included, from time to time, conducting inmate disciplinary hearings. Dkt. # 1, pp. 3–4; Dkt. # 21, pp. 1–2. Sergeant Noto was a DOCS Sergeant on plaintiff's housing unit at Gowanda. Dkt. # 1, p. 4; Dkt. # 22, pp. 1–2.

On July 22, 2003, at approximately 8:30 p.m., Correctional Officer Millich discovered several marijuana cigarettes during a search of inmate Meja's cell. Dkt. # 22, p. 3. Consequently, defendant Noto initiated an investigation into the matter. Dkt. # 1, p. 8; Dkt. # 22, p. 3. Defendant Noto maintained that Meja told him that he had purchased the marijuana cigarettes from plaintiff. Dkt. # 22, p. 3. Based on Meja's identification of plaintiff and information allegedly received from confidential informant(s)—who identified plaintiff as a drug dealer and indicated that the sale in question occurred between 7:00 and 8:00 p.m. on July 22, 2003 in the prison yard—defendant Noto issued a misbehavior report charging plaintiff with violating Inmate Rule 113.25. Dkt. # 1, pp. 22 and 25; Dkt. # 22, p. 3. Inmate Rule 113.25 provides that "an inmate shall not make, possess, sell or exchange any narcotic, narcotic paraphernalia, controlled substance or marijuana. An inmate shall not conspire with any person to introduce such items into the facility." Dkt. # 22, p. 2; *see also* 7 NYCRR § 270.2(14)(xv).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

On July 28, 2003, a Tier III disciplinary hearing was conducted before defendant Knowles. Dkt. # 1, p. 23; Dkt. # 21, p. 2. At the hearing, plaintiff testified in his own defense that he was at a Nation of Islam ("NOI")/Black studies program during the period of the alleged drug sale in the prison yard. Dkt. # 1, p. 24; Dkt. # 21, p .6. Plaintiff called two other inmates, Ford and Williams, as alibi witnesses. Dkt. # 1, p. 29; Dkt. # 21, p. 7. Ford and Williams attended the NOI/Black studies program with plaintiff, but could not verify the time plaintiff left. Dkt. # 21, pp. 7 and 16. The sign-out sheet for the NOI/Black studies class did not indicate the time plaintiff left, although it indicated that both Ford and Williams left at 7:00 p.m. *Id.* Plaintiff did not sign back into his housing unit until 8:10 p.m. and no one was able to verify his whereabouts after 7:00 p.m. Dkt. # 21, p. 17. Defendant Knowles interviewed the confidential informant(s) outside the presence of plaintiff and found them to be credible witnesses. Dkt. # 21, pp. 7–8. The confidential informant(s) identified plaintiff as a drug dealer and indicated that the sale of the drugs to Meja occurred between 7:00–8:00 p.m. in the prison yard. *Id.* Meja also testified at the hearing, and recanted his initial identification of plaintiff as the person who sold him drugs. Dkt. # 1, p. 26; Dkt. # 21, p. 11. When asked by defendant Knowles why he initially told defendant Noto that plaintiff was the individual who sold him drugs, Meja answered that he did so because he wanted defendant Noto to "leave [him] alone." Dkt. # 24, Ex. D, p 5. In response, defendant Knowles asked Meja to confirm, by answering in either the affirmative or the negative, if he initially identified plaintiff as the individual who sold him drugs, to which Meja answered in the affirmative. *Id.*

**\*2** On August 3, 2003, at the close of the disciplinary hearing, defendant Knowles entered a guilty finding against plaintiff. Dkt. # 24, Ex. C. Based on the Hearing Disposition Report completed by defendant Knowles, he based his guilt determination on the following evidence: defendant Noto's misbehavior report and his testimony that Meja initially identified plaintiff as the individual who sold Meja drugs in the yard; and the testimony of the confidential informant(s). *Id.* Defendant Knowles imposed a penalty of 12 months of confinement in special housing unit ("SHU") and a loss of privileges between the period August 22, 2003 and August 22, 2004.

***DISCUSSION AND ANALYSIS***
**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982. A party seeking to defeat a motion for summary judgment must do more than make broad factual allegations and invoke the ap-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

propriate statute. The non-moving party must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

Pursuant to Fed.R.Civ.P. 56(e), affidavits in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Thus, affidavits "must be admissible themselves or must contain evidence that will be presented in an admissible form at trial." *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir.2001), *citing Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454–55 (2d Cir.1991) (hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in an affidavit).

**Due Process Claim**

**\*3** Plaintiff alleges that defendants deprived him of his constitutional right to procedural due process. Dkt. # 1, p. 42. This allegation appears to be based on the following: (1) that he was not afforded all of the procedural safeguards set forth in *Wolff v. McDonnell*[FN1] during the Tier III disciplinary hearing; and (2) that defendant Knowles was not an impartial hearing officer.

> FN1. 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1975).

To prevail on a procedural due process claim under § 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998).

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In assessing whether the discipline imposed rises to this level, the Court of Appeals for the Second Circuit has directed the district courts to consider both the conditions of confinement and their duration, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Id.,* quoting *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999). In light of this standard, the Court of Appeals has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights" and has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 64–65.

Notwithstanding the foregoing, courts in this Circuit "generally require that the duration of confinement be at least 100 days" to be categorized as constituting an "atypical and significant hardship." *Palmer v. Goss,* No. 02 Civ 5804(HB), 2003 U.S. Dist. LEXIS 18103, 2003 WL 22327110 (S.D.N.Y. Oct. 10, 2003), *aff'd, Palmer,* 364 F.3d 60; *Sims v. Artuz,* 230 F.3d 14, 24 (2d Cir.2003) (vacating dismissal of, *inter alia,* procedural due process claims, stating, during little more than a 4 1/2 month period, Sims was sentenced to SHU for a total of nearly 3 1/2 years); *Durran v. Selsky,* 251 F.Supp.2d 1208, 1214 (W.D.N.Y.2003) (quoting *Tookes v. Artuz,* No. 00CIV4969, 2002 U.S. Dist. LEXIS 12540, 2002 WL 1484391 (S.D.N.Y. July 11, 2002)) ("[c]ourts in this Circuit routinely hold that an inmate's confinement in special housing for 101 days

Not Reported in F.Supp.2d, 2010 WL 3911414 (W.D.N.Y.)
**(Cite as: 2010 WL 3911414 (W.D.N.Y.))**

or less, absent additional egregious circumstances, does not implicate a liberty interest."); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (instructing district courts to develop detailed factual records "in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days"). Here, following the Tier III disciplinary hearing, defendant Knowles imposed a penalty of 12 months of confinement in SHU and a loss of privileges between the period August 22, 2003 and August 22, 2004. Thus, there can be no dispute that plaintiff has demonstrated a protected liberty interest. The issue that remains and that which will be addressed below, is whether plaintiff was deprived of that protected liberty interest without due process. Defendants maintain that plaintiff was not. Dkt. # 21, p. 2; Dkt. # 22, p. 7.

**\*4** In *Wolff,* the Supreme Court enumerated certain procedural safeguards that must be afforded to an inmate during the course of a prison disciplinary proceeding in order to ensure that the minimum requirements of procedural due process are satisfied. *Wolff,* 418 U.S. at 563–66. Specifically, the Supreme Court identified the following procedures: advance written notice of the claimed violation or charges; the opportunity for an inmate to call witnesses and present documentary evidence in his/her defense, provided that such a process would not jeopardize institutional safety; and a written statement by the fact finder of the evidence relied upon and the reasons for the disciplinary action taken. *Id* . Additionally, the findings must be supported by some evidence in the record. *Walpole v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

Here, contrary to plaintiff's contention, he was afforded all of the procedural safeguards set forth in *Wolff.* Dkt. # 24, p 4–5. Plaintiff was provided with a copy of defendant Noto's misbehavior report before the hearing, giving him advance notice of the charge against him.[FN2] Dkt. # 1, p. 22; Dkt. # 21, p. 5. Plaintiff had the opportunity to call witnesses and present evidence. Dkt. # 1, pp. 26, 29; Dkt. #

21, pp. 6, 8. Plaintiff was also provided with a written statement of the guilty finding and the evidence relied on for the disposition. Dkt. # 21, p. 12. The guilty disposition was supported by evidence in the form of defendant Noto's notes; defendant Noto's misbehavior report and testimony; and the testimony of the confidential informant(s), particularly because plaintiff's alibi was uncorroborated. *Id.* at pp. 10–11. Thus, plaintiff's claim that he was deprived of procedural due process fails as a matter of law.

> FN2. Plaintiff concedes this fact. However, he suggests that he was deprived of his due process rights under the standard set forth in *Wolff* because defendant Knowles found him guilty of drug possession, rather than sale of a narcotic substance, which he was charged with in the misbehavior report. Dkt. # 24, p 5. However, inmate Rule 113.25, which plaintiff was charged with in the misbehavior report and found guilty of at the close of the Tier III hearing, encompasses possession ***and*** sale of a narcotic. Dkt. # 21, pp. 5 and 19.

**Impartial Hearing Officer**

Plaintiff contends, in particular, that his due process rights were violated because defendant Knowles was not an impartial hearing officer. *See* Dkt. # 1, p. 6–8. Plaintiff points to the following to support his allegation: (1) that defendant Knowles was involved in both the Tier III hearing and in the investigation into plaintiff's drug sale; (2) that defendant Knowles instructed Meja to respond affirmatively at the hearing that plaintiff had sold Meja drugs although Meja testified at the hearing that he did not know plaintiff; and (3) that defendant Knowles rejected his alibi and confused the time of the drug sale at issue. Dkt. # 1, pp. 28, 39; Dkt. # 24, p. 6.

Indeed, as plaintiff correctly contends, "[a]n inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see Wolff,* 418 U.S. at

570–71; *Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994). An impartial hearing officer "is one who, inter alia, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

**\*5** It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46 ("Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46. A hearing officer may satisfy the standard of impartiality if there is *"some evidence* in the record" to support the findings of the hearing. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (emphasis added).

In this case, there is ample evidence to support defendant Knowles' guilty finding: defendant Noto's misbehavior report and his testimony that Meja originally identified plaintiff as the individual who sold him drugs; and the testimony of the confidential informant(s), which was considered outside the presence of plaintiff. Dkt. # 21, pp. 8–9.

Notably, plaintiff's only defense at the Tier III hearing was that he had been at an NOI/Black studies program at the time of the drug sale, which took place allegedly between 7:00–8:00 p.m. Dkt. # 21, p. 7. However, inmates Ford and Williams could not verify plaintiff's alibi defense. *Id.* Because plaintiff did not sign back into his cell area until 8:10 p.m., defendant Knowles determined that there was ample time for plaintiff to sell the drugs in the yard during the period of his unexplained absence. Dkt. # 21, pp. 7, 16–18.

Plaintiff further contends that defendant Knowles violated his constitutional right to due process by failing to adhere to the state guidelines for conducting prison disciplinary hearings (set forth in Title 7 of the NYCRR §§ 253.1(b), 254.1 FN3) because, he alleges, that defendant Knowles conducted the Tier III hearing and was also involved in the investigation of plaintiff's drug sale. Dkt. # 24, p 6.

> FN3. 7 NYCRR § 253.1 gives superintendents the discretion to designate DOCS employees to conduct disciplinary hearings. Pursuant to § 253.1(b), "[n]o person who has participated in any investigation of the acts shall be a hearing officer at a hearing relating to those acts, nor shall any person who has prepared or caused to be prepared the misbehavior report on which a hearing is held, act as the hearing officer on that charge." Section § 254.1 of 7 NYCRR precludes a person who was a witness to or who investigated an incident that is the subject of a disciplinary proceeding from acting as a hearing officer relating to that incident.

This argument fails because violations of state law that do not deprive the plaintiff of a right "secured by the Constitution and laws" are insufficient to support a claim under § 1983. *See Baker v. McCollan,* 443 U.S. 137, 139–40, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Shakur v. Selsky,* 391 F.3d 106, 119 (2d Cir.2004); *Blouin v. Spitzer,* 356 F.3d 348, 362 (2d Cir.2004). State procedural protections do not give rise to substantive federal rights. *See Olim v. Wakinekona,* 461 U.S. 238, 249–50, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Holcomb v. Lykens,* 337 F.3d 217, 224 (2d Cir.2003) ("[S]tate statutes do not create federally protected due process entitlements to specific state-mandated procedures."). Moreover, "[s]tate procedures designed to protect substantive liberty interests entitled to pro-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

tection under the federal constitution do not themselves give rise to additional substantive liberty interests." *Blouin,* 356 F.3d at 363. It is "federal law, not state regulations, [that] determines the procedures necessary to protect that liberty interest ." *Id.* (citing *Watson v. City of New York,* 92 F.3d 31, 38 (2d Cir.1996)). Therefore, "the only relevant inquiry was whether the constitutional [procedures] were met, not whether state procedures were followed." *Shakur,* 391 F.3d at 119 (citing *Holcomb,* 337 F.3d at 224). As set forth above, plaintiff's constitutional rights were not violated during the Tier III hearing. Plaintiff's exclusive reliance on defendants' alleged violations of 7 NYCRR §§ 253.1(b) and 254.1 is insufficient to support his claim under § 1983. *See Shakur,* 391 F.3d at 119; *Holcomb,* 337 F.3d at 224; *Ramsey v. Goord,* 661 F.Supp.2d 370, 391–92 (W.D.N.Y.2009).

**\*6** Accordingly, since plaintiff received all of the process he was due in the course of the Tier III disciplinary hearing, defendants' motion for summary judgment on plaintiff's due process claim is granted.

**Retaliation Claim**

Plaintiff alleges that, in retaliation for attending a Nation of Islam ("NOI")/Black Studies course and/or for his affiliation therewith, defendant Noto filed a false misbehavior report and gave false testimony and that defendant Knowles found him guilty. Dkt. # 1, p. 43.

"In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for 'adverse action' taken against him by defendants." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,*

239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), superseded by 2003 U.S.App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citing *Dawes,* 239 F.3d at 491). Accordingly, plaintiff must set forth nonconclusory allegations. *Id.* Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.*

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

**\*7** Here, even assuming plaintiff's affiliation

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

with the NOI/Black studies program was constitutionally protected conduct, he cannot show that his affiliation therewith was a substantial motivating factor for the filing of the misbehavior report and the subsequent finding of guilt concerning the report. Defendant Knowles declares that he "did not even recall plaintiff prior to the hearing he conducted," and had no involvement whatsoever in any NOI activities. Dkt. # 21, p. 22. Similarly, defendant Noto declares that he had no knowledge of plaintiff's participation in the NOI/Black Studies program, and, up until the time of the instant litigation, "did not know that plaintiff attended such a course or was a member of the NOI." Dkt. # 22, p. 6. To this extent, plaintiff cannot demonstrate that his affiliation with the NOI/Black studies program was a motivating factor in defendants' actions. Since plaintiff cannot establish any plausible connection between NOI/Black studies participation and the misbehavior report and the guilty finding, his retaliation claim fails as a matter of law.

Assuming, *arguendo,* that plaintiff could show that the disciplinary actions were motivated by retaliatory animus (an assumption that has no basis in the record before this Court), plaintiff's retaliation claims would fail because defendants can easily show that they would have taken the same disciplinary actions even in the absence of the protected conduct. *See Davidson v. Chestnut,* 193 F.3d at 149 ("At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail."). The record shows that there was sufficient evidence, based on defendant Noto's investigation, to have charged plaintiff with a drug sale. Further, there was ample evidence at the Tier III disciplinary hearing for defendant Knowles to find plaintiff guilty of the drug sale charge. This is so particularly in the context of prison administration where courts must be cautious to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

Accordingly, defendants' motion for summary judgment on plaintiff's claim of retaliation is granted.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. Dkt. # 18. The Clerk of the Court is directed to enter judgment in favor of the defendants.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**\*8 SO ORDERED.**

W.D.N.Y.,2010.
Allred v. Knowles
Not Reported in F.Supp.2d, 2010 WL 3911414 (W.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 610652 (N.D.N.Y.)
**(Cite as: 1997 WL 610652 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Timothy DUMPSON, Plaintiff,
v.
Captain ROURKE; Hans Walker, Superintendent,
Auburn Correctional Facility; Donald Selsky, Dir-
ector of Department of Correctional Services; and
Du Seitz, Hearing Officer Defendants.

No. CIVA96CV621 (RSP/GJD)
Sept. 26, 1997.

Timothy Dumpson, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney Gener-
al, New York State Department of Law, The Capit-
ol, Albany, New York, Howard L. Zwickel, Assist-
ant Attorney General, of Counsel.

*ORDER*

POOLER, J.

*1 The above matter comes to me following a
Report–Recommendation by Magistrate Judge
Gustave J. Di Bianco, duly filed on the 2nd day of
September, 1997. Following ten days from the ser-
vice thereof, the Clerk has sent me the entire file,
including any and all objections filed by the parties
herein.

Plaintiff Timothy Dumpson, an inmate incar-
cerated in the state of New York, brought this civil
rights action alleging violations of his rights to due
process of law and freedom from cruel and unusual
punishment in connection with a Tier III disciplin-
ary hearing held on March 18, 1994, and the sub-
sequent punishment imposed of one day of
keeplock and a seven day restricted diet. The ma-
gistrate judge recommended that I dismiss
Dumpson's complaint n its entirety and deny his re-
sponse filed as a cross-motion. Dumpson has filed
objections to the report-recommendation.

I review the sections of the magistrate judge's
report-recommendation to which Dumpson has
filed specific objections *de nov. See* 28 U.S.C. §
636(b); Fed.R.Civ.P. 72(b). I review the remainder
of the report-recommendation for clear error.

Dumpson contends primarily that his due pro-
cess and Eighth Amendment claims against defend-
ant Seitz should be allowed to go forward because
Seitz (1) violated state by failing to interview in-
mate Green, who refused to testify at Dumpson's
disciplinary hearing, to ascertain the reasons for
Green's refusal and (2) imposed a seven day restric-
ted diet which Dumpson was unable to eat without
becoming ill. Dumpson contends that Seitz's viola-
tion of state law rises to the level of a due process
violation and that imposition of the restricted diet
constitutes cruel and unusual punishment.

I conclude that the magistrate judge correctly
held that the hearing officer's failure to investigate
the reasons for inmate Green's refusal to testify
does not constitute a due process violation. As
noted in the report-recommendation, when a hear-
ing officer denies an inmate witness, due process
requires only that officials provide some explana-
tion either at the time of the hearing or sub-
sequently in court. *Russell v. Selsky,* 35 F.3d 55, 58
(2d Cir.1994) (citing *Ponte v. Real,* 471 U.S. 491,
498–99, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985)). In
this case officials have stated that inmate Green re-
fused to testify. The Hearing Record Sheet signed
by defendant Seitz also notes that Green refused to
testify. Dkt. No. 15, Ex. A. Finally, a Witness Re-
fusal Form indicating that Green both refused to
testify and refused to sign the form is attached and
signed by a corrections officer. *Id.* Yet another cor-
rections officer noted at the bottom of the form that
he specifically asked Green to provide a reason for
his refusal and Green refused to provide further in-
formation. *Id.* When an inmate refuses to testify, a
hearing officer need not call the witness, *Silva v.
Casey,* 992 F.2d 20, 22 (2d Cir.1993), or make an
independent investigation into the refusal to testify,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Greene v. Coughlin,* 1995 WL 60020, *14 (S.D.N.Y.). Consequently, Seitz's failure to investigate Green's refusal to testify does not constitute a due process violation.

**\*2** Dumpson's Eighth Amendment claim also fails. As the magistrate judge noted, plaintiff alleges that he suffered because of his refusal to accept the food offered to him on the restricted diet, not that the diet harmed him in any way. In addition, Dumpson does not allege that the restricted diet was nutritionally inadequate and doest not controvert defendant Walker's statement that the diet includes a "nutritionally adequate loaf and cabbage." Walker Aff. at ¶¶ 4, 5. Although Dumpson alleges in his objections that he refused the food offered on the restricted diet because he knew from past experience that the food would make him sick, I do not find those allegations in the pleadings. In addition, Dumpson does not allege that he informed prison officials that the restricted die food had made him sick in the past. Dumpson failed to contest defendants' statement that Dumpson never complained about the diet. Consequently, Dumpson fails to state a claim of an Eighth Amendment violation, and his Eighth Amendment claims are dismissed.

However, the magistrate judge has recommended that I dismiss Dumpson's Eighth Amendment claim against Seitz without prejudice in light of recent developments in the Second Circuit with regard to this issue. *See Phelps v. Kapnolas,* 123 F.3d 91, 1997 WL 469904 (2d Cir.). I agree, and I dismiss Dumpson's Eighth Amendment claim against Seitz only without prejudice.

Dumpson's remaining objections are general in nature. Therefore, finding no clear error, I adopt the magistrate judge's report-recommendation with respect to the remaining issues.

After careful review of all of the papers herein, including the Magistrate Judge's Report–Recommendation, and the objections submitted thereto, it is

ORDERED, that:

1. The Report–Recommendation is hereby approved;

2. The departments' motions are granted and the action dismissed for the reasons set forth in the Magistrate Judge's Report;

3. The plaintiff's cross-motion is denied; and

3. The Clerk shall serve a copy of this Order on the parties by regular mail.

IT IS SO ORDERED.

REPORT–RECOMMENDATION
GUSTAVE J. DI BIANCO, Magistrate J.
This matter was referred to the undersigned for report and recommendation by the Honorable Rosemary S. Pooler, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rules N.D.N.Y. 72.3(c).

In the instant civil rights complaint, plaintiff alleges that he was denied due process of law in connection with a Tier III disciplinary hearing held against him, beginning on March 18, 1994, and as a result of which, he received the sanctions of one day of keeplock FN1 and a seven day restricted diet. Plaintiff also alleges an Eighth Amendment violation as the result of the imposition of the diet.

> FN1. Keeplock is a form of confinement which can be administrative or disciplinary, and which involves an inmate's confinement to his own cell, deprived of participation in normal prison routine, and denied contact with other inmates. *See Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989) (defining administrative keeplock).

Plaintiff seeks injunctive and monetary relief.

Presently before the court is a motion for summary judgment filed on benefit of defendants Sel-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

sky, Walker, and Seitz [FN2] pursuant to FED.R.CIV.P. 56 (Docket # 14). Plaintiff responded to the defendants' motion [FN3] (Docket # 19). Defendant Rourke [FN4] has filed a motion for judgment on the pleadings pursuant to FED.R.CIV .P. 12(c) (Docket # 20). On February 3, 1997, plaintiff filed his "Second Reply for Cross–Motion in Opposition for Summary Judgment" [FN5] (Docket # 23).

> FN2. The plaintiff mistakenly referred to defendant Seitz as "Duseitz" in the complaint. It is clear, however, that Lieutenant Seitz was the Hearing officer in plaintiff's case and will be referred to by his correct name. The court would also point out that originally, the plaintiff sued Philip Coombe, Jr. in addition to the other defendants. Philip Coombe, Jr. is the present Commissioner of the Department of Correctional Services. However, the plaintiff submitted an amended complaint, in which he deleted Coombe as a defendant. Therefore, Philip Coombe, Jr. is no longer in this action and does not need to be included in the motion for summary judgment.

> FN3. Plaintiff labeled his response as "Notice of Motion Reply to Opposition for Summary Judgment" (Docket # 19). The document is merely a responsible to the defendants' motion.

> FN4. Defendant Rourke was not included in the defendants' motion for summary judgment because he had not been served at the time.

> FN5. Plaintiff labeled his responsible as "Cross–Motion", and it was docketed as such, but the document is merely a response to the defendants' motion (Docket # 23).

**\*3** For the following reasons, the undersigned agrees with the defendants and will recommend dismissal of the amended complaint.

DISCUSSION

**1. *Summary Judgment:***

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must doe more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). At that point, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.*

**2. *Judgment on the Pleadings:***

After the pleadings are closed, a motion to dismiss for failure to state a claim is properly brought as a motion for judgment on the pleadings pursuant to FED.R.CIV.P. 12(c). *Maggette v. Dalsheim,* 709 F.2d 800, 801 (2d Cir.1983) (citations omitted). *See* FED.R.CIV.P. 12(b), 12(c), and 12(h)(2). The motion for judgment on the pleadings is then treated according to the same standard as a motion under Rule 12(b)(6). *Id.*

A court may not dismiss an action pursuant to Rule 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (citing *inter alia Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The court must accept the material facts alleged in the complaint as true. *Id.* (citing *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (per curiam)).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

In determining whether a complaint states a cause of action, great liberality is afforded to *pro see* litigants. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (citation omitted).

### 3. *Facts:*

Plaintiff was given a misbehavior report on March 14, 1994 by Lieutenant Rourke, charging plaintiff with demonstration, creating a disturbance, and refusing a direct order. Defendants' Exhibit A. The misbehavior report involved an incident when Lieutenant Rourke and another officer were attempting to "talk [another inmate] out of his cell." Defendants' Exhibit A at p. 5. Defendants rourke stated in the misbehavior report that plaintiff yelled and continuously interrupted the officers as they were "making headway with the inmate", resulting in the inmate's refusal to leave the cell and the need to use chemical agents to remove the inmate. Rourke stated in the misbehavior report that he told plaintiff three times to be quiet, but plaintiff continued to interrupt. *Id.*

**\*4** The disciplinary hearing began on March 18, 1994. Plaintiff requested five witnesses. Defendants' Exhibit A at p. 4. Four of the five inmate witnesses testified, two by speakerphone in the inmate's presence, and two outside of the inmate's presence. *Id.* One inmate refused to testify. *Id. See also id.* at p. 8. An officer named Sergeant Smith the at the request of the hearing officer. *Id* . Plaintiff was ultimately found guilty of creating a disturbance and refusing a direct order. Defendants' Exhibit A at p. 1. Plaintiff was found not guilty of the demonstration charge. *Id.*

As a sanction for the violations, defendant Seitz sentenced plaintiff to one day of keeplock, to be served after plaintiff was released from the Special Housing Unit (SHU) in the year 2000. In addition, Seitz imposed a 7 day restricted diet that was to commence almost immediately. The diet disposition was imposed because the plaintiff was confined to SHU (on other sanctions) until the year 2000, and "no other disposition [could] be applied that [would] have an immediate effect." Defend-

ants' Exhibit A at p. 2. This reasoning is set forth in the "Restricted Diet Form", which is a memorandum to the Commissioner of Correctional Services, informing the Commissioner of the imposition of the diet. *Id.*

Plaintiff appealed the decision to defendant Selsky, who reversed the hearing officer's disposition on May 17, 1994. Defendants' Exhibit C. Selsky also ordered plaintiff's records expunged. *Id.* at p. 2. The hearing officer's decision was reversed by Selsky because the "[h]earing [o]fficer failed to make the required meaningful effort to obtain the requested witness testimony ." There was no "indication that [Seitz] questioned the officer who signed [sic] witness refusal form." *Id.* at p. 2. Plaintiff was subjected to the restricted diet prior to the reversal, but he never served the keeplock sanction because that sanction was not set to commence until the year 2000.

Plaintiff alleges that he was denied due process in connection with the disciplinary hearing. He alleges that he was denied the right to be present when his witnesses testified. Plaintiff also claims that the hearing officer failed to investigate the refusal of one of plaintiff's witnesses to testify. Plaintiff alleges that he was denied his right to call inmate Cruz as a witness, and denied the right to obtain documentary evidence. Plaintiff states that the hearing officer was not impartial and alleges that defendant Rourke filed a false misbehavior report.

Plaintiff also claims Eighth Amendment violations due to the restricted diet. Plaintiff alleges that he refused to eat for the 7 day period, thus he suffered pain, weight loss, dermatitis, depression, headaches, and nightmares.

### 4. *Due Process:*

As the Second Circuit stated in *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996), in order to award damages under 42 U.S.C. section 1983 for a procedural due process violation, the court must find that the defendants acted under col-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

or of state law and deprived the plaintiff of a liberty or property interest without due process of law. Once the "color of state law" hurdle is past, the remaining inquiry is whether plaintiff had a protected liberty or property interest and whether that interest was deprived without due process. *Id.* If the court determines that plaintiff was not deprived of any due process right, then the court need not decide whether plaintiff had a protected liberty interest.

**\*5** In the instant case, the court has reviewed all the records submitted, and finds that plaintiff was not denied constitutional due process, notwithstanding the reversal of his disciplinary hearing. Thus, the undersigned need not decide whether plaintiff had a protected liberty interest in either the keeplock confinement or the restricted diet.

In the case of prison disciplinary procedures, the Supreme Court has outlined the procedural protections necessary once a liberty interest is found to exist. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). These protections include twenty-four hour notice of the claimed violation, a written statement of the evidence relied upon by the fact finder, and the reasons for the disciplinary action taken. *Wolff,* 418 U.S. at 563–65.

Additionally, the inmate should be able to call witnesses and present documentary evidence when doing so will not be unduly hazardous to safety or correctional goals. *Id.* at 566. However, witnesses may be denied for irrelevance or lack of necessity. *Russell v. Selsky,* 35 F.3d 55, 58 (2d Cir.1994) (citations omitted). When denying the inmate witnesses, the officials are only required to provide some explanation *either at the time of the hearing or subsequently in court. Id.* (citing *Ponte v. Real,* 471 U.S. 491, 498–99, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985)).

In the instant case, plaintiff alleges that defendant Seitz did not allow some witnesses to testify in the plaintiff's presence. Plaintiff alleges that Seitz did not call inmate Cruz as a witness. However, the hearing record sheet indicates that inmate Cruz test-

ified from Southport Correctional Facility, using a speakerphone. Defendants' Exhibit A at p. 4. The fact that Cruz was not transported to Auburn Correctional Facility to testify does not rise to the level of a constitutional violation. Another inmate also testified by telephone from Southport. An inmate has no constitutional right to have his witnesses testify in his presence. *Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir.1989) (quoting *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987). It has also been held that testimony taken by telephone in the inmate's presence is constitutionally sufficient. *Greaves v. New York,* No. 95 Civ. 9725 WL 278109, p. *3 (S.D.N.Y. May 22, 1997) (citing *Sinclair v. Coughlin,* 128 A.D.2d 883, 513 N.Y.S.2d 806, 807 (2d Dep't 1987)).

Plaintiff also claims that Seitz did not investigate inmate Green's refusal to testify on plaintiff's behalf. Green's Refusal Form is included on page 8 of Defendants' Exhibit A. Although Green apparently refused to testify, he also refused to sign the Refusal Form. *Id.* Defendant Selsky reversed the hearing disposition based upon the hearing officer's failure to investigate this refusal. The violation of state law alone, however, does not necessarily rise to the level of a constitutional violation. *See Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). A hearing officer has no power to force an inmate to testify, and when the inmate refuses, the hearing officer need not call the witness. *Silva v. Casey,* 992 F.2d 20, 21–22 (2d Cir.1993). It has also been held that a hearing officer need not make an independent evaluation of the basis for the refusal to testify. *Greene v. Coughlin,* No. 93 Civ. 2805, 1995 WL 60020, p. *14 (S.D.N.Y. February 10, 1995). Thus, the fact that Seitz did not interview the officer who witnessed the refusal does not rise to the level of a constitutional violation.

**\*6** The plaintiff's only complaint against defendant Selsky is that he failed to reverse the hearing disposition quickly enough to avoid the imposition of the restricted diet on plaintiff. *See* Plaintiff's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Second Reply to Defendants' Summary Judgment Motion (Docket # 23 at p. 3). Plaintiff states that he filed his Notice of Appeal on March 25, 1994, and the restricted diet was commenced on March 28, 1994. Plaintiff states that Selsky did not reverse the hearing disposition until May 17, 1994. The undersigned cannot find that the less than 60 day delay between the plaintiff's appeal and the reversal rose to the level of a constitutional violation, or any violation. Certainly, given the amount of disciplinary appeals that are probably filed, it would be almost impossible for defendant Selsky to review and decide a disciplinary appeal within 3 days. Thus, the case must be dismissed against defendant Selsky based only on this allegation by plaintiff.

Plaintiff also claims that the hearing officer was not impartial. Plaintiff, however, makes only this conclusory allegation, without any basis whatsoever for the claim. The fact that the hearing officer did not decide in the plaintiff's favor does not make him biased in the constitutional sense. Conclusory allegations are insufficient to state a claim under section 1983. *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987). Thus, no due process violations occurred at or subsequent to the disciplinary hearing.

**5. False Misbehavior Report:**

Defendant Rourke has submitted a motion for judgment on the pleadings. The only claim against defendant Rourke is that the misbehavior report was falsified. The court would first point out that in the plaintiff's first response to the defendants' summary judgment motion, he basically agrees with the facts stated by Rourke. Defendant Rourke and another officer were attempting to extricate another inmate from his cell. The plaintiff admits that "several prisoners voiced complaints to the defendants ... about improper treatment and harassment by staff against [the other inmate]." Docket # 19 at p. 3. Plaintiff also admits that as a result of this, chemical agents had to be used against the other inmate to get him out of the cell. *Id.* at 3–4. Plaintiff may be claiming that he was not one of the inmates

involved. However, it appears that the misbehavior report was not false. Whether plaintiff was guilty of the misbehavior was an issue for the disciplinary hearing. In fact, the Second Circuit has held that a false misbehavior report does not rise to the level of a constitutional violation, as long as the inmate has the opportunity at a disciplinary hearing to challenge the report. *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988).

In the instant complaint, plaintiff alleges only that defendant Rourke filed a false misbehavior report. Thus, the case may be dismissed as to this defendant.

**6. *Respondeat Superior:***

**\*7** It is well settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978), and that the doctrine of respondent superior is inapplicable to section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 610652 (N.D.N.Y.)
**(Cite as: 1997 WL 610652 (N.D.N.Y.))**

caused the unlawful condition or event. *Id.*

In the instant case, plaintiff names the superintendent of Auburn Correctional Facility as a defendant. However, there is no indication that defendant Walker had any personal involvement with the plaintiff's case. Therefore, summary judgment may be granted in defendant Walker's favor.

### 7. *Eighth Amendment:*

Apart from any due process claims regarding the restricted diet, plaintiff seems to allege that the restricted diet violated his Eighth Amendment right to be free from cruel and unusual punishment. "The inquiry to be made [in an Eighth Amendment cruel and unusual punishment claim] is whether the prison conditions 'deprived inmates of the minimal civilized measure of life's necessities.' " *Morgan v. Ward,* 699 F.Supp. 1025, 1054 (N.D.N.Y.1988) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). "Not all deprivations, therefore, give rise to Eighth Amendment concerns, 'instead the deprivations that trigger Eighth Amendment scrutiny are deprivations of essential human needs.' " *Morgan v. Ward,* 699 F.Supp. at 1054 (quoting *Inmates of Occoquan v. Barry,* 844 F.2d 828, 836 (D.C.Cir.1988)). The Eighth Amendment is implicated when inmates claim that they are denied essential food, medical care, or sanitation, or when the conditions are such that the threat of violence among inmates is increased. *Id.* (quoting *Rhodes v. Chapman,* 452 U.S. at 348).

In the instant case, plaintiff alleges that the imposition of the restricted diet constituted cruel and unusual punishment in violation of the Eighth Amendment. Plaintiff alleges that because the diet was improperly imposed, he refused the food and therefore, suffered a variety of ailments including pain, headaches, nightmares, and cramps. It does appear that plaintiff created some of his own problems by refusing food. He does not allege that the restricted diet was in any way nutritionally unsound. The fact that he refused the food does not create an Eighth Amendment violation. As stated above, the hearing did not violate plaintiff's due process right. The sanction of restricted diet was imposed properly, and based on plaintiff's own admissions, it was not the diet that caused him injury, it was his refusal of the food.

**\*8** The court is aware of the Second Circuit's decision in *Phelps v.. Kapnolas,* No. 96–2242, slip op. at 5744 (2d Cir. August 19, 1997), wherein the court held that it could not say that there are no facts under which the imposition of a seven day diet might constitute cruel and unusual punishment. The court then vacated a sua sponte dismissal on the diet issue and remanded for service of the complaint and for further development of the Eighth Amendment claim. The instant case is different in that it is at the summary judgment stage, plaintiff refused the food, did not make a nutritional argument, and defendnat Walker has submitted an affidavit stating that the medical department reviews inmates placed on restricted diets to make sure there is no medical problem which would prevent its imposition. Finally, defendant Walker states that the diet includes a "nutritionally adequate loaf and cabbage." Walker Affidavit at ¶ 4, 5. Finally, the defendants argue that plaintiff never complained about the diet. Plaintiff's response to the summary judgment motion does not contest any of those facts.

Thus, as the complaint stands, plaintiff cannot claim an Eighth Amendment violation relating to the restricted diet. However, based on the liberality with which *pro se* complaints are treated, and based upon *Phelps,* the undersigned will recommend dismissing plaintiff's Eighth Amendment claim without prejudice.

WHEREFORE, based on the above, it is hereby

RECOMMENDED, that defendants' motion for summary judgment (Docket # 14) be **GRANTED** as to any due process claims, and the complaint be dismissed as to defendants Walker, Selsky, and Seitz on the due process issues, and it is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 610652 (N.D.N.Y.)
**(Cite as: 1997 WL 610652 (N.D.N.Y.))**

RECOMMENDED, that the defendants' motion for summary judgment (Docket # 14) be **GRANTED** on the Eighth Amendment claim, and the complaint be dismissed **with prejudice** as to defendants Walker and Selsky on the Eighth Amendment claim, but **without prejudice** as to defendant Seitz on the Eighth Amendment diet claim, and it is

RECOMMENDED, that defendant Rourke's motion for judgment on the pleadings (Docket # 20) be **GRANTED,** and the complaint be dismissed as against defendant Rourke in all respects, and it is further

RECOMMENDED, that plaintiff's response, filed as a cross-motion (Docket # 23), be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing reports. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R .Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1997.
Dumpson v. Rourke
Not Reported in F.Supp., 1997 WL 610652 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2014 WL 296859 (N.D.N.Y.)
**(Cite as: 2014 WL 296859 (N.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Jeffrey COLLINS, Plaintiff,
v.
Sergeant CARON, Upstate Corr. Facility; Marsh,
Corr. Officer, Upstate Corr. Facility; J. McGaw,
Corr. Officer, Upstate Corr. Facility; and John Doe,
Corr. Officer, Upstate Corr. Facility, Defendants.

No. 9:10–CV–1527 (GTS/RFT).
Jan. 27, 2014.

Nixon Peabody LLP, Daniel J. Hurteau, Esq., of
Counsel, Albany, NY, for Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Laura A. Sprague, Esq., As-
sistant Attorney General, of Counsel, Albany, NY,
for Defendants.

### *DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** An evidentiary hearing in this prisoner civil
rights action, filed *pro se* by Jeffrey Collins
("Plaintiff") pursuant to 42 U .S.C. § 1983, was
held on October 29, 2013, before the undersigned.
The hearing regarded the affirmative defense of the
four above-described New York State correctional
employees ("Defendants") that Plaintiff failed to
exhaust his available administrative remedies, as
required by the Prison Litigation Reform Act, be-
fore filing this action on December 9, 2010. At the
two-hour-long hearing, documentary evidence was
admitted. In addition, testimony was taken of
Plaintiff as well as two defense witness (Upstate
Correctional Facility Inmate Grievance Program
Supervisor Scott Woodward, and New York State
Department of Corrections and Community Super-
vision Inmate Grievance Program Director Karen
Bellamy) whom Plaintiff was able to cross-examine
through an experienced *pro bono* trial counsel. At

the conclusion of the hearing, the undersigned in-
dicated that a written decision would follow. This is
that written decision. For the reasons stated below,
Plaintiff's Second Amended Complaint is dismissed
without prejudice because of his failure to exhaust
his available administrative remedies before filing
this action.

### I. RELEVANT LEGAL STANDARD

The Prison Litigation Reform Act of 1995
("PLRA") requires that prisoners who bring suit in
federal court must first exhaust their available ad-
ministrative remedies: "No action shall be brought
with respect to prison conditions under § 1983 ... by
a prisoner confined in any jail, prison, or other cor-
rectional facility until such administrative remedies
as are available are exhausted." 42 U .S.C. § 1997e.
The PLRA was enacted "to reduce the quantity and
improve the quality of prisoner suits" by
"afford[ing] corrections officials time and oppor-
tunity to address complaints internally before al-
lowing the initiation of a federal case." *Porter v.
Nussle,* 534 U.S. 516, 524–25 (2002). In this re-
gard, exhaustion serves two major purposes. First,
it protects "administrative agency authority" by
giving the agency "an opportunity to correct its
own mistakes with respect to the programs it ad-
ministers before it is haled into federal court, and it
discourages disregard of the agency's procedures."
*Woodford v. Ngo,* 548 U.S. 81, 89 (2006). Second,
exhaustion promotes efficiency because (a)
"[c]laims generally can be resolved much more
quickly and economically in proceedings before an
agency than in litigation in federal court," and (b)
"even where a controversy survives administrative
review, exhaustion of the administrative procedure
may produce a useful record for subsequent judicial
consideration." *Woodford,* 548 U .S. at 89.[FN1]
"[T]he PLRA's exhaustion requirement applies to
all inmate suits about prison life, whether they in-
volve general circumstances or particular episodes,
and whether they allege excessive force or some
other wrong." *Porter,* 534 U.S. at 532.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 296859 (N.D.N.Y.)
**(Cite as: 2014 WL 296859 (N.D.N.Y.))**

**FN1.** In addition, a third purpose of the PLRA has been identified by the Second Circuit: "to curtail what Congress perceived to be inmate abuses of the judicial process." *Ortiz v. McBride,* 380 F.3d 649, 658 (2d Cir.2004).

**\*2** In accordance with the PLRA, the New York State Department of Corrections and Community Supervision ("DOCCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7.**FN2** *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.**FN3** If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

**FN2.** *See also Murray v. Palmer,* 03–CV–1010, 2010 WL 1235591, at \*1 & n. 1 (N.D.N.Y. March 31, 2010) [citation omitted].

**FN3.** The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.**FN4** Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can—and must—be appealed to the next level, including CORC, to complete the grievance process. 7 N.Y.C.R.R. §

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

701.6(g)(2) ("Absent [an] extension, matters not decided within the time limits may be appealed to the next step.").FN5

FN4. *See Murray v. Palmer,* 03–CV–1010, 2010 WL 1235591, at *2 & n. 3 (N.D.N.Y. March 31, 2010) (citing *Groves v. Knight,* 05–CV–0183, Decision and Order at 3 [N.D.N.Y. filed Aug. 4, 2009], an appeal from which was subsequently dismissed as frivolous, *see Groves v. Knight,* No. 09–3641, Mandate [2d Cir. filed Jan. 15, 2010].)

FN5. *See also Murray,* 2010 WL 1235591, at *2 & n. 4 [collecting cases].

**\*3** In light of the plain language of 7 N.Y.C.R.R. § 701.6(g)(2), the Second Circuit has indicated that the IGRC's nonresponse must be appealed to the superintendent even where the plaintiff's grievance was never assigned a grievance number.FN6 Moreover, this point of law has been expressly recognized by district courts in the Northern District,FN7 Southern District,FN8 and Western District.FN9 The Court notes that, if the plaintiff attaches to his appeal a copy of his grievance (or even if he adequately describes, in his appeal to the superintendent, the substance of that grievance), there is something for the superintendent to review.FN10

FN6. *See Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

FN7. *See, e.g., Rosado v. Fessetto,* 09–CV–0067, 2010 WL 3808813, at *7

(N.D.N.Y. Aug. 4, 2010) (Baxter, M.J.) ("Courts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *adopted by* 2010 WL 3809991 (N.D.N.Y. Sept. 21, 2010) (Hurd, J.); *Murray v. Palmer,* 03–CV–1010, 2008 WL 2522324, at *15, 18 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting ReportRecommendation of Lowe, M.J.) ("[E]ven if Great Meadow C.F. did not ... have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level."), *accord, Midalgo v. Bass,* 03–CV–1128, 2006 WL 2795332, at *7 (N.D.N.Y. Sept. 26, 2006) (Mordue, C.J., adopting Report–Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *cf. Croswell v. McCoy,* 01–CV–0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA.").

FN8. *See, e.g., Walters v. Carpenter,* 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004); *Veloz v. New York,* 339 F.Supp.2d 505, 515–16 (S.D.N.Y.2004) (rejecting inmate's argument that prison's grievance procedure had been rendered unavailable by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial

filing was not forthcoming"), *aff'd,* 178 F. App'x 39 (2d Cir.2006); *Hernandez v. Coffey,* 99–CV–11615, 2003 WL 22241431, at *4 (S.D.N.Y. Sept. 29, 2003) (rejecting plaintiff's argument that he could not have exhausted because he never received a grievance number, finding he could nonetheless have appealed any such nonresponse to the next level); *cf. Wesley v. Hardy,* 05–CV–6492, 2006 WL 3898199, at *4 (S.D.N.Y. Dec. 12, 2006) ("If a prisoner submits a grievance and receives no response, he cannot be considered to have been actively obstructed or frustrated, as he is free to appeal to the next level of review."), *accord, Sims v. Blot,* 00–CV–2524, 2003 WL 21738766, at *3 (S.D.N.Y. July 25, 2003) ("[E]ven if no response is received by an inmate to his grievance within the allotted time period, he may then appeal that grievance (and the absence of a decision thereon) to the next step in the grievance process."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002) ("Had plaintiff utilized this procedure, any failure by Artuz to render a decision on his matter within twelve working days could have been appealed to Albany, thus completing the grievance cycle and exhausting his remedies in a matter of weeks."), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *Martinez v. Williams,* 186 F.Supp.2d 353, 357 (S .D.N.Y.2002) ("[P]laintiff now argues in his opposition brief that he filed a grievance in November 1999 and did not receive a response.... Plaintiff's argument that he is excused because defendants failed to act with respect to the grievance is unpersuasive. Plaintiff could have and should have appealed the grievance in accordance with grievance procedures."); *Waters v. Schneider,* 01–CV–5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr. 23, 2002) ("Waters alleges

that he attempted to file a grievance with the Inmate Grievance Resolution Committee ... in April 2001 but never received a response.... In either case, it is undisputed that Waters did not pursue the available appeals within the prison grievance system.").

FN9. *See, e.g., Collins v. Cunningham,* 06–CV–0420, 2009 WL 2163214, at *3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available where his grievance of March 20, 2004, was not assigned a grievance number); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

FN10. This point of law has been explicitly recognized in some cases. *See, e.g., Goodson v. Silver,* 09–CV–0494, 2012 WL 4449937, at *4 (N.D.N.Y. Sept. 25, 2012) (Suddaby, J.); accord, *Murray,* 2010 WL 1235591, at *2. In addition, it has been implicitly recognized in other cases. *See, e.g, Murray,* 2008 WL 2522324, at *15, 18 & n. 46 ("[E]ven if Great Meadow C.F. did not ... have a functioning grievance-recording process (thus, resulting in Plaintiff's alleged grievance never being responded to), Plaintiff still had the duty to appeal that non-response to the next level."); *Midalgo,* 2006 WL 2795332, at *7 (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Hernandez,* 2003 WL 22241431, at *4 (rejecting plaintiff's argument that he could not have exhausted because he never received a grievance number, finding he could nonetheless have ap-

pealed any such non-response to the next level); *Collins,* 2009 WL 2163214, at *3, 6 (rejecting plaintiff's argument that his administrative remedies were not available where his grievance of March 20, 2004, was not assigned a grievance number).

It is also important to note that DOCCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

"An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040.

Generally, if a prisoner has failed to properly follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies, and his claims are subject to dismissal. *Woodford,* 548 U.S. at 93; *Porter,* 534 U.S. at 524; *Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006). However, a plaintiff's fail-

ure to exhaust does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

**\*4** With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678–79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004).[FN11] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing,[FN12] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim.[FN13] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

DOCCS regulations governing the grievability of his claim, (b) the inmate was specifically informed that the claim in question was grievable, (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC, (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion, and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC.FN14 Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim, and/or (b) the inmate did not appeal his disciplinary hearing conviction.FN15

> FN11. The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id.* at 88–103 (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano–Testman* line of cases.

> FN12. *Giano,* 380 F.3d at 678 ("[W]hile

Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696–98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

> FN13. *Testman,* 380 F.3d at 696–98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *see also Murray,* 2010 WL 1235591, at *3 & n. 9 [citing cases].

> FN14. *Murray,* 2010 WL 1235591, at *3 & nn. 10–14 [citing cases].

> FN15. *Id.* at *3 & nn. 15–16 [citing cases].

Finally, two additional points bear mentioning regarding exhaustion hearings. First, the Second Circuit has ruled that a plaintiff in a lawsuit governed by PLRA is not entitled to a jury trial on disputed factual issues relating to his exhaustion of administrative remedies; rather, PLRA exhaustion is a matter of judicial administration. *Messa v. Goord,* 652 F.3d 305, 308–10 (2d Cir.2011). Second, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies.FN16 However, once a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then "counter" the defendant's assertion by showing exhaustion,

unavailability, estoppel, or "special circumstances." FN17 As a result, practically speaking, while the burden on this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it.

FN16. *Id.* at *4 [citation omitted].

FN17. *Id.* at *4 & n. 17 [citing cases].

## II. ANALYSIS

### A. Availability of Administrative Remedies

After carefully considering the evidence submitted at the exhaustion hearing, the Court finds that Plaintiff did not file a grievance regarding the assault alleged in this action, despite the fact that administrative remedies were available to Plaintiff during the time in question. The Court makes this finding for the following five reasons.

**\*5** First, Defendants have adduced admissible evidence establishing that Plaintiff did not file a grievance regarding the assault alleged in this action, nor did he pursue any such grievance to CORC. (*See, e.g.,* Hrg. Tr. at 5, 12, 31–32, 34–36; Hrg. Exs. D–2, D–3; *cf.* Dkt. No. 8, at ¶ 53, 55–57, 60; Hrg. Exs. P–2, P–4, P–5, P–6.)

Second, Defendants have adduced admissible evidence establishing that, during the time in question, an inmate grievance program was in existence at Upstate Correctional Facility ("Upstate C.F."). (Hrg. Tr. at 5–11, 24; Hrg. Exs. D–1, D–2, D–4.)

Third, Defendants have adduced admissible evidence establishing that, during the time in question, Plaintiff was advised of Directive 4040 each time he was received at a correctional facility, had access to Directive 4040, and was aware of the inmate grievance program at Upstate C.F. (Hrg. Tr. at 41–42, 48–49, 54–55, 60–61, 63, 71–72; Hrg. Exs. D–3, D–4.) For example, Plaintiff filed grievances at Upstate C.F. on March 20, 2009, and April 1, 2009. (Hrg. Ex. D–3; Hrg. Tr. at 71–72.) Similarly, Plaintiff had filed grievances at another correctional

facility on August 29, 2006, October 13, 2006, January 19, 2007, and February 18, 2009. (Hrg. Ex. D–3; Hrg. Tr. at 30–32, 54, 73.) Moreover, in his Verified Second Amended Complaint, Plaintiff swore that, during the time in question, he was aware of (1) the need to file a grievance, and (2) the office at Upstate C.F. to which to submit that grievance. (Dkt. No. 8, at ¶¶ 51–58.)

Fourth, Defendants have adduced admissible evidence establishing that the inmate grievance program at Upstate C.F. was working during the time in question. (Hrg. Tr. at 11–12, 38–41, 43–45; Hrg. Ex. D–2.) For example, on March 20, 2009, and April 1, 2009, Plaintiff filed grievances at Upstate C.F., which he subsequently pursued all the way to CORC. (Hrg. Ex. D–3; Hrg. Tr. at 71–72.) Indeed, between July 5, 2009, and July 20, 2009, forty-one other staff misconduct grievances were successfully filed at Upstate C.F. (Hrg. Ex. D–2; Hrg. Tr. at 11–12.)

Fifth, the Court finds the relevant portions of Plaintiff's hearing testimony (i.e., that he mailed grievances to the grievance office on July 6, 2009, July 16, 2009, and July 19, 2009, which were lost or destroyed during mailing or processing) to be incredible due to various admissions, omissions and/ or inconsistencies in that testimony, and his demeanor during his testimony. (Hrg. Exs. P–1, P–2, P–3; Hrg. Tr. at 3–22, 47–80.)

### B. Forfeiture/Estoppel

After carefully considering the evidence submitted at the exhaustion hearing, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or that Defendants are estopped from raising the defense by taking actions that inhibited Plaintiff's exhaustion of remedies.

With regard to the forfeiture issue, Defendant's Amended Answer asserted this affirmative defense, and Plaintiff's counsel made no argument regarding forfeiture at the hearing. (Dkt. No. 50, at ¶ 18; *see generally* Hr. Tr. 80–87.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*6** Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* in any way interfered with Plaintiff's ability to file a grievance during the time in question. (*See, e.g.,* Hrg. Tr. at 51–52, 72–73.) A defendant in a prisoner civil rights action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies (for purposes of the second part of the three-part inquiry established by the Second Circuit) based on the actions or inactions of *other* individuals. This point of law is clear from Second Circuit cases.[FN18] Furthermore, this point of law has been relied on by district courts in the Northern District,[FN19] Southern District,[FN20] Eastern District,[FN21] and Western District.[FN22]

FN18. *See Amador v. Andrews,* 655 F.3d 89, 102 (2d Cir.2011) ("The second part considers whether defendants forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether defendants' *own* actions inhibiting the inmate's exhaustion of remedies estops one or more of the defendants from raising the exhaustion defense.") (emphasis added); *Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 178 (2d Cir.2006) ("In our prior cases recognizing that *defendants' actions* may estop them from raising non-exhaustion as a defense .... Ruggiero does not allege beatings or threats of retaliation for filing a grievance or that he made any attempt to file a grievance and was denied that opportunity *by Defendants–Appellants."* ) (emphasis added); *Hemphill v. New York,* 380 F.3d 680, 689 (2d Cir.2004) (explaining that, where several defendants played different roles in the acts giving rise to estoppel, "it is possible that some individual defendants may be estopped, *while other may not be"* ) (emphasis added).

FN19. *See, e.g., Belile v. Griffin,* 11–CV–0092, 2013 WL 1776086, at \*9

(N.D.N.Y. Feb. 12, 2013) (Peebles, M.J., *adopted by* 2013 WL 1291720 (N.D.N.Y. March 27, 2013) (McAvoy, J.); *Bailey v. Fortier,* 09–CV–0742, 2013 WL 310306, at \*2 (N.D.N.Y. Jan. 25, 2013) (Sharpe, C.J.); *Thompson v. Bellevue Hosp.,* 09–CV–1038, 2011 WL 4369132, at \*12 (N.D.N.Y. Aug. 29, 2011) (Lowe, M.J., *adopted by* 2011 WL 4369132 (N.D.N.Y. Aug. 29, 2011) (Mordue, C.J .); *Calloway v. Grimshaw,* 09–CV–1354, 2011 WL 4345299, at \*4 (N.D .N.Y. Aug. 10, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4345296 (N.D.N.Y. Sep. 15, 2011) (McAvoy, J.); *Murray v. Palmer,* 03–CV–1010, 2010 WL 1235591, at \*5 & n. 26 (N.D.N.Y. March 31, 2010) (Suddaby, J.); *Snyder v. Whittier,* 05–CV–1284, 2009 WL 691940, at \*9 (N.D.N.Y. March 12, 2009) (Report–Recommendation of Peebles, M .J., adopted by McAvoy, J.); *Murray v. Palmer,* 03–CV–1010, 2008 WL 2522324, at \*19 (N.D.N.Y. June 20, 2008) (Report–Recommendation of Lowe, M.J., adopted by Hurd, J.); *McCloud v. Tureglio,* 07–CV–0650, 2008 WL 1772305, at \* 12 (N.D.N.Y. Apr. 15, 2008) (Report–Recommendation of Lowe, M.J., adopted by Mordue, C.J.); *Shaheen v. McIntyre,* 05–CV–0173, 2007 WL 3274835, at \*16 (N.D.N.Y. Nov. 5, 2007) (Report–Recommendation of Lowe, M.J., adopted by McAvoy, J.); *Gill v. Frawley,* 02–CV–1380, 2006 WL 1742378, at \*12 (N.D.N.Y. June 22, 2006) (Report–Recommendation by Lowe, M.J., adopted by McAvoy, J.); *Smith v. Woods,* 03–CV–0480, 2006 WL 1133247, at \*16 (N.D.N.Y. Apr. 24, 2006) (Report–Recommendation of Lowe, M.J., adopted by Hurd, J.).

FN20. *See, e.g., Collins v. Goord,* 438 F.Supp.2d 399, 415, n. 16 (S.D.N.Y.2006).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN21. *See, e.g., McCullough v. Burroughs,* 04–CV–3216, 2005 WL 3164248, at *4 (E.D.N.Y. Nov. 29, 2005).

FN22. *See, e.g., Barad v. Comstock,* 03–CV–0736, 2005 WL 1579794, at *6 (W.D.N.Y. June 30, 2005).

The Court notes that a contrary interpretation of the second part of the Second Circuit's three-part exhaustion inquiry would turn the ancient doctrine of estoppel on its head, transforming it-in Orwellian fashion-into one of "vicarious estoppel." *See Black's Law Dictionary* at 629 (9th ed) (defining "estoppel" as "[a] bar that prevents one from asserting a claim or right that contradicts what one has said or done before ...."). Moreover, such an invention would be wholly unnecessary: the vicarious conduct sought to be protected against is already protected against by the "special circumstances" inquiry established by the Second Circuit.

Finally, while it may be argued that such an interpretation of the doctrine of estoppel is nonetheless appropriate because the purpose of the PLRA is to enable the institution to resolve disputes efficiently rather than protect the individual,FN23 prisoner civil rights suits are suits against prison officials in their individual capacities rather than suits against them in their official capacities (which would effectively be suits against the State and thus be barred by the Eleventh Amendment). As a result, the crux of the second part of the Second Circuit's three-part exhaustion inquiry is whether the officials may avail themselves of that defense, not whether the institution may avail itself of the defense.

FN23. For the sake of brevity, the Court will set aside the fact that this argument ignores the fact that there are two other purposes for the PLRA (i.e., to produce a useful record for subsequent judicial consideration, and to curtail what Congress perceived to be inmate abuses of the judicial process). *See, supra,* Part I of this Decision

and Order.

**C. Special Circumstances**

After carefully considering the issue, the Court finds that there exists no special circumstances justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witness, raise the specter of four excuses for not having exhausted his available administrative remedies before he filed this action on December 9, 2009:(1) Plaintiff reasonably misunderstood the grievance process to permit him to appeal the non-processing of his grievances directly to CORC on July 28, 2009; (2) Plaintiff's letter of August 30, 2009, to the Superintendent of Elmira Correctional Facility ("Elmira C.F.") notifying him that Plaintiff "would like to have [his] appeal sent to" CORC completed the exhaustion process; (3) Plaintiff's contact with the Inspector General's Office in September of 2009 completed the exhaustion process; and (4) Plaintiff's initial exchange of correspondence with the office of the Superintendent of Upstate C.F. between July 5, 2009, and July 12, 2009, satisfied the pre-appeal exhaustion process.

**\*7** With regard to Plaintiff's first excuse (i.e., that he reasonably misunderstood the grievance process to permit him to appeal the non-processing of his grievances directly to CORC), the Court finds that this excuse does not suffice for two alternative reasons: (1) he does not credibly argue that he misunderstood the need to first appeal to the facility superintendent; and (2) any such misunderstanding of the proper grievance process was not reasonable, given that (a) the language of 7 N.Y.C.R.R. § 701.6(g)(2) clearly stated this part of the process,FN24 (b) Plaintiff possessed copies of his grievances that he could have sent to the superintendent, and (c) by the time in question, Plaintiff had been incarcerated in the New York State Department of Corrections and Community Supervision for some 16 years, and had filed numerous grievance appeals. (*See* Hrg. Ex. D–3; Hrg. Tr. at

30–32, 47–80.) *See also* 7 N.Y.C.R.R. § 701.6(g)(2) ("Absent [an] extension, matters not decided within the time limits may be appealed to the next step."). With regard to the first reason, the Court notes that, when asked why he wrote directly to CORC, Plaintiff responded vaguely as follows: "I found out through, you know, they got like organizations that tell you how to-how to go about things so they told me that if you don't receive responses, you should write directly to the IGP in Albany." (Hrg. Tr. at 59.) Plaintiff does not specify such details as what "organization" gave him this advice, or even that the advice regarded non-responses from *inmate grievant offices* rather than from superintendents. (*Id.*) With regard to the second reason, the Court notes that, for a misunderstanding of the law to constitute a special circumstance, that misunderstanding must be *reasonable.* FN25

> FN24. *See, supra,* Part I of this Decision and Order.

> FN25. *See Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (explaining that the third or the three caveats for mandatory exhaustion is the existence of "special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement."); *cf. Giano v. Goord,* 380 F.3d 670, 679 (2d Cir.2004) (finding that special circumstances had been demonstrated because plaintiff's action were the result of "reasonable" confusion about the proper administrative channel through which to pursue his claim); *Johnson v. Testman,* 380 F.3d 691, 696–98 (2d Cir.2004) (finding that "special circumstances" included plaintiff's "reasonable" but mistaken belief regarding the grievance process).

With regard to Plaintiff's second excuse (i.e., that his letter of August 30, 2009, to the Superintendent of Elmira C.F. completed the exhaustion process), the Court finds that this excuse does not suffice for three alternative reasons: (a) the subject of the letter of August 30, 2009—i.e., the underlying grievance of August 10, 2009, which was submitted to the inmate grievance office at Upstate C.F.-was untimely and never accepted for filing by the grievance office at Upstate C.F.; (b) the rejection of the underlying grievance of August 10, 2009, at Upstate C.F. needed to be appealed to the Superintendent of *Upstate* C.F., not to the Superintendent of Elmira C.F.; and (c) Plaintiff never received a denial of his letter of August 30, 2009, nor filed an appeal from any such denial with CORC. (Hrg. Exs. P–6, P–8, P–9; Hrg. Tr. at 23–80.) With regard to the first reason, the Court notes, if exhaustion could be accomplished simply through appealing the denial of a request for leave to file an untimely grievance, then the time deadlines contained in the exhaustion process would lose all meaning. *See Smith v. Kelly,* 06–CV–0505, Decision and Order, at 21 (N.D.N.Y. filed Oct. 30, 2013) (Suddaby, J.) ("It would eviscerate the exhaustion requirement to deem an inmate to have exhausted his available administrative remedies where he files a grievance four-and-a-half years late ..., then skips the superintendent and appeals the rejection of his grievance (based on untimeliness) to CORC, which never passes on the merits of his grievance. If exhaustion were permissible under such circumstances, every inmate could exhaust his available administrative remedies without fulfilling the functions of the exhaustion requirement ...."). As the Supreme Court explained, "We are confident that the PLRA did not create such a toothless scheme." *See Woodford v. Ngo,* 548 U.S. 81, 95 (2006) (reversing Ninth Circuit decision holding that prisoner had exhausted his administrative remedies under the PLRA because none remained available to him after his grievance was rejected as untimely by state prison officials).

**\*8** With regard to Plaintiff's third excuse (i.e., that his contact with the Inspector General's Office in September of 2009 completed the exhaustion process), the Court finds that this excuse does not

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

suffice for two alternative reasons: (1) it does not appear that the investigation by the Inspector General was upon *referral* from either the Superintendent of Elmira C.F. or the Superintendent of Upstate C.F.; and (2) it does not appear that Plaintiff appealed a finding of unsubstantiation by the Inspector General's Office to CORC. (Hrg. Tr. at 68–80; Hrg. Ex. P–10.) Both of those things are required in order for an inmate's letter to an Inspector General's Office to complete the exhaustion process. *Goodson v. Silver,* 09–CV–0494, 2012 WL 4449937, at *4, 9 & n. 7 (N.D.N.Y. Sept. 25, 2012) (Suddaby, J.) (collecting cases).

With regard to Plaintiff's fourth excuse (i.e., that his initial exchange of correspondence with Upstate C.F. Superintendent in early July 2009 initiated the exhaustion process), the Court finds that this excuse does not suffice for three alternative reasons: (1) an inmate's direct correspondence with the superintendent, bypassing the inmate grievance office, is not a grievance under the governing regulations (nor did that correspondence even contain a copy of his grievance); FN26 (2) Plaintiff did not file an appeal (from the Superintendent's response) with CORC within seven days of receiving the response on July 12, 2009, as required by 7 N.Y.C.R.R. § 701.5(a)(1); and (3) in Plaintiff's letter of July 28, 2009, to CORC, he did not attach, or even reference, either his letter of July 5, 2009, to the Superintendent or the Superintendent's response of July 12, 2009, despite possessing copies of both documents. (Hrg. Exs. D–4, D–5, P–4; Hrg. Tr. at 11, 16, 18, 20–21, 32–33, 52, 55, 57.) With regard to the first reason, it should be noted that the regulations clearly provide that, any grievances alleging staff misconduct must be filed under the normal procedure with the grievance office, which will then give the grievance a grievance number and send it immediately to the superintendent for review. 7 N.Y.C.R.R. § 701.8(a), (b). With regard to this third reason, it should be noted that the regulations clearly provide that, if possible, appeals to CORC shall contain, *inter alia,* both the underlying grievance and the superintendent's written response

to the grievance. 7 N.Y.C.R.R. § 701.5(d)(1). It should also be noted that, during the time in question, Plaintiff knew how to file an appeal from the denial of a grievance by a superintendent, having done so at least six times. (Hrg. Ex. D–3; Hrg. Tr. at 30–32, 71–73 .)

> FN26. Indeed, the correspondence expressly referred to the grievance as a *separate* document, which the superintendent would receive at some point in the future. (Hrg. Ex. D–4 [stating that "You shall receive a grievance concerning a Sgt Caron and three (3) officers assaulting me while in OMH"].)

For all these reasons, the Court finds that Plaintiff's four proffered excuses—whether considered individually or together—do not constitute special circumstances justifying his failure to exhaust his available administrative remedies before filing this action. A procedure was available for Plaintiff to grieve the assault alleged in this action; and that procedure was made known to him; however, for whatever reason, he simply failed to follow it. Under the circumstances, the sound purposes of the exhaustion requirement (*see, supra,* Part I of this Decision and Order) have been thwarted.

**\*9 ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 8) is **DISMISSED in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

N.D.N.Y.,2014.
Collins v. Caron
Slip Copy, 2014 WL 296859 (N.D.N.Y.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 296859 (N.D.N.Y.)
**(Cite as: 2014 WL 296859 (N.D.N.Y.))**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.